1

1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - -X
3  UNITED STATES OF AMERICA,       : 17-CR-434 (ARR)
                                    :
4             Plaintiff,            :
                                    :
5         -against-                 :
                                    :
6  JOSÉ MIGUEL MELENDEZ-ROJAS,      :
   also known as "Gueramex,"        :
7  "Gueracasa," and "José           :
   Melendez Perez"; JOSÉ            : United States Courthouse
8  OSVALDO MELENDEZ-ROJAS,          : Brooklyn, New York
   ROSALIO MELENDEZ-ROJAS, also     :
9  known as "Leonel," "Wacho,"      :
   and "El Guacho"; FRANCISCO       :
10 MELENDEZ-PEREZ, also known       :
   as "Paco," and "el Mojarra";     :
11 and ABEL ROMERO-MELENDEZ,        :
   also known as "La Borrega"       :
12 and "Borrego"                    :
                                    : Monday, March 2, 2020
13          Defendants.             : 2:00 p.m.
   - - - - - - - - - - - - - - - -X
14

15
           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
16      BEFORE THE HONORABLE ALLYNE R. ROSS AND A JURY
             UNITED STATES DISTRICT SENIOR JUDGE
17

18

19            A P P E A R A N C E S :

20 For the Government:      RICHARD P. DONOGHUE, ESQ.
                           United States Attorney
21                         Eastern District of New York
                           271 Cadman Plaza East
22                         Brooklyn, New York 11201
                           BY:  ERIN ARGO, ESQ.
23                              TANYA H. HAJJAR, ESQ.
                               GILLIAN KASSNER, ESQ.
24                             Assistant United States Attorneys

25

2

1          A P P E A R A N C E S   (CONTINUED)

2

3   For the Defendant          SUSAN G. KELLMAN, ESQ.
    José Miguel                25 Eighth Avenue
4   Melendez-Rojas:            Brooklyn, New York 11217

5   For the Defendant          M. GOLUB PLLC
    José Osvaldo               225 Broadway
6   Melendez-Rojas:            Suite 1515
                               New York, New York 10007
7                              BY:  MITCHELL A. GOLUB, ESQ.

8
    For the Defendant          THOMAS F.X. DUNN, ESQ.
9   Rosalio                    225 Broadway
    Melendez-Rojas:            Suite 1515
10                             New York, New York 10007

11
    For the Defendant          MICHAEL H. GOLD, ESQ.
12  Francisco                  350 Fifth Avenue
    Melendez-Perez:            Suite 6800
13                             New York, New York 10118

14
    For the Defendant          MICHAEL HUESTON, ESQ.
15  Abel                       16 Court Street
    Romero-Melendez:           Suite 1800
16                             Brooklyn, New York 11241

17                                     AND

18                             LAW OFFICES OF JACQUELINE E. CISTARO
                               11 Broadway
19                             Suite 615
                               New York, New York 10004
20                             BY:  JACQUELINE E. CISTARO, ESQ.

21  Court Reporter:            DAVID R. ROY, RPR
                               225 Cadman Plaza East
22                             Brooklyn, New York 11201
                               (718) 613-2609
23                             drroyofcr@gmail.com

24
    Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

```
 1            P R O C E E D I N G S

 2

 3                    --oo0oo--

 4

 5       (In open court; jury not present.)

 6       THE COURT:  If any of the defense counsel need a

 7  mic.

 8       THE INTERPRETER:  Your Honor, if I may, for the

 9  interpreters it's impossible for us to hear the entire words

10  that are being projected that way and not that way, and we're

11  speaking at the same time so everybody has to use a

12  microphone.

13       THE COURT:  So everybody has to use a microphone,

14  that's great.

15       I'm assuming nobody is using the ELMO during the

16  openings; is that correct?

17       MR. HUESTON:  That's correct, Your Honor.

18       MR. GOLUB:  I'm not.

19       MS. KELLMAN:  That's correct, Judge.

20       MS. ARGO:  That's correct, Judge.

21       THE COURTROOM DEPUTY:  All rise.

22       (Jury enters courtroom.)

23       THE COURT:  Please be seated.  Dennis, if you could

24  swear the jury.

25       (Jury sworn.)
```

```
                          Proceedings                      4
```

1           (THE JURY:  I do.

2           THE COURTROOM DEPUTY:  Please be seated.

3           THE COURT:  Ladies and gentlemen of the jury, we're

4    about to begin the trial of this criminal case about which

5    you've heard something during the course of jury selection.

6    But before the trial begins, there are certain things that I

7    wish to tell you to help you understand what will be presented

8    and how you should conduct yourselves during the trial.

9           To begin with, you are here to administer justice in

10   this case according to the law and the evidence.  You are to

11   perform this task with complete fairness and impartiality and

12   without bias, prejudice or sympathy for or against the

13   government or the defendants.  This case is important to the

14   defendants who are charged with committing crimes and who have

15   the constitutional right to receive a fair trial.  The case is

16   also important to the government since the enforcement of the

17   criminal laws is important.

18          The case is based on an indictment.  During jury

19   selection I read the indictment to you.  I instructed you then

20   that the indictment is simply the document by which a criminal

21   action is commenced.  It is merely an accusation, it is not

22   evidence of a defendant's guilt.

23          Because the defendants have pleaded not guilty, the

24   government has the burden of proving each of the essential

25   elements of the crime charged in the indictment beyond a

Proceedings                                      5

1   reasonable doubt.  The purpose of the trial is to determine

2   whether the government meets this burden.  The defendants are

3   not required to prove their innocence.  On the contrary, the

4   defendant is presumed to be innocent of the accusations

5   contained in the indictment.

6           As you've already heard, the indictment contains 15

7   counts.  I will define each of these crimes and their elements

8   for you in my instructions after the presentation of evidence.

9   In most general terms, Count One charges all of the defendants

10  with conspiring, that is, agree to smuggle aliens.

11          Count Two charges all defendants with conspiring to

12  transport minors to engage in prostitution.

13          Count Three alleges all of the defendants -- charges

14  all the defendants with conspiring to engage in sex

15  trafficking.

16          Count Four charges three defendants, José Miguel

17  Melendez-Rojas, Rosalio Melendez-Rojas and Abel

18  Romero-Melendez with the sex trafficking of a minor, Jane Doe

19  number one, that is Diana.

20          Count Five charges three defendants, José Miguel

21  Melendez-Rojas, José Osvaldo Melendez-Rojas and Rosalio

22  Melendez-Rojas with the sex trafficking of Jane Doe number

23  two, that is Veronica.

24          Count Six charges two defendants, José Osvaldo

25  Melendez-Rojas and Rosalio Melendez-Rojas with the sex

Proceedings                                     6

1    trafficking of Jane Doe number three, that is Fabiola.

2              Count Seven charges the same two defendants with

3    alien smuggling of Jane Doe number three, who is Fabiola.

4              Count Eight charges two defendants, José Osvaldo

5    Melendez-Rojas and Francisco Melendez-Perez with the sex

6    trafficking of Jane Doe number four, that is Maria.

7              Count Nine charges the same two defendants with

8    alien smuggling of Jane Doe number four, that is Maria.

9              Count Ten charges four defendants, José

10   Melendez-Rojas, José Osvaldo Melendez-Rojas, Rosalio

11   Melendez-Rojas, and Francisco Melendez-Perez with the sex

12   trafficking of Jane Doe number five, that is Delia.

13             Count Eleven charges the same four defendants with

14   the transportation of a minor Jane Doe number five, that is

15   Delia to engage in prostitution.

16             Count Twelve charges the same four defendants with

17   alien smuggling of Jane Doe number five, who is Delia.

18             Count Fifteen charges the same four defendants with

19   conspiring to launder money.

20             Count Sixteen charges the same four defendants with

21   distributing the proceeds of a prostitution business, and

22   Count Eighteen charges defendant Abel Romero-Melendez with

23   illegal reentry into the United States.

24             The trial will proceed in the following order:

25             First, the parties have the opportunity to make

Proceedings                                                7

1    opening statements.  The government will make such a

2    statement, then the defendants may do so.  The defendants are

3    not, however, obligated to make an opening.  Indeed, the

4    defendants have no obligation to do anything in the course of

5    the trial.  What is said in these opening statements is not

6    evidence, rather the attorneys will attempt to give you an

7    introduction to or an overview the evidence which they expect

8    will be produced in the course of the trial.

9            After the opening statements, the government will

10   introduce evidence in support of the charge contained in the

11   indictment.  This may be testimony from witnesses, it may be

12   physical items, documents and exhibits which are offered in

13   evidence.  If an item is received in evidence, the attorneys

14   may choose to have you look at it here in open court right at

15   the moment that it is received.  Whether they do this or not

16   however, if you wish to study any exhibits further, and to the

17   extent practical, I will send any requested exhibits received

18   in evidence into the jury room during your deliberations so

19   you will have ample opportunity to examine them.

20           You should pay careful attention to the testimony

21   given by the witnesses.  Let me say, however, that if in the

22   course of your deliberations you have any questions as to what

23   a witness in fact said on any matter, the court reporter is

24   available to go his or her notes and read back to you the

25   portions on which you have a question, or we will make copies

Proceedings                                    8

1   of the relevant transcript available to you in the jury room.

2        Second, when the government has concluded putting on

3   its evidence the defendant may put on evidence but they are

4   not required to do so.  The burden is always on the government

5   to prove every element of an offense charged beyond a

6   reasonable doubt.  The law never imposes on a defendant in a

7   criminal case the burden of any calling any witnesses or

8   introducing any evidence.

9        Third, if a defendant puts on any evidence, the

10  government may or may not wish to put further evidence before

11  you to rebut what the defense has set forth.

12       Once all evidence has been presented, each party has

13  the opportunity to present closing arguments or summations to

14  you.  What is said in these arguments is not evidence.  Each

15  party is simply presenting to you its view of what the

16  evidence has shown and suggesting to you the inferences or

17  conclusions you should draw from the evidence.  You may find

18  an argument sound and persuasive or you may not.  Because the

19  government has the burden of proof in the case it has the

20  right to argue first, followed the defendants after which the

21  government may give a rebuttal summation.

22       Fifth, after you've heard the arguments, I will

23  instruct you on the applicable law.  You will then retire to

24  consider your verdict.  Your verdict must be unanimous.  You

25  have a tremendously important task as jurors.  It is to

Proceedings                                          9

1    determine the facts.  Our Constitution gives the defendant a

2    right to have you, who are members of the community, find

3    those facts.  You and not the Court are the sole judges of the

4    facts.  I shall try to preside impartially and not to express

5    any opinion concerning the facts.  If, at any time, I should

6    make any comment with respect to the facts, you may disregard

7    it.  It is your judgment as to the facts not mine which

8    controls.  As sole judges of the facts you must determine

9    which of the witnesses you believe, what portion of their

10   testimony you accept and what weight you attach to it.

11           In the course of the trial the attorneys may from

12   time to time stand and say that they object to a certain

13   question or to certain evidence.  There are certain rules that

14   apply to the receipt of evidence in trials.  If I sustain an

15   objection, it means that I think the law does not prevent

16   receipt of the evidence in question.  You are to disregard the

17   question asked.  You are not to speculate about how it might

18   have been answered, you simply have no evidence before you on

19   that subject.  If I sustain an objection after the answer has

20   been given, I will strike the answer.  Meaning that you are

21   not to consider it at all in your deliberations.  You are to

22   act as if that answer had never been given.

23           On the other hand, if I overrule an objection, it

24   means that I find no legal reason not to allow the evidence to

25   come before you.  You should not, however, attach any special

Proceedings                                               10

1   significance to evidence that comes in over an objection,

2   simply consider it together with all the other evidence in the

3   case.

4          No statement, ruling, remark or comment which I may

5   make during the course of the trial is intended to indicate

6   any opinion as to how you should decide the case or to

7   influence you in any way in your determination of the facts.

8   At times I may ask questions of witnesses, I do so simply to

9   bring out matters which I think should be brought out and not

10  in any way that indicate an opinion about the facts or the

11  weight you should give the testimony of the particular

12  witness.

13         You must not be influenced by anything you may have

14  seen or heard outside this courtroom.  This case must be

15  decided by jurors who base their decision solely on the

16  witness's testimony and the other evidence introduced at

17  trial.  This means from today until the end of the trial you

18  must not conduct any independent research about this case, the

19  matters in this case or the individuals involved in this case.

20         In other words, you should not consult dictionaries

21  or reference materials, search the Internet, look to websites

22  or blogs or use any other electronic tools to obtain

23  information about this case or help you in your decision as

24  jurors.  It is very important that your decision be made

25  solely on the basis of the evidence presented in this case and

1   that you not seek information from any source outside the

2   confines of this courtroom.

3           There are several rules which should govern your

4   conduct during any recess or break that we take in the trial.

5   First, do not discuss the case among yourselves or with anyone

6   else during any recess.  Even as among yourselves you see, it

7   is important that each of you keep an open mind reaching a

8   conclusion only during your final deliberations after all of

9   the evidence is in and you've heard the attorneys' summations

10  and my instructions on the law.  Only then will you begin to

11  exchange views among yourselves and reach your verdict.

12          Now the instruction that I've just given is

13  counterintuitive, it is contrary to human nature.  Serving on

14  a jury is a unique experience.  It's an interesting

15  experience.  It's an experience that you'll perhaps have only

16  once or twice in your lifetime and it is something that you

17  would naturally want to share with friends or family as the

18  trial goes along.  What's wrong with that is that as you begin

19  discussing the case with others, they begin giving you their

20  opinion about what they think about the case, even though they

21  haven't been here, even though they haven't heard any of the

22  evidence, even though they haven't heard the arguments of

23  counsel or my instructions on the law and it fundamentally

24  deprives all of the parties of a verdict that's based on the

25  determination of jurors who have heard all of what I've just

Proceedings                                                                    12

1   referred to.  So as difficult as it may be, please do not

2   discuss the case with anyone else.  And when I say do not

3   discuss the case, I'm talking about the evidence in the case

4   in particular and any view that you might have about the

5   evidence.  Please do not discuss the case at all.

6           The same is true with respect to discussing the case

7   among yourselves.  That, too, is counterintuitive and contrary

8   to human nature.  After all, the thing that brings you all

9   together here is this trial.  What's wrong with beginning your

10  discussion in the case before the case is submitted to you is,

11  if you begin talking about the case even among yourselves you

12  begin to come to tentative opinions and conclusions that might

13  close your mind to other evidence, arguments by counsel, or to

14  my instructions on the law.  Here again, when I say do not

15  talk about the case, what I'm telling you is a common sense

16  rule.  You can talk about how you think the lawyers look,

17  whether you like what they're wearing or not, innocuous

18  conversation is perfectly all right.  When I say don't talk

19  about the case even among yourselves, I'm talking about the

20  evidence that you hear in the courtroom and whether the

21  defendants are guilty or not guilty.  Also you should not

22  permit any other person to discuss this case with you or in

23  your presence.  And if anyone should approach you in an effort

24  to discuss the case with you, you should report that back to

25  me and you should tell that person that you cannot discuss the

Proceedings                                    13

1    case.  You should not, however, discuss with your fellow

2    jurors either that fact or any other fact that you may feel

3    necessary to bring to my attention.  The reason is obvious, if

4    something occurs that affects the ability of a juror to

5    continue to serve fair and impartially and that juror

6    communicates it to fellow jurors, then more than one of you

7    may be affected.

8              Third, although it's normal for people to talk with

9    those with whom we are thrown in day-to-day contact, please do

10   not, while you're serving as jurors in this case, have any

11   conversation with the parties, the attorneys, or any witnesses

12   in the case whether in the courtroom, in the hallways, in the

13   elevator, outside or anywhere else.  By this I mean not only

14   do not talk about the case, do not talk at all even to pass

15   the time of day.  You see, someone seeing a juror in

16   conversation with a party, lawyer or witness might think that

17   something improper was being discussed.  To avoid even the

18   appearance of impropriety then, have no conversations.  The

19   lawyers as officers of the court are particularly sensitive to

20   this.  So I can tell you that if they pass you in the halls

21   without even acknowledging your presence, they do not mean to

22   be rude.

23             Those of you who have been selected as alternate

24   jurors should listen just as carefully and conscientiously as

25   the other jurors.  You may very well be called upon prior to

Proceedings                                                    14

1   the conclusion of the case to take the place of one of the

2   jurors and then you will have to render a verdict.  So please,

3   pay strict attention at all times.

4            And with that by way of introduction, we will now

5   hear from the prosecutor.  Ms. Kassner.

6            MS. KASSNER:  Thank you, Your Honor.

7            In May 2010, in a small town in Mexico, a 14-year

8   old girl named Delia thought she was in love.  She decided to

9   leave her parents' home and move in with her boyfriend,

10  Francisco.  She thought she was leaving for a better life.

11  What Delia didn't know is that Francisco and his relatives had

12  other plans for her.  What Delia didn't know is that the

13  defendants, Francisco Melendez-Perez, his cousin Abel

14  Romero-Melendez and his uncles José Miguel Melendez-Rojas,

15  José Osvaldo Melendez-Rojas, and Rosalio Melendez-Rojas

16  together made their living by smuggling young women and girls

17  like Delia to the United States where they forced them to work

18  in prostitution.  Sex trafficking was their family business.

19           Delia didn't know any of these things so she went

20  with Francisco to his family home in Mexico and when Francisco

21  asked her to go with him to the United States she agreed.

22  Together, Delia and Francisco made their way from Mexico to

23  Arizona and from Arizona to Queens in New York City.  There

24  they moved into an apartment with Francisco's uncle, the

25  defendant Rosalio Melendez-Rojas.  After they arrived in New

Proceedings                                      15

1   York City, Francisco ordered Delia for the first time to work

2   as a prostitute.  Delia refused but Francisco and Rosalio

3   forced her, they told her that she didn't speak English, that

4   she had no papers and that she owed thousands of dollars in

5   smuggling fees for being brought to the United States.  They

6   told her that if she tried to ask the police for help they

7   wouldn't believe her and they would arrest her and deport her.

8   You will learn that Delia was completely alone with no money,

9   nobody to turn to in the United States and nowhere to go.

10          On her first night, Francisco forced Delia to have

11  sex with 15 to 20 men.  She was only a 14-year old girl.  And

12  after that night things only got worse.  Whenever Delia

13  refused to work, Francisco threatened her and then beat her.

14  He threatened her again, he beat her again, he punched her in

15  the face, he dragged her on the floor and whenever he thought

16  she was pregnant, he would try to force her to have a

17  miscarriage.  For four years Delia was forced to live this

18  life until she finally found the courage to escape.

19          During this trial you will learn that Delia was not

20  the only victim the defendants trafficked in this way.  In

21  addition to Delia you will hear testimony from five other

22  victims, five other women who were forced into prostitution by

23  the defendants and their relatives.  You'll hear from Maria,

24  you'll hear from Veronica, you'll hear from Fabiola, you'll

25  hear from Diana, you'll hear from Daisy.

Proceedings                    16

1          This case is about what the defendants did to all of

2     these women and girls and others who you will hear about

3     during the course of the trial.  It is about the tactics the

4     defendants used over the course of a decade to deceive them,

5     to manipulate them and to sexually exploit them for profit.

6          You will learn that each defendant's role varied

7     depending on the victim.  For each victim there was one main

8     trafficker who recruited her and maintained primary control

9     over her.  But the defendants all worked together to ensure

10    that both the victims they recruited and those their family

11    members recruited all stayed in line with their demands.

12    Their roles varied but the goal was the same, to make money.

13         To recruit their victims the defendants approached

14    young women and girls often in small towns in Mexico and tried

15    to seduce them.  They gave them gifts and met their families.

16    They made promises, promises of love or of marriage or of a

17    better life in the United States.  Then they lured their

18    victims to their family compounds where they made arrangements

19    to bring them to the United States.  They paid smugglers to

20    transport them on buses or guide them as they walked days

21    through the desert to get here.  But after the women and girls

22    arrived in the United States a new reality set in.  The

23    defendants told their victims that they had no choice but to

24    have sex with strangers for money.  Money the defendants kept.

25         In forcing their victims into prostitution, the

Proceedings                                          17

1   defendants employed a delivery service model, where drivers

2   took the women and girls to clients all night long.  Each

3   session lasted about 15 minutes and it cost about $30.  During

4   a six- to seven-hour shift, a girl would typically see between

5   15 and 20 men.  At the end of the shift, half the money went

6   to the driver and the other half to her trafficker.  Every day

7   the defendants' victims were driven by these delivery drivers

8   from client to client to client in Delaware, in Connecticut,

9   in New Jersey, on Long Island and right here in New York City.

10  Every night before each shift, the defendants would carefully

11  count out and hand their victims a set of condoms and every

12  night after each shift they would carefully count the ones

13  that remained to make sure their victims had turned over every

14  cent of their earnings to them, then the defendants took that

15  money and wired it back to Mexico to their own family members

16  and associates.

17          The evidence will show that the defendants used

18  threats and force to keep their victims working seven days a

19  week without a break even if they were sick, or bleeding, or

20  injured.  And you will learn that their victims were often

21  injured.  For years the defendants abused them.  They

22  threatened to hurt or to kill their mothers, their sisters,

23  their brothers, their daughters.  They punched them in the

24  face and in the ribs, they kicked them and they raped them.

25          This is the life that the defendants forced these

1   women and girls to endure.  Day after day, shift after shift,

2   some of them for months and many of them for years.

3           For smuggling young women and girls from Mexico into

4   the United States, the defendants are charged with alien

5   smuggling and immigration offenses.  For forcing young women

6   and girls to have six against their will for money, the

7   defendants are charged with sex trafficking, sex trafficking

8   conspiracy, sex trafficking of minors and prostitution

9   offenses.  And for taking the money that their victims were

10  given and sending it to their own family members and criminal

11  associates, the defendants are charged with the illegal

12  distribution of proceeds of a prostitution business and money

13  laundering offenses.

14          We will prove these charges to you beyond a

15  reasonable doubt with several types of evidence.

16          First, the victims.  As I mentioned, during the

17  trial you will hear from the victims themselves.  They will

18  tell you about all the ways the defendants physically and

19  psychologically forced and coerced them into prostitution,

20  claims of love, promises for a better life, followed by

21  threats, violence, slaps, punches, verbal abuse, rape and as

22  to several victims, forced abortions.

23          Second, you'll see physical evidence that was

24  recovered from the defendants' and victims' apartments.  Some

25  of these items will include tolls of the prostitution trade,

1  condoms, cell phones, notebooks with lists of phone numbers in

2  them, and dozens and dozens of cars used by delivery drivers

3  to attract clients, which you'll hear referred to as "chica"

4  cars during the trial.

5           And finally, you'll see documents that will provide

6  an inside look into the defendants' prostitution business.

7  These will include phone records, wire transfer records and

8  border crossing records that show women coming into the

9  country and money going out back to the defendants in Mexico.

10  This is just a summary of some of the evidence that we'll

11  present during the course of the trial.

12           As you see and hear the evidence you will be exposed

13  to some of the details of forced sex trafficking right here in

14  New York City by women who lived through it.  Then at the end

15  of the trial after you've seen and heard all the evidence, we

16  will come back to you and we will ask you to return the only

17  verdict consistent with that evidence, and that is a verdict

18  of guilty.  Thank you.

19           THE COURT:  Ms. Kellman.

20           MS. KELLMAN:  Thank you, Your Honor.  Everybody who

21  knows me knows I don't need a microphone and that I will

22  probably trip somewhere along the way, but I'll do my best.

23           Members of the jury, criminal prosecution of a

24  fellow human being presents a lawyer and a jury, each of you

25  individually and collectively, with a unique challenge.

1    You've heard the government's opening.  You've heard words

2    like smuggling, alien smuggling, trafficking, prostitution,

3    extortion, and violence.  And consciously or unconsciously

4    that narrative will challenge you.  And here's the challenge.

5    Can you be true to the oath that you just swore in this very

6    court.  The oath to fairly and impartially listen and weigh

7    the evidence, weigh it impartially and come up ultimately with

8    a lawful verdict.  When each of you took that oath, you

9    promised the defendants and the Court that you would fairly

10   try this case, that you would listen and that you would keep

11   an open mind and that you would remember that the each of the

12   defendants in this case is presumed to be innocent.  As they

13   sit here today, my client, José Miguel Melendez-Rojas, is

14   presumed to be innocent.  If the trial ended right now and you

15   were asked to render a verdict, you would have to say not

16   guilty.  And that's true at the end of -- the beginning and

17   the end of every trial day until such time as the jury is --

18   the trial ends and the jury goes in to deliberate and that is

19   the first time that you'll actually have an opportunity to

20   have a discussion about what, if anything, the evidence

21   proves.

22           Now, Judge Ross told you in her opening remarks, and

23   it is very important, that each of the defendants is presumed

24   innocent and has no obligation to testify, has no obligation

25   to say anything at all because the burden of proof rests

1  solely and exclusively and always at that table.  And if the

2  government can't prove its case beyond a reasonable doubt,

3  then your oath requires you to render a verdict -- to return a

4  verdict of not guilty.

5          Now notwithstanding that the defendants don't have

6  to say anything, my client, Mr. Melendez-Rojas José Miguel,

7  has spoken in this very court when he was notified of the

8  charges, the ones that were read to you by the Judge, he stood

9  in this very court and said, Your Honor, I am not guilty.  Not

10  guilty.

11          Now, I want to share a little personal story with

12  and you maybe first I'll tell you who I am.  Hi.  My name is

13  Susan Kellman and I represent one of the defendants in this

14  case and that is José Miguel Melendez-Rojas.  Now you may

15  think this has nothing to do with where we're headed, but I

16  promise you it does.

17          About a month ago I had a flood in my house and it

18  was a mess.  And the insurance company arranged for me to move

19  into another house and so I went to look at the house and I'm

20  looking around, is this where I want to spend the next few

21  months.  It's very uncomfortable and weird, and the people who

22  live there weren't there.  And as I walked through the house

23  to see if I was comfortable, one of the things I saw was lots

24  of family pictures around.  I saw repeatedly a picture of an

25  older couple with their arms around each other and then I saw

1    other pictures with 20 somethings and 30 something-year old

2    kids, also all in photographs and then five, six, three,

3    four-years olds.  So in my mind the evidence that I saw said

4    that this was an older couple who owned this home and they had

5    children along the way, and their children had children along

6    the way and they were very proud of the family that they had

7    built because the pictures were everywhere.

8            The next thing I noticed as I walked through the

9    house was at the top of one of the staircases there was a

10   legal-looking document, although it was awfully pretty, but

11   legal looking.  What it was was something called a Ketubah.

12   And a Ketubah is something I knew about, it's a Jewish

13   marriage contract and I recognized the word in Hebrew,

14   everything else was in Hebrew and it didn't really matter, I

15   knew what it was, but it said Ketubah.

16           Now, I have a picture of this elderly couple and all

17   of their children and their children's children and the

18   Ketubah, so this tells me that they are a married couple, that

19   they're Jewish and that they have lots of kids and grandkids.

20           (Continued on the next page.)

21

22

23

24

25

1              (In open court.)

2              MS. KELLMAN (CONTINUING):  So I have seen more facts

3     and reached more conclusions.

4              I then go into the kitchen to look around, to see if

5     it's going to be agreeable to me, if I'm going to be

6     comfortable; and I see something that I don't see in every

7     house, and it's two sinks.  One sink on one island, and one

8     sink on another island.  And this says to me, why do people

9     have two sinks in the same kitchen?  Well, if they were an

10    observant Jewish family, Jewish families oftentimes, observant

11    Jewish families, have two sinks because the Torah tells them,

12    the bible tells them, that you can't mix milk and meet.  So

13    you have one sink where you wash things, dishes that have meat

14    involved in them, and another one that has dairy involved in

15    them.

16             You are all dying to know where this is going.  I

17    can see that.

18             Finally, I say to the real estate agent, who has now

19    joined me, why are these people not here for so many months?

20    Why are they leaving their beautiful home?  And they said,

21    well, every winter they go down to Palm Beach and they

22    vacation.  Snowbirds is the word, the phrase, I was raised

23    with.  What is a snow bird?  It's the old Jewish couples who

24    go down to Florida, hang around with other old Jewish couples

25    until it gets warm in New York, and then they come back up.

1        Why am I telling you this?  Because every fact I saw

2   led to another conclusion, and every conclusion I reached

3   turned out to be wrong.  Every one.  Even though as I heard it

4   I confronted it, and I knew it to be not just reasonable but

5   the only conclusion I thought I could reach.

6        So the real estate agent, after I told him I liked

7   the apartment, says you should go back there and try to bring

8   as much stuff as you can before the couple leaves and get to

9   meet them.  So I ring the doorbell, and I got my dogs, my kids

10  in the car, and everybody is carrying something.  And I ring

11  the doorbell and an African-American man opens the door, and I

12  said, oh, I'm sorry.  I didn't mean to disturb you.  Is

13  Nathaniel around?  Because I was told the man's name was

14  Nathaniel.  He said, oh, I'm Nathaniel.  Okay.

15       This did not look like an old Jewish man because

16  this was a 20-something African-American man.  So I'm

17  thinking, why is this Nathaniel.  What am I missing?  And then

18  ten seconds later Dominick comes over, introduces himself, and

19  puts his arm around Nathaniel; and Nathaniel, a middle-aged

20  Jewish guy -- and Nathaniel and Dominick are married.  And had

21  I taken the time to look at the Ketubah more carefully, I

22  would have seen both of their names on the Ketubah.

23       I'm thinking it's this African-American man and this

24  Italian man, whose parents are Jewish, one of his parents are

25  Jewish.  What's with the two sinks?  So now I really just have

1   to ask because also I don't want to violate.  If they do keep

2   a kosher home, I don't want to violate the rules.  Do I need

3   to keep two sinks?  Do you divide by meat and dairy?  Oh, no.

4   Don't be ridiculous.  Nathaniel, he is a nut.  We have two

5   dogs.  He doesn't like when I wash the dogs' dishes in the

6   sink where we have our food.  So he requires me to use two

7   separate sinks, one for the dogs and one for our food.

8           So now I have got pretty much everything wrong, but,

9   still, why is this young gay couple going to Palm Beach to

10  vacation with all old Jewish people.  So I sort of have to

11  ask, and they say, Palm Beach?  Why would we go down to Palm

12  Beach with all the old people.  We go to Palm Springs.

13          Every fact I heard and every conclusion I reached

14  was wrong.  And I tell you this because the most important

15  thing that you will do here as jurors is keep an open mind.

16          When you hear a fact, file it away, but don't close

17  your mind to it.  You know, I know that every one of you, when

18  you got the jury notice, you said, yes, I hit the jackpot.

19  I'm so lucky today.  To you especially.  I know I'm going to

20  be a juror.  Isn't that just fantastic?  And this morning,

21  when you were on your way here -- whether it was by bus or by

22  train -- you may read the newspaper or read some news online,

23  and you were allowed to believe it.  You didn't have to

24  believe it, but you were allowed to believe it.

25          But that all changed when you took the oath just a

1   little while ago, because once you take the oath you can no

2   longer believe everything you hear, like I do.  You have to

3   critically -- you have to listen with a critical ear.  You

4   have to decide whether or not you are getting a true story,

5   whether or not you are getting the whole story.  And you can't

6   do that until you have heard it all.

7           I will make you one promise, and that is that when

8   this trial is over you will feel the better for having served

9   as jurors because it is as important a role as we get as

10  citizens of this great country.  You will see that when you

11  enter the room, we all rise, and we rise for three reasons.

12          One, we rise to show our respect for the office of

13  juror, because that's who you are now.  You are officials.

14  You are jurors.

15          We also rise to remind you that you are the sole

16  judges of the facts.  Judge Ross is the sole judge of the law.

17  She will tell you what the law is.  But it's your job to

18  figure out what the facts are; and because you hear something

19  on Monday, it may not be the same on Tuesday because other

20  pieces of the puzzle get filled in; and whenever you are not

21  sure about that, I want you to think about Palm Beach and

22  think about the dog's sinks, but the reality is the

23  conclusions I reached I would have sworn to.  They were

24  100 percent.  But they were 100 percent wrong.  So I beg you,

25  keep an open mind.

1          The third reason -- I did tell you there were three

2     reasons we rise -- and the third is to remind each of you of

3     the importance of your office and to show our respect for each

4     of you as jurors.

5          My client and the other defendants in this case are

6     presumed to be innocent, and, at the end of the day, at the

7     end of the case, members of the jury, it is my fervent hope

8     that when you weigh all of the evidence that you come to the

9     only fair and just conclusion, and that is that José Miguel

10    Melendez-Rojas is not guilty.

11         Thank you very much.

12         Thank you, Your Honor.

13         THE COURT:  Mr. Golub.

14         MR GOLUB:  Something I have never needed was a

15    microphone.  Oh, boy.  It's after 5:00.  You are looking

16    tired, exhausted.  I can't possibly match what you just heard.

17         My name is Mitchell Golub.  Good afternoon.  I

18    represent José Osvaldo Melendez-Rojas.  He has the blue shirt

19    on.

20         As Ms. Kellman told you, you have taken an oath.

21    You said you would keep an open mind.  You are going to listen

22    to the evidence in this case and you are going to follow the

23    judge's instructions, and the first one she told you was that

24    my client -- all the defendants that are here -- are presumed

25    innocent.

1          They have made the only statement they ever have to

2    make in the case by pleading not guilty.  They are accused by

3    an indictment.  They pled not guilty.  There is nothing

4    further they have to do in the case.

5          Now, the government has presented to you a version

6    of the facts, as they think they are going to prove them; and

7    what I had planned to do as the defense attorney in this case

8    is to question and challenge the witnesses that you are going

9    to hear.  As Ms. Kellman already told you, you can't take

10   anything that you hear at face value because as jurors that

11   have taken the oath, you have to be critical and listen to

12   everything that you hear.

13         What you have been told here was in the accusations

14   that women had come that are victims of sex trafficking, money

15   laundering, a whole slew of other charges that are all related

16   to that.  What do you need to know about all of this?  What

17   you need to know is that each of these women who is going to

18   come in here and testify for you, and they are going to take

19   an oath and they are going to swear to tell the truth, but you

20   have to decide if they are actually telling the truth.

21   Because one of the things that you have to consider when you

22   hear what they say is, what are they getting out of their

23   testimony?  Why are they doing this?  What is the purpose of

24   that?

25         What you are going to find out in the case of each

1   of the women is that each of them face charges of

2   prostitution, they face charges of illegal entry into the

3   country.  They face all these other charges they could face

4   jail time for, and then eventually deportation afterwards.

5   What you are going to find out is that each of these women --

6   in exchange for saying that not that they voluntarily were

7   prostitutes and not that they voluntarily came to this country

8   to do this because they wanted to make a living because they

9   were impoverished in Mexico -- what they did here, they did

10  this because of the fact that the government says to them, oh,

11  if you are -- if you are a victim of sex trafficking, no

12  verdicts.  We are not going to prosecute you.

13          In fact, we are going to give you a visa and we are

14  going to help you get a green card so you can stay here

15  permanently.  You are not going to face any charges and you

16  are going to get your dream.  You wanted to come here to

17  America to stay?  You are going to get here to stay.  You were

18  here illegally, you are subject to deportation?  Not anymore.

19  You are facing criminal charges?  Not anymore.  All of that

20  changes by virtue of the fact that you have taken the witness

21  stand now and you are saying whatever actually happened, I was

22  a victim of sex trafficking.

23          So the credibility of the women who come in here is

24  an issue in the case.  It's a central issue in the case.  So

25  what I want you to do when you are listening to the women --

1    and particularly listening to cross-examination -- is say is

2    there a motive for them testifying the way they did.  Because

3    none of us are going to dispute that the women were

4    prostitutes.  The question is:  Were they doing this of their

5    own volition, of their own free will; and only now, because

6    they are otherwise facing prosecution for it, criminal

7    charges, deportation, everything else, having now turned

8    around and said, well, I was forced to do it, I was a victim.

9    That's the key issue in this case.

10            My client is here because, as I said, he pled not

11    guilty.  He says, I haven't forced anybody to do anything.

12    People who have come here, came here of their own free will.

13    Nobody twisted their arm.  Nobody hijacked them.  Nobody snuck

14    them in against their will.  They all came here willingly.

15    They all engaged in prostitution willingly, but they are now

16    changing the scenario because the government is now going to

17    give them a green card.  The government is going to give them

18    benefits.  They are going to do all these other things for

19    them in exchange for their testimony.  You have to consider

20    that in evaluating the situation in this case.

21            So again, it's late.  The hour is late.  I'm not

22    going to belabor any more.  I'm going to ask you to keep an

23    open mind, and, I hope, if you do that and you follow the oath

24    as jurors, at the end of the case you are going to find that

25    the people have not met their burden of proof and not proven

1  the charge against my client; and I'm going to ask you to come

2  back with a verdict of not guilty.  Thank you.

3            THE COURT:  Mr. Dunn.

4            MR. DUNN:  I'm ready.  Good afternoon, ladies and

5  gentlemen.  Good afternoon to the government team and to the

6  defense.  Mr. Melendez-Rojas, my client, is the gentleman in

7  the blue sweater with the white stripes.

8            I know I can't be more eloquent than Ms. Kellman

9  was, and she basically put in a nutshell basically what I was

10  going to say, not as elaborate and things like that.  So what

11  you are going to hear is you are going to hear a lawyer

12  probably talk less than a minute.

13           And this is basically what I want to say.  The

14  government talks about evidence, evidence, evidence.  The

15  question is:  Is it a fact?  Is it true?  You can drive a

16  truck in here with a lot of different things, but is it

17  evidence.  If it is evidence, is it a fact?  Is it true?  Is

18  it credible?

19           So you are going to have to look at these witnesses,

20  and they are going to testify.  As they testify, that is

21  evidence.  Is it true?  Is it a fact?  And as you see them on

22  direct examination, how they answer the prosecution -- the

23  prosecutors, and as you see them on cross, if lawyers ask them

24  on cross-examination -- because we don't have to do anything;

25  I can go back over there and just go to sleep if I want to --

1    but just remember that, people say it's evidence but is it a

2    fact?  Is it true?

3            At the end of this case, I'm going to come back, and

4    I will point out to you why I don't think certain things are

5    true or factual.  I'm going to ask you to return a verdict of

6    not guilty.

7            Thanks very much.  A little over a minute.

8            THE COURT:  Mr. Gold.

9            MR. GOLD:  Thank you.  Good afternoon.  My name is

10   Michael Gold.  I represent Francisco Melendez-Perez, who is

11   seated next to me at the table.

12           We spent a lot of time this morning -- Judge Ross, I

13   should say, spent a lot of time this morning talking to you

14   about the charges in this case and how dramatic, inflammatory,

15   sensitive, offensive that they are.  To try and steel your

16   resolve and determine whether or not each and every one of you

17   were appropriate and ready to serve on a case of such a

18   nature.

19           Frankly, it was impossible this morning, as you

20   heard a sterile recitation of what was to come before you, I

21   think, for you to truly get the picture of what your task will

22   be over the next several weeks.

23           You just heard from my friend, Ms. Kassner.  She has

24   described to you -- in excruciating, horrific detail --

25   stories that you will hear from the witness stand; and,

1    frankly, while you each took an oath, you are determined to

2    satisfy that oath, we, all of us in this courtroom, are

3    relying on your ability to follow that oath, I'm scared to

4    death.

5            I'm scared to death that the very nature of this

6    case, the very charges in this case will make that impossible

7    for you.  That upon hearing stories of 14-year-olds being

8    forced into prostitution, your blood starts burning, your

9    stomach starts turning, and your mind turns off, that that's

10   it.  Why?  Because it's revolting.  I don't blame you.  I get

11   it.

12           But that's your job.  You signed up for individual

13   justice, not mob vengeance; and we are counting on you.  I'm

14   counting on you.  My client is counting on you.

15           Now, as you see, there are five defendants here,

16   each represented by separate counsel.  You have heard they are

17   related in various ways.  But while they may be related and

18   the charges somewhat overlap, in all important respects, in

19   essence, these are five separate charges.  That's why they

20   each have five separate counsel.

21           While we will try, because we are not a team, we

22   will try not to repeat the same things, I'm going to stand

23   here now and try not to repeat the same things my colleagues

24   have already told you and discussed with you, but, frankly,

25   it's inevitable.  There will be questions that are

1    repetitious.  There will be themes that are discussed that are

2    duplicative.  It's unavoidable, and I apologize to you in

3    advance, but it's going to happen.

4            Now, I believe Judge Ross has already indicated that

5    nothing I'm telling you is evidence.  Nothing that my friend

6    Ms. Kassner has told you is evidence.  And there is good

7    reason for that.  If Ms. Kassner was a witness, she would be

8    called to the witness stand, she'd take an oath similar to the

9    oath that you took, and then she would tell you, raise her

10   hand and tell you all the things that she told you during her

11   opening statement, all of those horrific, despicable,

12   revolting things.  Frankly, you would probably believe her.

13   She's got a good job.  She has no ax to grind.  She is not

14   here with an agenda.  She won't benefit or suffer from the

15   outcome of this case in any regard.

16           She is here, as you would expect anybody to take a

17   witness stand in the courts of the United States of America,

18   raise their right hand, swear to tell the truth, and do

19   exactly that, tell the truth.  She's a hard witness to

20   challenge and, frankly, you would believe her.  But here is

21   the catch.  She is not a witness.  She didn't see any of the

22   things she told you occurred.  She didn't hear any of the

23   things that these witnesses who will be coming before you will

24   claim to have had happen to them.

25           The evidence in this case will come from human

1   beings.  Human beings with maybe horrific stories of a

2   personal history, but human beings who you must scrutinize and

3   challenge in your mind, as we will with our questions, to

4   ensure the truth surfaces.  Because, as in my example,

5   Ms. Kassner had no ax to grind, no benefit, no agenda, that's

6   not the case with the witnesses who are going to come here

7   before you.  Because from the very start of this

8   investigation, you will hear that they had a very real and

9   life-altering stake in the outcome of this -- of first the

10   investigation and now very well on the outcome of your

11   verdict.

12          It is that self-interest that we will come to you --

13   I will come to you at the end and highlight as one of many

14   reasons why Delia should not be believed.  As you heard, she

15   is the primary witness against my client, against Francisco.

16   And there, she has led a life that no one should lead.  She

17   has suffered in a way that no one should suffer.

18          She was 14 when she met Francisco, as Ms. Kassner

19   told you.  Before that -- that's not even remotely when the

20   worst part of her life occurred.  Because she will tell you

21   that at the age of nine and ten she was raped by her father

22   and her uncle, repeatedly.  And her mother didn't believe her.

23   And so she ran away.  She left them.

24          Imagine that?  Nine, ten years old.  Your heart will

25   go out to her, as it should, unless you are dead.  You can't

1    help it.  But being sympathetic is not the same as being

2    credible.  And that's what you are going to have to bear in

3    mind.

4              It was because of this -- I run out of adjectives.

5    I don't even know how to -- because of her life as she led it,

6    she desperately needed to get out of Mexico.  She desperately

7    needed to get away.  And she met Francisco, she fell in love

8    with him at the tender age of 14, as Ms. Kassner told you; and

9    he broached with her the subject of leaving Mexico and

10   starting a life in the United States, together, as a couple.

11   She was a baby.

12             What Ms. Kassner didn't mention is that Francisco

13   was a baby too.  He was 15, 16.  Two babies falling in love,

14   deciding to strike out in America.  This is a story that

15   generations have heard and been told, and now she thought it

16   was their turn.

17             They didn't have any jobs awaiting them when they

18   got here.  They didn't have their own apartment.  They didn't

19   have income.  But she so desperately needed to get away and

20   was so in love, as Francisco was with her, that these two

21   babies came here.

22             Once they came this wasn't some romantic fantasy.

23   It's not some sitcom.  It was real life.  And the reality of

24   no money, no income, no job, immediately became self-apparent,

25   on top of which carrying an $11,000 debt to smugglers --

1    coyotes, as they may or may not be referenced during the

2    course of the trial -- that was owed and had to be repaid.

3    This is no joke.  These are bad people.

4            So what happens?  She makes a decision.  This little

5    baby coming from an horrific background of abuse, assumed that

6    perhaps the best and only way to survive was to appeal to that

7    base, vile instinct; and she decided to become a prostitute.

8    She was not forced, coerced, tricked into coming here.  She

9    came of her own volition, out of love and desire to be here

10   with the man of her choice.  I'm not saying it was a good

11   choice, but it was hers.

12           And the goal and intent was that they would come

13   here, and she would work for whatever period of time it would

14   take to pay off the smugglers, to buy a house together in

15   Mexico and return as a couple.  That's what happened.  After

16   several years, this is how it continued.  They lived together

17   as man and wife.

18           Her job -- and you will hear the details of it, I'm

19   quite sure -- was reprehensible.  But that's what she suffered

20   because, as Ms. Kassner stated, didn't want to be arrested,

21   didn't want to be deported, was still trying somehow to etch

22   out a place that was safe to return to in Mexico with her --

23   for all intents and purposes, her husband, raise a family and

24   live there.

25           Slowly that dream died.  By April 2014, it was clear

1   the relationship was over, and she left and she walked into

2   the police -- arms of the police.  And, as you have heard,

3   made an arrangement, helped by the government, to qualify and

4   file for this T visa that gave her legal status here and

5   permits her to be here to this day.  Now, there is no

6   agreement on paper.

7           And let me clarify that and make sure you

8   understand.  There is no deal on the table that says that if

9   Delia testifies before you in this trial that all her troubles

10  are washed away, no criminal charges will ever be brought to

11  bear against her.  This is not on paper.

12          And let me make something else perfectly clear.  At

13  no time did any of my friends behind me at the government

14  table ever suggest, tell, threaten, coerce -- fill in whatever

15  word you want -- to force her to come here and testify.

16  Didn't happen.  They didn't do that.  I will not allege that

17  ever.

18          But if you think in her mind that it's just a

19  coincidence that she hasn't been charged as long as she came

20  forward and was willing to testify against Francisco and the

21  others, and that it's merely coincidental that while she came

22  here illegally, as did Francisco -- she will be on the witness

23  stand; he sits at the table -- while she was here, sending

24  money back, wire transferring money back to Mexico -- as my

25  client Francisco is accused of doing -- she appears on the

1   witness stand, he sits at the table.  All these things happen.

2          If you think for a minute that in her mind it's

3   coincidental that he is at the table, she is on the witness

4   stand, and that she got this legal status as a gift, and that

5   there was no -- God, I hate even saying the word --

6   quid pro quo, well, I tell you what.  If you believe it's a

7   coincidence, when you go out tonight, take a good look at the

8   bridge because tomorrow morning I want to sell it to you.

9          She absolutely links her appearance, her complaint

10  that she first filed in April of 2014, she absolutely links it

11  with her ability to stay her legally and to avoid being a

12  codefendant at the table and instead being a witness against

13  him.

14         So aren't you happy I'm flipping all these pages

15  here.  That's pretty good.

16         Now, you will also hear -- and I'm going to finish

17  soon, I promise.  It's a long day.  You will hear that

18  prostitution in Mexico is considered differently than it is

19  considered here.  In fact, in the state of Chiapas, which is

20  where Delia is from, the state actually runs a brothel.  It's

21  legal.

22         And I want you to remember that I just said that to

23  you; and, when you listen to the testimony, I want you to

24  remember that and ask yourself a question.  After everything

25  you just heard from my friend Ms. Kassner, with prostitution

1   being legal in Mexico, in Chiapas, her very own hometown, home

2   state, was it really necessary for 16-year-old Francisco to

3   seduce and trick, coerce, force a very unwilling 14-year-old

4   to come to America and work as a prostitute under threat of

5   death to her and her family?  Was it really necessary to do

6   that when you have got all of these legally working

7   prostitutes that could easily have been approached without

8   force, without threat, and ask, hey, you want to go to America

9   and work with me as a prostitute?  What's so hard?

10          And then, when you come here, to live with her for

11  three and a half years as husband and wife.  Was that really

12  necessary?  I want you to think about that.  At the end of the

13  case, I'm going to come back to you and I'm going to answer

14  that question to you based on the evidence that will be

15  adduced during the course of the trial; but have that in mind,

16  with everything you hear, every witness that speaks

17  particularly Delia.

18          Why?  Why?  Why go through all that trouble?  All

19  that hassle?  Worrying that this victim -- you are victimizing

20  somebody; that this victim is going to turn on you; that this

21  victim is going to come and fill a complaint against you.  Go

22  to an 18-year-old, go to a 17-year-old.  Want to come to

23  America?  The money is better.

24          I'm not afraid of your sober, fair, and honest

25  evaluation of the evidence; and, if you find, at the

1  conclusion of that, that the government has met its burden,

2  don't hesitate to convict.  I don't believe you will because I

3  don't think the evidence will support that, because, having

4  said all of this, don't think for a minute I'm standing here

5  advocating for prostitution or for sex trafficking, for forced

6  sex of any kind.  I don't.

7          I stand here advocating for Francisco, and the

8  evidence in this case allows me to do both without a conflict.

9  I am confident that at the end of this case, when all the

10  evidence has been presented to you, that you too will conclude

11  that the government has not met its burden of proof beyond a

12  reasonable doubt; and I will come to you and ask you to return

13  a verdict of not guilty.

14          Thank you.  Thank you.

15          THE COURT:  Mr. Hueston.

16          MR. HUESTON:  Thank you, Your Honor.

17          It's late.  But there is some formality I'm going to

18  do, and this is how I have been trained in doing this job for

19  these years.

20          May it please the court, Judge Ross, colleagues,

21  ladies and gentlemen of the jury.  My name is Michael Hueston,

22  and I represent Abel Romero-Melendez.  You see him at the end

23  of the table.

24          Now, you have heard a lot of concepts, and I'm the

25  fifth opening statement you have heard and I'm going to try to

1   be brief.  I have been taking notes.  You may have noticed, if

2   you have been watching me at all, that I have been scratching

3   things away, because there is less and less for me to say and

4   not waste your time; but a couple of things I must say to you

5   today.

6           First, again, a defendant has no obligation to offer

7   proof or argument in his defense.  This is a key principle of

8   our constitutional superstructure.  Not every society has it.

9   They don't value it.  Why?  Because we believe that the

10  government has that sole burden.  And you, as the trier of

11  fact, have that sole responsibility to make that decision.

12  It's valuable, it is sacred, it is completely necessary for a

13  free society.

14          Now, I do want to make a couple of brief statements

15  about what I think the evidence is going to show.  I think you

16  have begun to see it being presented in the different opening

17  statements that you have heard, and I think I can boil it down

18  to one word.  It's resistance.  Resistance.  Now, why do I use

19  that term?  Why do I think it's important?

20          I used to study war theory.  It was Carl

21  von Clausewitz, in "On War," and he wrote in that book, in

22  that treatise -- that they study at West Point, that they

23  study around the world -- that the closest thing to warfare is

24  litigation.  That's how serious this is.  We know lives are at

25  stake.  Freedom is at stake.  This is deadly serious business,

1  and I will carry it out with a deadly serious concentration on

2  behalf of my client.

3        Now, this is an adversarial process.  This, despite

4  the decorum and the sacredness of this courtroom, this is a

5  field of combat; and what you are going to see over the next

6  days, perhaps weeks, is a series of engagements, where lawyers

7  are going to ask questions of witnesses.  The government is

8  going to put them up, and we are going to question them.

9  Obviously, we have an obligation to be fair.  We have that.

10        It's such an important obligation, to be fair; but

11  we have an absolute right to make sure our clients are not in

12  any way denied clear, concise, precise, persistent, dogged

13  questioning to make sure that the people who have been brought

14  here are telling the truth; and, as each one of the lawyers

15  have said, they have a motive.  They have reason to lie, to

16  fabricate.

17        So, yes, this will be about resistance.  You are

18  going to see the government is going to use various methods, I

19  would assume.  Photos.  They may try to put charts or

20  spreadsheets, sort of create this menagerie, this image, that

21  somehow this is all perfectly okay; that there is really no

22  basis to really doubt what they are putting forward.

23        But I want you to really focus on the questioning

24  that you are going to -- about to see, and, you know, in part

25  of war theory -- I'm not going to talk about what I'm going to

1    attempt to do.  You know, there is an element of surprise in

2    this.  You will see patterns from the defense emerge

3    throughout this case that will undermine their credibility;

4    that will put in doubt the government's arguments and proof.

5    I'm going to ask you to look for those patterns.

6            Now, at the end of these skirmishes, so to speak,

7    these engagements, we are going to come back, and I'm going to

8    then talk about it in summation.  And at that point I really

9    will be clear about those patterns, and I will be going over

10   each of the witnesses that I think are important to the

11   government's proof and breaking them apart.  I have no doubt

12   about that.

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HUESTON (CONTINUED):  And at that point I

2    really will be clear about those patterns.  And I will be

3    going over each of the witnesses that I think they're

4    important to the Government's proof in breaking them apart.

5    I have no doubt about that.

6          And as all the lawyers have said, until that time,

7    you know, you must keep an open mind.  Obviously don't

8    accept anything I'm saying as the truth.  It goes beyond

9    common sense to ask for your trust.  You know, that's

10   something you earn.  And I'm hoping and it's my duty and my

11   obligation over the time of this trial, that I will ask

12   those questions.  I would have shown the weaknesses of

13   the Government's case and then you will trust that it is

14   appropriate to bring a verdict of not guilty for my client.

15         Thank you.

16         THE COURT:  Ladies and gentlemen, it's been a

17   really long day.  You have been wonderful jurors.  I know

18   the entire process through jury selection was a very

19   difficult one and a trying one, and here you are at ten

20   minutes of 6:00.  I'm sorry to have kept you so late, but it

21   made a certain sense for you to hear all of the opening

22   statements.  We'll come back tomorrow.  If you'll be in the

23   jury room at 9:30, Dennis will get you and bring you up to

24   the courtroom and we'll commence with witnesses tomorrow

25   morning.

1          Thank you so much.  Don't talk about the case.

2          THE COURTROOM DEPUTY:  All rise.

3          (Jury exits the courtroom.)

4          (The following matters occurred outside the

5    presence of the jury.)

6          THE COURT:  There's something I would like to talk

7    about initially.  One of the jurors, I believe it was Juror

8    Number 7, Dennis is going to detain her.  Made some comment

9    that she had some appointment tomorrow afternoon that she

10   had to attend.  I'm going to find out what that is.  I don't

11   know what -- I mean, it's a little ridiculous.  Why don't we

12   do that first, and then we'll go into anything else that we

13   need to do.

14         Emily, will you see if Dennis has that juror.

15         THE COURTROOM CLERK:  Yes.

16         THE COURT:  I believe it's Juror Number 7.

17         THE COURTROOM CLERK:  One moment.

18         THE COURT:  Okay.

19         (Pause in proceedings.)

20         THE COURTROOM DEPUTY:  All rise.

21         (Jury enters the courtroom.)

22         (Jury present.)

23         THE COURT:  Please be seated everyone.

24         You are Ms. Matos; is that right?

25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  I gather you indicated to Dennis that

2    you had some kind of an appointment tomorrow?

3          PROSPECTIVE JUROR:  On the 12th.

4          THE COURT:  On the 12th, which is a week?

5          PROSPECTIVE JUROR:  Thursday.

6          THE COURT:  Huh?

7          PROSPECTIVE JUROR:  Next Thursday.

8          THE COURT:  What is the appointment?

9          PROSPECTIVE JUROR:  A doctor's appointment.

10         THE COURT:  I'm sorry?

11         PROSPECTIVE JUROR:  Doctor's appointment.

12         THE COURT:  A doctor's appointment.

13         Would you rather discuss this at sidebar with

14   counsel?

15         PROSPECTIVE JUROR:  Sure.

16         (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Proceedings                           48

```
 1            (The following occurred at sidebar.)

 2            (Prospective juror approaches.)

 3            THE COURT:  Let's wait until they all get here.

 4            Okay.  What kind of doctor appointment?

 5            PROSPECTIVE JUROR:  Mammo.

 6            THE COURT:  Mammogram?

 7            PROSPECTIVE JUROR:  Uh-huh.

 8            THE COURT:  Have you already had one; this is a

 9   follow-up?

10            PROSPECTIVE JUROR:  Right.

11            THE COURT:  This trial will probably be over a day

12   or so later.  I can understand your concern about the

13   appointment.

14            You can see where we've now launched into what has

15   been a very complex trial to put together?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  It's taken months on the part of the

18   Government, Defense Counsel, and my Chambers.  It will all

19   be over in two weeks.  Will you make an effort --

20            PROSPECTIVE JUROR:  Sure.

21            THE COURT:  -- to change the appointment?

22            I think it will probably be okay early the next

23   week, but just to be certain, if you could change it from

24   the middle of next week because, of course, we would like to

25   have you stay on the jury?
```

Proceedings                                                  49

1              PROSPECTIVE JUROR:  Sure.

2              THE COURT:  You've been selected because everybody

3     wanted you.

4              So I do understand your concern about -- but, of

5     course, somebody can fit you in an mammogram.  Thank you?

6              PROSPECTIVE JUROR:  Thank you.

7              (Prospective juror exits.)

8              THE COURT:  Dennis will take you out.

9              MR. GOLUB:  Judge, while we're here, maybe we can

10    find out once and for all the order of witnesses for

11    tomorrow?

12             THE COURT:  Yeah, I was going to ask that.

13             MS. ARGO:  We were actually going to put it on the

14    record.

15             THE COURT:  Yes, we can sit down and do it in open

16    court.

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

Proceedings                                    50

1              (Sidebar ends; in open court.)

2              THE COURT:  Okay.

3              MS. ARGO:  Your Honor, the Government plans to

4    call as witnesses Daisy and then Maria.

5              THE COURT:  Daisy and Maria?

6              MS. ARGO:  Yes, Your Honor.

7              THE COURT:  All right.  And I take it there's no

8    doubt but that will take up the whole day?

9              MS. ARGO:  We believe so, Your Honor.  We believe

10   that to be accurate.

11             THE COURT:  Okay.

12             Any other questions?

13             MR. GOLUB:  That was it.

14             MS. KELLMAN:  How about Day 2.

15             THE COURT:  Well, actually do you happen -- do you

16   know who you were thinking of for the next day?

17             MS. HAJJAR:  We don't, Your Honor.  We think it

18   may be another victim witness, but we would like to just see

19   the first witness and have a determination then.  We expect

20   this will go well into the second day.

21             THE COURT:  You expect?

22             MS. HAJJAR:  That these two witnesses will go into

23   the second day.

24             THE COURT:  Will go into the second day.

25             MS. HAJJAR:  Yes.

Proceedings                                                51

1          THE COURT:  All right.  And can you tell us what

2    witnesses you are considering as the third witness, just so

3    counsel can be can prepared?

4          MS. HAJJAR:  The two witnesses that will likely

5    follow but the order may shift, Your Honor.

6          THE COURT:  That's okay.

7          MS. HAJJAR:  Are Delia and Fabiola.

8          MR. GOLD:  Which Fabiola?

9          THE COURT:  The Fabiola who was the Jane Doe

10   Fabiola.

11         MS. HAJJAR:  Correct.

12         MR. GOLD:  Thank you.

13         MS. ARGO:  Your Honor, I also had brought with me

14   to court stipulations that each defense counsel has

15   indicated that they do plan on signing.

16         THE COURT:  Let's do it right now.  Get out your

17   pens.

18         MS. ARGO:  With respect to that, I do understand

19   that I think defense counsel would like to address the

20   admissibility of the records, not the authenticity of the

21   records.  I believe that would be their characterization of

22   their signing of the stipulations and the Government's happy

23   to address those concerns around the admissibility.

24         THE COURT:  Well, we might as well do it tonight

25   instead of waiting to do it.

```
                         Proceedings                      52
```

1           MS. ARGO:  Okay.

2           THE COURT:  When would you put this in?

3           MS. ARGO:  The records, Your Honor?

4           THE COURT:  Yes.

5           MS. ARGO:  It would be towards the end of this

6   week.

7           THE COURT:  Okay.

8           MS. ARGO:  It could be as early as late Wednesday,

9   early Thursday.

10          THE COURT:  Okay.  These are the telephone

11  records?

12          MS. ARGO:  Telephone records and wire records,

13  Your Honor, wire remitter records.

14          THE COURT:  And precisely what are the defendants

15  objecting to in terms of relevancy of the wire records and

16  telephone records?

17          (No audible response.)

18          THE COURT:  Don't all speak at once.

19          MR. HUESTON:  Your Honor, I'll volunteer.

20          My real issue deals with two -- the witnesses that

21  have been identify in the 3500 material.

22          THE COURT:  I know and they're now in the 3500

23  material, but they're not going to be called, right?

24          MS. HAJJAR:  Likely not, Your Honor, no.

25          MR. HUESTON:  So it's Cristina and Lizbeth.

Proceedings                              53

1        THE COURT:  Right.

2        MR. HUESTON:   The argument is this, Your Honor:

3   Given that I see it so that the shifting nature of who are

4   they?  At one point earlier in the case when we were doing

5   our pretrial motions, the Government made the statement in

6   its motion in opposition to my motion when I was seeking

7   breaking here, Your Honor, that the Government was not

8   claiming or alleging that my client or any of the

9   co-defendants trafficked either of these two women.

10       THE COURT:   It's my understanding is that that has

11  been the Government's position, they were not trafficked; is

12  that correct?

13       MS. HAJJAR:  Your Honor, I think we made this

14  clear at the status conference before Your Honor a little

15  while ago.

16       The Government's -- Mr. Hueston's client is not

17  charged with trafficking those two women.

18       THE COURT:  Right.

19       MS. HAJJAR:  However, testimony and evidence

20  regarding those two women, the circumstances under which

21  they came to the United States, that they were forced --

22  that they were forced into prostitution will come out at

23  this trial.  It is part of the sex trafficking conspiracy,

24  and it is a conspiracy -- it is a conspiracy.

25       THE COURT:  No, I know it's a conspiracy and if it

Proceedings                                      54

1   comes in through the rules, it would be relevant.  But I

2   guess in terms of your concern, nobody is saying that your

3   client did anything.

4           Is that correct?

5           MS. HAJJAR:  That's not correct.  That's not

6   correct.

7           THE COURT:  Do you mean as part of the conspiracy?

8           MS. HAJJAR:  Yes.

9           In other words, witnesses will testify about their

10  observations of those witnesses.

11          THE COURT:  Yes, and they can.

12          MS. HAJJAR:  And so to the extent Mr. Hueston is

13  arguing that evidence related to these two women -- I'm not

14  sure --

15          THE COURT:  I think I made clear that evidence

16  relating to those women insofar as it came in as non-hearsay

17  testimony, as legitimate evidence, insofar as it's relevant

18  and could well be relevant.  It could be very relevant to

19  one or more defendants, I have no idea.  And in that sense

20  it's relevant to the conspiracy, but nobody will say that

21  your client personally was involved in trafficking of them.

22          Is that correct?

23          MS. HAJJAR:  That's not correct, Your Honor.  I

24  think that evidence will come out through these -- in non-

25  hearsay -- not implicating hearsay at all.

1           THE COURT:  Okay.

2           MS. HAJJAR:  But these direct observations will

3    come out in evidence.

4           THE COURT:  Direct observations can come out.

5           I'm sorry, it was awhile since we did those

6    motions but I think I went through a whole list of things

7    that I thought could come out very legitimately.

8           MR. HUESTON:  You did, Your Honor, and the reason

9    I bring it up because we had this sort of -- I think it's

10   fair to describe sort of this varying position of the

11   Government.  I understand what they're saying now.  And I

12   understand the rulings that have been made that there are

13   non-hearsay needs to, you know, put in these two women's

14   experience, then they're going to attempt do that.

15          My concern is this:  That say, for instance, with

16   the wire records, and the wires will have Cristina Sanchez

17   Sanchez and will have $85,000 that she sent over a period of

18   years.  Now they put that record in of wire transfers.  And

19   at the end of the day if there's no one talking about

20   Cristina or Cristina doesn't even come to testify, you know,

21   we're not clear about that, then I'm concerned that the

22   Government's not -- not have the position, we'll not be able

23   to say, well, here we showed you that Cristina was

24   trafficked because of these wire transfers but --

25          THE COURT:  Well, I think that's something that's

Proceedings                                      56

1  going to be part of your summation.  The Government's going

2  to argue that whatever evidence they have proves that these

3  people were trafficked and that's why this is relevant.  And

4  you're going to argue they don't have enough evidence to

5  even prove these people were trafficked, so this the

6  completely irrelevant.

7          MR. HUESTON:  Your Honor, not to belabor the

8  point, now the stipping out to phone records, we have the

9  same issue.  So it's known that Cristina Sanchez or Lizbeth

10 is using and the Government is going to say, well, this

11 shows that they were involved, they were being trafficked, I

12 get --

13          THE COURT:  No, I mean -- the fact that

14 somebody -- those phone records, there are a lot of

15 different people who may or may not have used individual

16 telephones.  And I think -- you know, I don't know whoever's

17 going to testify about it, but I suspect that

18 the Government's isn't even saying that everybody who is

19 listed used the phones.

20          MR. HUESTON:  Uh-huh.

21          THE COURT:  So I don't think -- I don't anticipate

22 that that's going to be a problem.

23          MR. HUESTON:  What I don't want to be in a

24 position, you know, I've created a record here and I don't

25 want to waive an issue and I see that --

Proceedings                    57

1          THE COURT:  You're not waiving any issue you want.

2          And the other thing is insofar as it's going to be

3    a relevancy issue before the jury, that is all subject to

4    argument at summation.  And it seems to me everybody is up

5    for grabs at summation.

6          I don't know what evidence the Government is going

7    to have as to particular individuals and particular phone

8    calls.  But, you know, if they haven't proven their case,

9    that somebody used a phone to make a connection, if all

10   they've proved is maybe this person had access to this

11   phone, but we have absolutely no idea who this person

12   called, or this phone may have called that phone, but we

13   don't know who did it and we don't know who got it, that's

14   all you're arguing.

15         You're not waiving that argument as to ultimate

16   relevance.  But I certainly can't say having gone through

17   many of those documents and charts that it is so irrelevant

18   that I would keep it out.

19         MR. HUESTON:  This is the issue, Your Honor, that

20   I'd see there's a difficulty for ne to say, okay, I agree

21   to -- to their admissibility in terms of -- what I hear from

22   the Government is that they believe that they're relevant.

23   Our position is they're not relevant.

24         THE COURT:  Well, yes, but there are two different

25   kinds of relevancy.  One I decide.

Proceedings                                      58

1          MR. HUESTON:  Yes.

2          THE COURT:  And the next one the jury decides.  I

3    anticipate, unless I hear something different, that they are

4    relevant for purposes of going into evidence, but their

5    ultimate relevance to the jury is something that will no

6    doubt be vehemently argued during summations and you haven't

7    waived anything like that.

8          MR. HUESTON:  I appreciate that, Your Honor, but

9    what I'm saying is if that's the Court's ruling I am going

10   to maintain my objection to introduction of those items.

11   These are --

12         THE COURT:  Well, you know, what we're going to

13   do, then, is you're going to have to show me which ones and

14   why because there are a lot that just don't even fall in

15   that category.

16         Telephone calls are always like that.  I mean, you

17   can only say a particular cell phone contacted another cell

18   phone.  You cannot say who did it.  Or who talked or what

19   they said.  That's just -- that's what that information is.

20         MR. HUESTON:  Your Honor, this is, I guess, the

21   final point I'll make about this.  That the Government is

22   asking us to sign a stipulation, actually they have exhibits

23   that they put together.  But I still believe that we're at a

24   disadvantage because they want my signature, you know, and

25   I'm fine in terms of the authentication.  I'm not asking for

Proceedings                                          59

1  custodians coming here, that's not the issue.

2           But --

3           THE COURT:  Well, if you want to make individual

4  relevancy objections at certain moments, I don't mind, we'll

5  deal with it at sidebar.

6           MR. HUESTON:  Your Honor, that is the way to deal

7  with the problem.  If I make by objections and we have a

8  ruling, you know, I'll be mindful of that, Your Honor, but I

9  didn't want to address it that just because of these two

10 sort of particular witnesses or individuals Cristina and

11 Lizbeth.

12          THE COURT:  Well, if there's special things that

13 you want to be able to address relating to the evidence, we

14 can do it as the trial goes along.  I don't see --

15          MS. HAJJAR:  My impression of Mr. Hueston's

16 argument is that he wishes to preserve on appeal or some

17 other time an argument that Your Honor abused her discretion

18 by allowing this under Rule 403, and therefore does not want

19 the sign a stipulation.  If that's what counsel's issue is,

20 I wish we would just resolve it now, sign the petition.

21          THE COURT:  Are you making a 403?

22          I don't know what you're doing.  That's the

23 problem.  I understand your situation with respect to two

24 people who may or may not be witnesses, who may or may not

25 be people that the Government can prove were forced to do

Proceedings                                          60

1    anything against their will.  That's relevancy.

2          And that -- I can't decide beforehand.  I have to

3    hear it.

4          But when you break that down into individual phone

5    calls, or individual wires it's not going to be very

6    meaningful to me.  It's certainly not that meaningful to me

7    right now.  It just seems to me that that's in the nature of

8    the evidence.  By the same token, all I'm saying is if there

9    are particular things that we can talk about because we're

10   talking so generally now, which has always been my problem

11   with this, if there are particular things that you want to

12   talk about, I'll talk about them again.

13         MR. HUESTON:  Your Honor, that seems fair.  And

14   I --

15         What's difficult as I see this is the shift, and

16   I'm frankly speaking.  These are witnesses the Government

17   says they didn't anticipate bringing them, and they are

18   bringing them and we're sort of just left in limbo.

19         What I would --

20         THE COURT:  Well, yes and no.  I mean, they

21   disclosed everything.  They disclosed every little piece of

22   3500 material about those witnesses.  So they've done what

23   they were supposed to do.  They've told you about the

24   witnesses before.  I mean, they've met their various

25   obligations.  Ultimately I have to make certain decisions.

Proceedings                                        61

1          I think I've told you what I anticipate my

2     decisions being.  By the same token, I can't fully

3     understand your specific problem with a specific piece of

4     evidence until I can put it in context.

5          MR. HUESTON:  Your Honor, that's my difficulty,

6     too.  Because I think if you -- your suggestion makes sense

7     as their -- as they have exhibits they want to discuss them,

8     then I am able to object if I think it's appropriate to

9     object.  I don't really know any other way to deal with it.

10         THE COURT:  Well, I think, I mean, signing the

11    stipulation, at least for purposes of authentication, which

12    nobody has any trouble with.  I mean, they don't have to

13    bring in witnesses to put the documents in.  If we have

14    legal arguments to make as time goes on, and I understand

15    your concern better and I understand the Government's case

16    better, we can talk about it.

17         MR. HUESTON:  Thank you, Your Honor.  That's all

18    I'm saying.  I never said that they had to bring a

19    custodian.  I don't want to waste time that way at all.

20         But I don't want to abandon an argument.

21         THE COURT:  You don't have to abandon any

22    arguments.  I'm just saying they don't mean anything to me

23    if I don't see really in context for the reasons that I just

24    expressed.

25         MR. HUESTON:  Thank you, Your Honor.

Proceedings                                      62

1          THE COURT:  Okay.

2          I gather nobody else has any problem?

3          MR. DUNN:  Nothing, Your Honor.

4          THE COURT:  Huh?

5          MR. DUNN:  No other problems.

6          THE COURT:  Thank you.  Have a nice night.

7          (Matter adjourned to Tuesday, March 3, 2020 at

8     6:15 p.m.)

9                          --ooOoo--

10

11

12

13

14     *I (we) certify that the foregoing is a correct transcript*
       *from the record of proceedings in the above-entitled matter.*

15
           */s/ David R. Roy*              *2nd Day of March, 2020*
16           *DAVID R. ROY*                        *Date*

17

18

19

20

21

22

23

24

25

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*