554

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - -X
 3  UNITED STATES OF AMERICA,     : 17-CR-434 (ARR)
                                   :
 4            Plaintiff,           :
                                   :
 5        -against-               :
                                   :
 6  JOSÉ MIGUEL MELENDEZ-ROJAS,    :
    also known as "Gueramex,"      :
 7  "Gueracasa," and "José         :
    Melendez Perez"; JOSÉ          : United States Courthouse
 8  OSVALDO MELENDEZ-ROJAS,        : Brooklyn, New York
    ROSALIO MELENDEZ-ROJAS, also   :
 9  known as "Leonel," "Wacho,"    :
    and "El Guacho"; FRANCISCO     :
10  MELENDEZ-PEREZ, also known     :
    as "Paco," and "el Mojarra";   :
11  and ABEL ROMERO-MELENDEZ,      :
    also known as "La Borrega"     :
12  and "Borrego"                  :
                                   : Thursday, March 5, 2020
13            Defendants.          : 9:30 a.m.
    - - - - - - - - - - - - - - - -X
14

15
           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
16      BEFORE THE HONORABLE ALLYNE R. ROSS AND A JURY
              UNITED STATES DISTRICT SENIOR JUDGE
17

18

19              A P P E A R A N C E S :

20  For the Government:        RICHARD P. DONOGHUE, ESQ.
                               United States Attorney
21                             Eastern District of New York
                               271 Cadman Plaza East
22                             Brooklyn, New York 11201
                               BY:  ERIN ARGO, ESQ.
23                                  TANYA H. HAJJAR, ESQ.
                                    GILLIAN KASSNER, ESQ.
24                                  Assistant United States Attorneys

25
```

555

```
 1        A P P E A R A N C E S    (CONTINUED)

 2
          For the Defendant       SUSAN G. KELLMAN, ESQ.
 3        José Miguel             25 Eighth Avenue
          Melendez-Rojas:         Brooklyn, New York 11217
 4

 5        For the Defendant       M. GOLUB PLLC
          José Osvaldo            225 Broadway
 6        Melendez-Rojas:         Suite 1515
                                  New York, New York 10007
 7                                BY:  MITCHELL A. GOLUB, ESQ.

 8
          For the Defendant       THOMAS F.X. DUNN, ESQ.
 9        Rosalio                 225 Broadway
          Melendez-Rojas:         Suite 1515
10                                New York, New York 10007

11
          For the Defendant       MICHAEL H. GOLD, ESQ.
12        Francisco               350 Fifth Avenue
          Melendez-Perez:         Suite 6800
13                                New York, New York 10118

14
          For the Defendant       MICHAEL HUESTON, ESQ.
15        Abel                    16 Court Street
          Romero-Melendez:        Suite 1800
16                                Brooklyn, New York 11241

17                                       AND

18                                LAW OFFICES OF JACQUELINE E. CISTARO
                                  11 Broadway
19                                Suite 615
                                  New York, New York 10004
20                                BY:  JACQUELINE E. CISTARO, ESQ.

21        Court Reporter:         DAVID R. ROY, RPR
                                  225 Cadman Plaza East
22                                Brooklyn, New York 11201
                                  (718) 613-2609
23                                drroyofcr@gmail.com

24
          Proceedings recorded by Stenographic machine shorthand,
25        transcript produced by Computer-Assisted Transcription.
```

Proceedings                                    556

1              P R O C E E D I N G S

2                      --oo0oo--

3

4         (In open court; outside the presence of the jury.)

5         THE COURT:  All right.  Are all the lawyers here,

6    Mr. Dunn?

7              MR. DUNN:  It looks like it.

8              THE COURT:  Okay.

9              MR. DUNN:  Your Honor, I have an application about

10   the timing of the trial.  My understanding from the

11   Government that they believe they'll finish their case a

12   week from today.  I just would note, and I think this is

13   going to continue throughout the trial, is that

14   the Government takes most of the day and then we get up

15   around 4:00 and the jury stays until about 6:00, and I'm

16   concerned that they may feel that we're the ones that are

17   extending the trial or they may hold that against us.  And

18   all I'm saying is now because it looks very good that we'll

19   finish their case by Thursday, I would just make the

20   application that we work every day until 5:00.

21             THE COURT:  I'm going to wait and see.

22             MS. KELLMAN:  Sounds very judicial.

23             MR. DUNN:  Thank you, Your Honor.

24             (Pause in proceedings.)

25             MR. GOLD:  Judge, do I have two minutes or are

1    they coming out?

2              THE COURT:  I'm sorry?

3              MR. GOLD:  Is the jury coming out now or do I have

4    two minutes?

5              THE COURT:  Would you repeat that.

6              MR. GOLD:  I'm sorry.  Is the jury coming out now

7    or do I have two minutes?

8              THE COURT:  Is the jury here?

9              THE COURTROOM DEPUTY:  Yes.

10             THE COURT:  Is everybody ready?

11             MR. HUESTON:  Just one moment, Your Honor.  Thank

12   you.

13             (Pause in proceedings.)

14             MR. HUESTON:  Thank you for your patience, Judge.

15             THE COURT:  Yes, why don't we have the witness on

16   the stand?

17             (The witness approaches the stand.)

18             MS. ARGO:  The interpreter has a correction from

19   something yesterday and she asks that she could state --

20             THE COURT:  Yes, when the jury comes in.

21             THE COURTROOM DEPUTY:  Can the interpreters please

22   raise their right hand.

23             (The interpreters are sworn.)

24             THE COURTROOM DEPUTY:  Please state your name for

25   the record.

Proceedings                                                    558

1              INTERPRETER SONIA BERAH:  Sonia Berah.

2              INTERPRETER ELIZABETH CARUSO:  Elizabeth Caruso.

3              INTERPRETER ROSSANA TESTINO-BURKE:  Rossana

4     Testino-Burke.

5              INTERPRETER GABRIEL MITRE:  Gabriel Mitre.

6              THE COURTROOM DEPUTY:  Thank you.

7              THE COURT:  We're going to get the jury.

8              (Pause in proceedings.)

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury enters the courtroom.)

11             (Jury present.)

12             THE COURT:  Everyone be seated, please.

13             Good morning, ladies and gentlemen.

14             THE JURY:  Good morning.

15             THE COURTROOM DEPUTY:  I just want to remind you

16    you're still under oath.

17             THE WITNESS:  Thank you.

18             THE COURT:  Mr. Golub.

19             MS. ARGO:  Your Honor, we wanted to --

20             THE COURT:  Oh, yes.  One thing.

21             Go ahead.

22             INTERPRETER SONIA BERAH:  Your Honor, at the end

23    of the day there was a term "matron of honor," and after

24    some research, a more accurate term would be "Bible bearer."

25             THE COURT:  Thank you.

1    **M A R I A   R O S A L B A**,

2        called as a witness, having been previously duly

3        sworn, was examined and testified as follows:

4    CROSS-EXAMINATION (CONTINUED)

5    BY MR. GOLUB:

6    Q    Maria, before I started speaking to you, asking you

7    questions yesterday, had we ever spoken before?

8    A    No.

9    Q    But you've spoken to agents of the Government many

10   times; is that correct?

11   A    Yes.

12   Q    How many meetings have you had with the agents?

13   A    I don't know exactly.  I've met several times.

14   Q    Was it more than five?

15   A    Yes.

16   Q    Was it more than ten?

17   A    Yes.

18   Q    How long did these meetings go on for?

19   A    Sometimes 3, 4 hours.

20   Q    Sometimes meetings of 3 or 4 hours; is that correct?

21   A    They didn't all last the same amount of time, but yes,

22   approximately.

23   Q    Were people taking notes?

24   A    There were people with notebooks.  I didn't see whether

25   or not they were taking notes.

1  Q     Were any of the people at the Government table in these

2  meetings?

3  A     Yes.

4  Q     Where there other agents as well?

5  A     Yes.

6  Q     In total, how many people have you spoken to?

7  A     At the meetings, well, three or four people.  But they

8  weren't always the same people.

9  Q     How many different people have you spoken to?

10 A     I don't remember.  I don't remember exactly how many.

11 Q     More than ten?

12 A     Maybe, yes.

13 Q     In addition you've also spoken to people at the MEXICAN

14 CONSULATE; is that correct?

15 A     Yes.

16 Q     And you've had a number of meetings there as well; is

17 that correct?

18 A     I just met with them on one occasion.

19 Q     And did you talk to them about an asylum application

20 that you wanted to make in the United States?

21 A     I didn't speak to them about anything regarding

22 immigration.  They just came to hear my story.

23 Q     Okay.  And you have other people, attorneys that are

24 helping you now working for a permit and things; is that

25 correct?  Work permit, among other things?

1   A     The association that I work with provided a lawyer and

2   she is the one who submitted the application for my work

3   permit.

4   Q     And is she also seeking a -- an asylum petition for

5   you?

6   A     I don't know.

7   Q     Well, isn't it a fact that you're making a claim that

8   you were a victim of sex trafficking and on that basis you

9   should not be deported back to Mexico; isn't that correct?

10  A     I don't know.  She just helps me with my work

11  authorization.

12  Q     Now, going back to a time when you first started to

13  live with Mr. José Osvaldo.  You indicated that he told you

14  that it would be good for you to exercise; is that correct?

15  A     He would make me workout.

16  Q     Well, we -- we saw some photos that you identified,

17  including one of them without his shirt on, I guess I would

18  call it like a muscle picture.  Do you remember that photo?

19  A     Those photographs were in the United States.

20  Q     Right.

21  A     Yes.

22  Q     But he clearly was very fit; would you agree?

23  A     Yes.

24  Q     Yeah.

25        He exercised a lot; is that correct?

1  A    He always worked out because he didn't do anything

2  else.

3  Q    Did he workout in Mexico while you were there with him?

4  A    He worked out at his house.

5  Q    Okay.  And so he wanted you to workout and he also

6  wanted you to eat healthy; is that correct?

7  A    He would tell me what to eat because he didn't want me

8  to be ugly and fat.

9  Q    Well, didn't you tell me -- excuse me.

10         Didn't you tell the Government and the jury that

11  when he met you he told you that he thought you were

12  beautiful and that he liked your body, you had a nice body?

13  A    Obviously, because he was trying to make me fall in

14  love with him.

15  Q    Well, that was the same body you had when you lived

16  with him a month later; am I right?

17  A    Well, obviously.  I mean, obviously if somebody tells

18  you that you're ugly and horrible nobody's going to like

19  that.  Who is going to like a person who offends you like

20  that?

21  Q    That's not my question to you.  My question is, you had

22  the same body when he met you as you did a month or two

23  later when you were living with him; am I right?

24  A    Yes.

25  Q    Now, did you share a bed with him every night?

1    A    Yes.

2    Q    And you had regular sexual -- regular sexual relations;

3    is that correct?

4    A    We had sex.  It wasn't always when I wanted to.

5    Q    But it wasn't as though he said, I'm repelled by you

6    and he never had sex with you and he kicked you out of the

7    bed and said sleep on the floor; nothing like that ever

8    happened; is that correct?

9    A    When we slept in the same bed, he would make me.  He

10   would force me to take off my clothes.  He wanted to have

11   sex with me.  He didn't let me sleep on the floor.

12   Q    Okay.  So it doesn't sound like somebody that was

13   repelled by your appearance if he wanted you to take your

14   clothes off so he could see you naked and have sex with you;

15   would you agree with me?

16   A    He just wanted to have sex.

17   Q    With you, not with somebody else?

18   A    I don't know if he had sex with other people.  He would

19   always leave, lock -- leave the door --

20                INTERPRETER ELIZABETH CARUSO:  Correction.

21   A    He would always leave at night, lock me in.  I don't

22   know where he went at night.

23   Q    I thought you said he spent the night with you and

24   slept in the same bed with you?

25   A    Of course.  He would come in at 2:00 or 3:00 in the

Maria Rosalba - Cross - Golub                 564

1    morning.

2    Q    Okay.  Now, you testified yesterday on direct

3    examination regarding going to Mexico City; do you remember

4    that?

5    A    Yes.

6    Q    And I thought your testimony was that you got there,

7    you had no idea what -- what you were doing there, and then

8    you slowly started to understand in the last few moments

9    before you met the lady that was apparently supposed to help

10   you meet customers; was that your testimony?

11   A    Yes.

12   Q    You remember being interviewed by the MEXICAN

13   CONSULATE.  I asked you that before.  Do you recall that?

14   A    Yes.

15   Q    And do you remember you said that you told them about

16   what had happened to you, all your experiences?

17   A    Yes.

18   Q    And did you include in that telling them about what

19   happened with you in Mexico City?

20   A    I don't remember everything I told them.

21   Q    Well, do you recall talking to them about the fact that

22   you had conversations before you had went to Mexico City

23   talking about prostitution and that women could make a lot

24   of money doing that; do you remember that?

25   A    I don't remember that.

Maria Rosalba - Cross - Golub                565

1    Q    Well, do you remember that you said that you rode over

2    with, among other people, a female with a slim build, lady

3    blond hair, fair skin, about 23 years old; do you remember

4    telling them that?

5    A    I remember the girl.

6    Q    And do you remember having a conversation with her in

7    the car ride over about as a prostitute you could make very

8    good money?  Do you remember -- do you remember telling the

9    people at the MEXICAN CONSULATE that?

10   A    I told them -- I didn't tell them I spoke to that girl,

11   because she was with the person who was driving.  She was

12   sitting up front, I couldn't have any conversation with her.

13   Q    Did you -- did you describe her as the driver, she was

14   his compadre -- rather the woman was -- the driver was her

15   compadre?

16   A    They would refer to each other, the man driving,

17   included, as compadres, good friend.

18   Q    All right.

19         And you don't -- you -- you didn't tell the people

20   at the MEXICAN CONSULATE that she turned around and spoke to

21   you and talked about the money you could make as a

22   prostitute.  You don't recall telling them that at the

23   MEXICAN CONSULATE?

24   A    The girl was asleep.

25   Q    You had a 15-page declaration regarding your -- your

1   meeting with them; do you remember that?

2   A    I don't know how many pages it was.

3   Q    Well, do you remember -- do you remember a long

4   document if I show -- if I showed you something, maybe it

5   would refresh your recollection?

6            THE COURT:  This is not going to be shown to the

7   jury.

8            INTERPRETER ELIZABETH CARUSO:  Your Honor, by the

9   interpreter, if the attorney is going to read from a long

10  document, do you think we could have a copy.

11           THE COURT:  We're going to do it on the Elmo.

12           MR. GOLUB:  Okay.

13  Q    I'm showing you what has been previously marked as

14  Government's Exhibit 3500 Maria 12-S.

15           Do you recognize what I'm showing you?

16  A    Yes.

17  Q    This is a document that was created with regard to your

18  meeting at the MEXICAN CONSULATE; is that correct?

19  A    Yes.

20  Q    On March 10th, 2016.  I think it says so on the first

21  page; is that correct?

22  A    The date is there.  I don't remember the date, but it

23  did happen.

24  Q    Okay.  And the document runs 15 pages, single spaced.

25  Do you see the page -- I'm turning to Page 15; is that

1    correct?  Do you recall that now?

2    A    Yes.

3    Q    And among the people present at that meeting was there

4    a Juan Carlos Rodriguez Muñoz who was a *segundo secretario*?

5    A    There were lots of people there.  I don't remember

6    everybody's name.

7    Q    All right.  But there were at least four people there,

8    three of whom, plus you, signed this document; is that

9    correct?

10   A    Yes.

11   Q    So this document was created based upon the interview

12   that you -- you gave to the MEXICAN CONSULATE on that date;

13   is that correct?

14   A    Yes.

15   Q    And you reviewed the document, which was prepared in

16   Spanish; is that correct?

17   A    I didn't really review it, because my daughter was with

18   me.  She was very young, so I did not review it carefully.

19   Q    Was your daughter with you in the meeting or did

20   someone else stay with her while you met with these agents

21   of the Mexican Government?

22   A    She came with me to the MEXICAN CONSULATE.  She was

23   with me for the whole time because it was around March and

24   so she was about a month old.  I was breastfeeding her, so

25   she was with me the whole time.

Maria Rosalba - Cross - Golub                    568

1    Q    Okay.  And then did they give you breaks so you could

2    breastfeed her and take care of her and nobody helped you

3    with the baby?

4            MS. ARGO:  Your Honor.

5            THE COURT:  Yes.  Can we -- I don't know how

6    that's relevant.

7            Could you just move on and get to the point.

8    Q    My point is that you met with them for how many hours

9    on that day?

10   A    For approximately 11 hours.

11   Q    I assume there were breaks taken?

12   A    Of course.  My daughter would cry and I had to take

13   care of her so that she would be comfortable.

14   Q    Okay.  And they'd let you do that?

15   A    Yes.

16   Q    And then you would continue afterwards?

17   A    Yes.

18   Q    And I assume you stopped to eat?

19   A    Yes.

20   Q    And you stopped to use the bathroom?

21   A    Yes.

22   Q    And at the end, they prepared this 16-page document in

23   Spanish which they gave you to look at and review; is that

24   correct?

25   A    Of course I signed because I wanted to go home, I

1    wanted to rest.

2    Q    Well, you were there because you were there to get

3    their help; is that correct?  You gave a statement about

4    what you say had happened to you?

5    A    I was giving my statement.  I was telling my truth.

6    What I remembered at that moment.

7    Q    So my question to you is:  It was important to you that

8    you get that done as accurately as possible?

9    A    Yes.

10   Q    It wasn't the police, these were people there to help

11   you?

12   A    There were police from the MEXICAN CONSULATE.

13   Q    But they weren't there to arrest you; is that correct?

14   A    No, they weren't there to arrest me.

15   Q    No.  They were there to help you; is that right?

16   A    Yes.

17   Q    So it was important to make the statement as accurate

18   as possible; is that right?

19   A    Yes.

20   Q    And the statement at the end of it you swore that

21   everything you said in there was the truth before you signed

22   and you -- you swore to the truth of it before you signed

23   it; isn't that true?

24   A    Yes.

25   Q    So in that statement when you said that on the ride

1   over to Mexico City this blond, tall, slim woman was talking

2   to you about the benefits of the money you could make in

3   prostitution, that's what you had said; isn't that correct?

4   A    Well, perhaps if I said it, I don't remember it

5   exactly.

6   Q    All right.

7        The point is that before you ever got to Mexico

8   City, you knew what you were going there for.  Would you

9   agree?

10  A    The girl explained -- she said what we had to do when

11  we were in Mexico City.  Once we were in Mexico City, she

12  took me to the hotel room and told me.

13  Q    Didn't you say that she told you that on the ride over?

14  A    I don't understand your question.

15  Q    The question is, this is not things that she told you

16  after you arrived in Mexico City.  These were things that

17  you were told on your ride to Mexico City before you ever

18  got there.  That's correct?

19  A    I don't remember actually how things happened, how

20  things transpired.

21  Q    You had brought the clothing that you were going to

22  wear in Mexico City before you even got in the car for the

23  ride to Mexico City; isn't that true?

24  A    José Osvaldo went to buy that clothing.

25  Q    Right.  And you had a discussion with him about the

Maria Rosalba - Cross - Golub                571

1    fact that you were going to work as a prostitute in Mexico

2    City?  This is before you ever made the trip.

3               MS. ARGO:  Your Honor --

4               THE COURT:  Yes, where does that come from?

5               MS. ARGO:  I can certainly explain at sidebar, if

6    you would like.

7               THE COURT:  Yes.

8               (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          THE COURT:  Okay.  Just one second.

3          MS. ARGO:  Your Honor, the witness has already

4    testified that she does not recall.  She has testified that

5    she had a one-month old child with her at the time that the

6    statement was signed, and that she did not review it

7    carefully.  She has already testified that as to her

8    recollection, she was not told until Mexico City.

9          These are you all things that Mr. Golub has

10   already elicited.  He is now asking the same questions over

11   and over again in an attempt to wear the witness down and to

12   get her to agree.  It is improper.

13         MR. GOLUB:  Judge, I respectfully disagree with

14   learned counsel.

15         I have a witness statement from her, and that

16   everything I'm saying here comes from the written statement

17   that I have now confirmed with her that they had an 11-hour

18   meeting.  It was prepared in Spanish.  She review it, to the

19   extent that she did.  She swore to the truth of it.  And now

20   I'm taking portions of that to refresh your recollection as

21   to what she said four years ago.

22         MS. ARGO:  But she told you.

23         THE COURT:  Okay.  Can you do this a little -- you

24   know, have the interpreter translate it and say, Does that

25   refresh your recollection --

Sidebar Conference                         573

1             MR. GOLUB:  Fine.

2             THE COURT:  -- and then move on?

3             MR. GOLUB:  Okay.

4             THE COURT:  Okay?

5             MR. GOLUB:  But the problem is, Judge, I go to

6    English.  I don't know specifically in Spanish where it is

7    because I don't speak Spanish.

8             THE COURT:  Well, why don't you tell the

9    translator where the lines are that you want read.

10            MR. GOLUB:  Okay.

11            THE COURT:  Okay?

12            MR. GOLUB:  Fine.

13            THE COURT:  Or she also has her computer there

14   that she can see.  Put it under the Elmo and point to the

15   line you want her to read and ask her the question, Does

16   that refresh your recollection.

17            MR. GOLUB:  Fine.  Thank you.

18            (Continued on the next page.)

19

20

21

22

23

24

25

Maria Rosalba - Cross - Golub                    574

1              (Sidebar ends; in open court.)

2              MR. GOLUB:  All right.  This is for the

3    interpreter.  Starting with Page 7 or --

4              INTERPRETER SONIA BERAH:  The interpreter needs to

5    hear you also.

6              MR. GOLUB:  All right.

7              INTERPRETER SONIA BERAH:  Thank you.

8              THE COURT:  Page 3500 Maria 12 of the English

9    version.

10             INTERPRETER ELIZABETH CARUSO:  English version?

11             INTERPRETER SONIA BERAH:  I only have a Spanish

12   version.

13             MR. GOLUB:  I put it up on the Elmo.

14             INTERPRETER SONIA BERAH:  Oh, okay.

15             MR. GOLUB:  Are you all set?

16             INTERPRETER SONIA BERAH:  Can you find -- is it

17   Page 12. /

18             MR. GOLUB:  Page 7.

19             INTERPRETER SONIA BERAH:  Page 7.

20             MR. GOLUB:  It's Maria 12-007, double 07.

21             INTERPRETER SONIA BERAH:  Thank you.

22             MR. GOLUB:  José Osvaldo, end of first line.

23             (Interpreter reading in Spanish.)

24   Q    Do you see that?

25   A    Yes.

1    Q    All right.  So José Osvaldo got angry asking me if I --

2              THE COURT:  Don't read from it.  Ask her to read

3    it -- ask the interpreter to interpret it or ask her to read

4    it in Spanish.

5              MR. GOLUB:  All right.  Judge, it would be easier

6    if I could just point to the interpreter for a second, point

7    out the line to read.  Can I do that?

8              THE COURT:  Yes.

9              (Pause in proceedings.)

10             THE COURT:  Would you just do it from the Elmo?

11   Put it on the screen and point it out, the interpreter can

12   see it.

13             INTERPRETER SONIA BERAH:  Your Honor, the

14   interpreter requests that we are able to read from the

15   Spanish so that we're not interpreting from English.

16             THE COURT:  That's fine.

17             So if you could find the line in the Spanish

18   version and read the Spanish version.

19             MS. ARGO:  Your Honor, actually can we just have a

20   sidebar on this?

21             THE COURT:  Yes.

22             MS. HAJJAR:  I'm sorry.

23             (Continued on the next page.)

24

25

1          (The following occurred at sidebar.)

2          MS. ARGO:  So Your Honor, one of the issues here

3  might well be the fact that this document was translated

4  from Spanish into English and very, very poorly.

5          THE COURT:  Oh.

6          MS. ARGO:  And in fact, that the issue is going to

7  be that the Spanish version may well reflect something

8  different than what the English version reflects.

9          And then Mr. Golub wants to read the English

10  version back to her.  It makes sense actually to translate

11  that back into Spanish for her, and what she --

12          THE COURT:  If that's what the problem is going to

13  be --

14          MS. ARGO:  Very well may say that that is

15  different than what it says in Spanish.

16          THE COURT:  Okay.  That's fine.

17          MS. ARGO:  She should compare -- she should

18  actually probably compare.

19          THE COURT:  Don't read it out loud.  Have the

20  translator translate --

21          MS. ARGO:  Just point to the trans --

22          MR. GOLUB:  That's what I would like to do.  I

23  would like to get the translator to --

24          MS. ARGO:  Just point to it on the Elmo.

25          THE COURT:  Right.

1          MS. ARGO:  She'll read it.

2          MR. GOLUB:  All right.

3          THE COURT:  Yeah.

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar ends; in open court.)

2          THE COURT:  I'm going to ask the translator, I

3   know this is unusual, to translate from the English version

4   rather than from the Spanish.

5          INTERPRETER ELIZABETH CARUSO:  Thank you.

6          MR. GOLUB:  Starting from where I'm pointing.

7          INTERPRETER ELIZABETH CARUSO:  Here?

8          MR. GOLUB:  From the first line.

9          INTERPRETER SONIA BERAH:

10         (Interpreter translating to the witness.)

11         MR. GOLUB:  Okay.

12  Q    Does that refresh your recollection as to the sequence

13  of events leading up to you going to Mexico City to be a

14  prostitute?

15  A    Yes, it refreshes my memory.

16  Q    All right.  So the sequence was that you and José spoke

17  about this first, that prostitutes can make good money; and

18  you agreed that you would do that, and that afterwards --

19         MR. GOLUB:  Why don't you translate that.

20  Q    -- and then after that, you went -- or he went and

21  bought some lingerie for you, and after that you drove down

22  to Mexico City and during the trip down there the slim blond

23  woman was describing to you the good money you could make in

24  prostitution.  And all those events took place before you

25  ever got to Mexico City; isn't that correct?

1  A    He threatened for me to go.  Before we went he

2  threatened me.  It was true, he knew where my family lived

3  and he could hurt them.

4  Q    Well, that's -- that's not what I'm asking you.

5        What I'm asking you is did you -- did you know and

6  did you agree to be a prostitute before you ever even got in

7  the car to go to Mexico City.

8        That's a yes-or-no question.

9  A    I can't answer with a yes or no.  I want to answer your

10  question, but not with just a yes or no.

11       THE COURT:  Go ahead and answer the question.

12  A    I was young.  I didn't know Mexico City.

13       MR. GOLUB:  Move to strike, not responsive,

14  Your Honor.

15       THE COURT:  I'm going to wait and hear the answer.

16  If it's not responsive I'll strike it.

17  A    He had threatened me.  He knew where my family lived.

18  He could hurt me any way he wanted to.  And any way you look

19  at it, I had to agree, I was afraid.

20  Q    My --

21  A    I was afraid for myself, I was afraid for my family.

22       MR. GOLUB:  Okay.

23       THE COURT:  Okay.

24  A    I agreed.

25       THE COURT:  One second.

Maria Rosalba - Cross - Golub                580

1              We're going to take about a ten-second break and

2       the court reporter's going to help me.

3              (Pause in proceedings.)

4       Q    My point is, that you agreed that you were going to do

5       this before you ever left for Mexico City; isn't that

6       correct?

7              THE COURT:  Asked and answered.

8              MR. GOLUB:  Okay.

9       Q    Yesterday you testified that you were surprised and

10      only slowly started to realize what was happening after you

11      were literally at the marketplace; do you recall testifying

12      about that?

13             THE COURT:  Okay.  Don't answer the question.

14             (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1           (The following occurred at sidebar.)

2           MS. ARGO:  The witness has already testified that

3  her recollection has been refreshed.  Mr. Golub made the

4  point that, perhaps, she learned of this before they left

5  for Mexico City.  She explained what had happened.  The

6  point has been made.  I'm not really sure what --

7           MR. GOLUB:  Well, the point that I'm --

8           THE COURT:  There's something about recycling that

9  you tend to do --

10          MR. GOLUB:  No.  The point was --

11          THE COURT:  -- when you make your point one way,

12 and then you --

13          MR. GOLUB:  No.  The point is --

14          THE COURT:  -- decide to then make it another way.

15          MR. GOLUB:  No.  The point is that she lied

16 yesterday, and that's the necessary -- I want the jury to

17 get the point.

18          MS. ARGO:  No, her recollection -- she did not

19 lie.  She just told you she didn't remember, and then you

20 showed her a document and it refreshed her recollection.

21          MR. GOLUB:  No.  She made this whole thing up

22 about, Oh, it slowly dawned on me.  She's clearly lying,

23 Judge, and the jury has to know that.  I mean, her

24 credibility is the only issue in this case.

25          THE COURT:  I know that her credibility is

Sidebar Conference                       582

1    important.  But you do circle back.  You try to make the

2    same point over and over and over again starting at a

3    different place just going back, and your cross-examination

4    could go all day this way.

5              MR. GOLUB:  All right, Judge.

6              THE COURT:  Please.

7              MS. KELLMAN:  May we just ask one question?

8              MR. GOLD:  Your Honor, I appreciate what you're

9    saying, and I was guilty of it myself.  But I don't want you

10   to keep in mind, this --

11             THE COURT:  I know the credibility is very

12   important.

13             MR. GOLD:  But beyond that.  Each of the witnesses

14   tend to give speeches rather than answers, and they go well

15   beyond any question that's asked either on direct or on

16   cross.

17             THE COURT:  Well --

18             MR. GOLD:  Okay.  That's the way they talk.

19             THE COURT:  -- they tend to explain their answers.

20             MR. GOLD:  Well, and that's what encourages

21   follow-up questions, which tend to be repetitious because

22   you have to get back to where you started to make the point

23   that you're trying to make.

24             THE COURT:  Well --

25             MR. GOLD:  So I appreciate what you're saying, but

Sidebar Conference                          583

1    I want you to understand what our difficulty is with these

2    witnesses.

3              MS. KASSNER:  Your Honor, if I may very briefly?

4              Some of the questions are narratives, as well.

5              THE COURT:  Yes, they really go on and on and on.

6              MR. GOLUB:  Judge, could I just offer this

7    portion, that she has adopted now as a prior inconsistent

8    statement?

9              MS. ARGO:  Your Honor, she said -- no.  She said

10   that she couldn't recall; that her recollection was first

11   that the woman was asleep.  He refreshed her recollection

12   with the document.  She said, I do recall this now, and then

13   she explained the circumstances under which it occurred.

14   There is nothing else to do.

15             THE COURT:  That was my understanding of the

16   testimony.

17             MS. ARGO:  There is nothing else to impeach.

18             THE COURT:  I know you want it to be different --

19             MR. GOLUB:  Well --

20             THE COURT:  -- but that was my understanding of

21   the testimony.

22             MR. GOLUB:  -- Judge --

23             MS. ARGO:  You've refreshed her recollection, and

24   that was entirely appropriate, and it had the effect that

25   you requested or wanted.

Sidebar Conference                        584

1          MR. GOLUB:  All right.  Then I will move on,

2   Judge.

3          (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Sidebar ends; in open court.)

2           THE COURT:  Don't answer the last question.

3           MR. GOLUB:  Judge, I think maybe we need a break

4   for the witness because it looks like she's a little

5   distraught.

6           THE COURT:  We'll take a few minutes if she wants,

7   but I don't think she needs a break.

8           MR. GOLUB:  All right.

9           THE COURT:  You just let us know when you're ready

10  and we'll start back.  All right?

11          (Pause in proceedings.)

12          THE WITNESS:  I'm okay.  We can continue.

13  BY MR. GOLUB:

14  Q    Now, after you arrived in Mexico City you said you went

15  to market and you met with the older lady; do you remember

16  that?

17  A    Yes.

18  Q    And she looked at your paperwork and she saw that you

19  were from, what was it, Tenancingo?

20  A    The Tenancingo address was on the ISE card that I had.

21  Q    Right.

22          And when she saw that, she said, No more girls

23  from Tenancingo, so you're not going to work here.

24  A    Yes, because she told me I looked young and she didn't

25  want any trouble.

1   Q    But you were of legal age at that point, weren't you?

2   A    Of course I was.  But I looked young.

3   Q    So you didn't -- you didn't get to work there; is that

4   correct?

5   A    That's correct.

6   Q    And sometime later you made several attempts to go to

7   the United States that we talked about yesterday; do you

8   remember that?

9   A    Yes.

10  Q    And wasn't it, in fact, you were going there to try and

11  do what you were unsuccessful in doing in Mexico City was to

12  work as a prostitute because it was a way to make good

13  money?

14  A    I came to the United States.  I was going to go to the

15  United States because José Osvaldo told me we were going to

16  be going to the United States and I was going to work in an

17  African market.

18  Q    So you were going to work as a prostitute in Mexico

19  City but now in the United States you were going to go work

20  in an African market; is that what you're telling the jury?

21  A    José Osvaldo said we were going to work in an African

22  market, and that was where his brother worked.

23  Q    This is even though you had all these clothing, the

24  lingerie and other things, that you were going to use to

25  work as a prostitute in Mexico City; is that right?

Maria Rosalba - Cross - Golub                587

1           THE COURT:  Sustained.

2    Q    When you get to the United States, and you start to

3    work as a prostitute, you were given a cell phone?

4    A    Yes.

5    Q    And you were away from José Osvaldo what, 18 or

6    19 hours a day, on a 24-hour day?

7    A    I was with a delivery guy.

8    Q    You weren't with José Osvaldo?

9    A    José Osvaldo would get in touch with me through the

10   delivery guys.

11   Q    That's not my question --

12   A    He knew, they know José Osvaldo.

13   Q    That wasn't my question to you.

14          My question was, how many hours a day were you not

15   seeing José Osvaldo?  For example --

16          THE COURT:  Well --

17          MR. GOLUB:  Fine.

18          THE COURT:  Just break it.

19          MR. GOLUB:  Yeah, that's fine, judge.

20   A    From 9:00 until 3:00 in the morning.  I would see him

21   when I finished my first shift.

22   Q    And the first shit you said was from 9:00 a.m. to

23   6:00 p.m.; is that what you said?

24   A    Yes, that's correct.

25   Q    So that was nine hours that you weren't with him.  And

Maria Rosalba - Cross - Golub                588

1    the second shift started at, what, 7:00 p.m. and that's --

2    A    Yes.

3    Q    And that you said went to 3:00 a.m.?

4    A    Yes.

5    Q    So that's another, what, eight hours?

6    A    Yes.

7    Q    So that's 17 hours out of 18 hours you weren't with

8    him; is that right?

9    A    Yes.

10   Q    And you had the cell phone?

11   A    I had a cell phone.

12   Q    And you could make calls on that cell phone?

13   A    José Osvaldo told me I couldn't use that phone to make

14   any kind of calls.  Because he told me his brother -- well,

15   it was theirs it had limited time.  They would know all of

16   the calls I made on it and everything I did with it.

17   Q    You've used cell phones since you've lived in Mexico

18   City -- or excuse me, back in Mexico, rather; is that

19   correct?

20   A    Of course.  I didn't know -- well, many in Mexico

21   people say, you know, in the United States, the way it

22   works -- well, people here can't call Mexico, they just

23   can't call Mexico because the calls are very expensive.  So

24   it wasn't easy for us to call Mexico.  It wasn't -- we

25   didn't know how to dial -- I don't know to call.

Maria Rosalba - Cross - Golub                589

1   Q    You didn't know how to make a call on a phone?

2   A    No.  Because we -- if I just dialled the number, the

3   call wouldn't go through.  We needed other numbers, which I

4   didn't know.

5   Q    Now the cell phone you had, I assume it had a camera on

6   it?

7   A    It was a small blue phone.

8   Q    Did it have a camera?

9   A    I don't remember.

10  Q    When you took a picture of the Western Union receipt,

11  did you take it with your phone camera?

12  A    No.

13  Q    What did you take it with?

14  A    Veronica had a different phone.

15  Q    Hers had a camera?

16  A    It did have a camera.  And then she sent that photo to

17  me as a text message.

18  Q    And you knew how to receive it that way?

19  A    It was a text message.

20  Q    Okay.

21       Now, you say there came a time when José Osvaldo

22  went back to Mexico; is that correct?

23  A    Yes.

24  Q    Before he went back to Mexico, you and he had a fight;

25  isn't that correct?

Maria Rosalba - Cross - Golub                590

1    A    Yes.

2    Q    And in that fight, you confronted him with the fact

3    that it was a Western Union receipt that you saw showing a

4    woman sending money apparently to him; isn't that correct?

5    A    He had sent money to a woman.

6    Q    Okay.  This is the receipt that had the photo of --

7    that was texted to you by Veronica; is that right?

8    A    Yes.

9    Q    And you got angry at him?

10   A    Yes.

11   Q    And you were so angry, you told him, Get out of this

12   apartment.  I don't want to see you.  Get out of here; isn't

13   that correct?

14   A    I was working in New Jersey.  I went to work that day.

15   And I told him everything, but our argument was over the

16   phone.

17   Q    You threw him out.  You told him to get out of the

18   apartment; isn't that correct?

19   A    I don't remember.

20              (Continued on the next page.)

21

22

23

24

25

1    (Continuing.)

2              MR. GOLUB:  All right.  Judge, we'll do this the

3    same way again.  I'm going to refer to page 14 of 3500 Maria

4    12, page 14.  I have my English version.

5              THE COURT:  Okay.  Why don't you put your English

6    version under the ELMO just for --

7              MR. GOLUB:  I'm going to highlight the part.  Just

8    give me a second, Judge.

9              (Pause.)

10             MR. GOLUB:  Okay.  Can you see it?

11             THE INTERPRETER:  Mr. Golub, this is the same

12   exhibit from before?

13             MR. GOLUB:  It is.  This is page 14.  I'm

14   highlighting the first bracket.  Can you see that?

15             THE INTERPRETER:  Yes.

16             MR. GOLUB:  Here's the second bracket.

17             (Interpreter reading document.)

18   A    In that version, it says that it was October of 2012, but

19   at that moment, I was no longer working as a sex worker.  I no

20   longer lived in Queens.  I don't know who translated this

21   page.

22   Q    It's the translation from the same Mexican Consulate, the

23   same 15-page document that you signed under oath.  Let's

24   assume that the year is wrong, it's not October 2012, it's

25   October 2011.  Does the rest of the version there refresh your

1   recollection that you threw José Osvaldo out of the apartment

2   after confronting him about the Western Union wire?

3           MS. ARGO:  Your Honor, we are now saying we are

4   going to assume certain things are true or not.

5           THE COURT:  Sidebar.

6           (Sidebar.)

7           (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                              593

1        (Sidebar conference held on the record out of the

2   hearing of the jury.)

3        MS. ARGO:  Your Honor, what Mr. Golub is trying to

4   do is have the witness adopt the document that he has now

5   conceded is inaccurate.  She's made clear she was not with him

6   in October 2012, and she says I don't know who translated this

7   page --

8        THE COURT:  I would think if what she's -- there's

9   clearly inaccuracy in the document.  By the same token, the

10  document may or may not refresh her recollection as to whether

11  she said something, whether she told Osvaldo to get out of the

12  apartment.  The answer probably should be no, but I don't

13  know.

14       MS. ARGO:  The only issue we're having is that

15  Mr. Golub is saying on one hand this is a sworn statement,

16  this is true; and on the other hand --

17       THE COURT:  I know --

18       MR. GOLUB:  If it's a typo in the document, Judge --

19       THE COURT:  I understand.  What I'm responding to is

20  something that wasn't said, which is your explanation to the

21  jury, this is the same document that was translated by the

22  embassy.  I mean, you --

23       MR. GOLUB:  She asked me what was this.  I'm telling

24  you where it came from.

25       THE COURT:  I'm telling you, you are the lawyer, you

1    don't answer these questions.  Okay?

2              MR. GOLUB:  Okay.  Judge.

3              (Sidebar end.)

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                                595

1           (In open court.)

2           THE COURT:  Okay.  We will take a five-minute break.

3           (Jury exits.)

4           (A recess in the proceedings was taken.)

5           MR. HUESTON:  Your Honor, there's just one issue I

6    wanted to address, and I talked to the Government about it

7    yesterday and today.

8           There appears to be, I believe, a lawyer for the

9    witness who is here, and yesterday there was a time, you know,

10   where she made a gesture that Mr. Cistaro saw, it was a thumbs

11   up, and there was another time where she sort of was making --

12   moving or gesticulating while the witness was here in the

13   presence -- with the jury.  I don't know if the jury saw

14   anything, but I have been, sort of --

15          THE COURT:  Are you saying that the lawyer was

16   gesticulating?

17          MR. HUESTON:  Yes.  I'm not casting any negative

18   aspect.  It could be emotional.  I don't know what the basis

19   is.  I've asked the prosecutors to talk with her about that.

20   She's an officer of the court and she should comport herself

21   appropriately, but I do think that -- I've spoken to counsel

22   on our side, and they do think it's appropriate I make a

23   record now.  We did talk to the prosecutor yesterday about it,

24   and then again at 10:45 this morning it happened again, and

25   so -- and this may happen again with other witnesses coming in

1   with lawyers who are advocates for them, and just to make --

2   to make sure this doesn't happen with any other witnesses.  I

3   just think it's time to, sort of, tackle it.

4           THE COURT:  That's fine.

5           MS. ARGO:  Your Honor, we did, in fact -- we did

6   speak to the lawyer for Ms. Maria Rosalba yesterday.  I

7   believe the concern was that at one point during some portion

8   of the proceedings -- I think it was a sidebar -- she gave a

9   small thumbs up.  The jury was still here, but she was

10  obviously way back in the gallery; however, I told her that,

11  you know, that's not okay; it's not appropriate when the jury

12  is still present.  I just spoke with -- all of us from the

13  Government just spoke with her again.  She apologies to the

14  Court.  She didn't realize she was doing anything, she -- it

15  was subconscious.  If she was doing something, she didn't

16  realize that she was, and she certainly didn't want to do

17  anything to -- you know, do anything inappropriate, and that's

18  not what her intention was at all.

19           I will make a record now also of another issue with

20  the witness.

21           Maria Rosalba is obviously -- this is very

22  stressful, very nerve-racking and nervous for her.  She,

23  unfortunately, threw up this morning.  She's now in the

24  bathroom throwing up again.  This is just an incredibly

25  traumatic experience for her, and so I think part of what's

*Proceedings*                                                    597

1    going on with her lawyer is that she just, you know,

2    subconsciously is --

3              THE COURT:  I appreciate what's happening --

4              MS. ARGO:  -- feeling very strongly about the

5    situation right now, but I would ask that we give the witness

6    a few more minutes --

7              THE COURT:  Of course.  Whatever she needs.

8              MS. ARGO:  -- just because it is incredibly

9    emotional and traumatic for her.

10             MR. GOLUB:  Judge, I was unaware that the lawyer was

11   present in the courtroom, and I think an inquiry needs to be

12   made -- I don't know how you want to handle it.  Has she

13   consulted with the lawyer with regard to her testimony

14   during -- during my cross-examination?  They had a break

15   overnight, for example, or even now.  I'm concerned about

16   that.

17             MS. ARGO:  Your Honor, she's allowed to consult with

18   her own attorney.  She's just not allowed to consult with us,

19   and we certainly have not spoken to her at all, and so we

20   would think that that's entirely inappropriate.  Her own

21   attorney who is representing her with respect to her

22   immigration issues and all of those things that she testified

23   to previously can certainly speak with her and be there to

24   support her in this situation.  We are not her attorneys, and

25   we have not spoken to her while she's on cross-examination.

*Proceedings*                                                    598

1          MR. GOLUB:  Judge, the problem I have with that is

2    that although they are not -- the lawyer is not a prosecutor,

3    the problem I have is that this testimony that she's giving

4    here, which is helping the prosecution, is also being used to

5    try to attempt to help her with regard to immigration status,

6    and so really no lawyer should be talking to her during my

7    cross-examination of the witness.

8          MS. ARGO:  I'm afraid --

9          THE COURT:  I know the Government shouldn't, but I

10   have never heard that someone could not consult with their own

11   independent attorney.  I'm not aware of that.

12         MR. GOLUB:  In this case, where they're almost

13   acting in concert, Judge, because what we are talking about --

14         THE COURT:  I really don't know.  I don't know who

15   this person is.  Is this the lady from the Sisters Society?

16         MS. ARGO:  My Sisters' Place is the nonprofit

17   organization with which this attorney works.  She --

18         THE COURT:  This is not somebody the Government

19   selected.

20         MS. ARGO:  No, Your Honor, absolutely not.  And, in

21   fact -- that's absolutely correct.  And whenever her attorney

22   is doing with regards to assisting her in any processes behind

23   the scenes, certainly the Government -- actually, I'm not

24   aware of and don't -- have not inquired deeply into what she

25   is doing to assist her.

*Proceedings*                                                          599

1          MR. GOLUB:  Wasn't it a fact that, perhaps I had it

2     wrong, that the Government made a referral to have her get one

3     of these attorneys?

4          MS. ARGO:  No.  We have referred her to the

5     nonprofit itself.

6          THE COURT:  The nonprofit.  And the nonprofit

7     independently decided that they would get her a lawyer.

8          MS. ARGO:  That's correct, Your Honor.

9          THE COURT:  This is not a lawyer under Government

10    control.  If you want to show me some authority that says

11    somehow that's appropriate, you are welcome to do so.  I know

12    you can't do it now, but if you find it before she's gone --

13         MR. GOLUB:  Clearly, that's not happening, Judge.

14         (Pause.)

15         THE COURT:  We are just finalizing the jury

16    instructions and since we have a moment, is it everyone's

17    understanding that in the final instructions I will substitute

18    the first name for the Jane Doe?

19         MS. HAJJAR:  Yes, Your Honor.

20         MR. DUNN:  Yes, Your Honor.

21         MR. GOLD:  Yes, Your Honor.

22         MR. HUESTON:  Yes, Your Honor.

23         THE COURT:  Okay.  I'm also going to include an

24    instruction on demonstrative evidence, and as I understand it,

25    so much of the cross-examination thus far has been consent, so

1   I do think it would be appropriate to put in the request made

2   by the Government with respect to minors, that minors cannot

3   consent.

4          MS. HAJJAR:  Yes.  Thank you, Judge.

5          THE COURT:  The language is:  "Whether or not a

6   minor consented to engage in a commercial sex act is

7   irrelevant, as the consent or voluntary participation of a

8   minor is not a defense to the charge."

9          MR. GOLD:  I'm sorry, Judge, can you repeat that?

10          THE COURT:  Yes.

11          "Whether or not a minor consented to engage in a

12   commercial sex act is irrelevant, as the consent or voluntary

13   participation of a minor is not a defense to the charge."

14          There was also an instruction about searches.  I

15   assume that there will be testimony from witnesses later about

16   the search of the apartment and what was found.

17          MS. HAJJAR:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MS. ARGO:  Your Honor, is there any way we can have

20   a sense from Mr. Golub how much longer this is going to go?

21          THE COURT:  Yes.

22          Mr. Golub, how much longer is it going to be?

23          MR. GOLUB:  I'm winding down, but Mr. Gold is next.

24          THE COURT:  Mr. Gold, you will have time now to weed

25   out what Mr. Golub has done.  How long do you think that you

*Proceedings*                                                     601

1     will be on different subjects?

2              MR. GOLD:  Again, assuming I get responsive answers,

3     I imagine ten, fifteen minutes.

4              THE COURT:  Okay.

5              And is anybody -- I guess Mr. Dunn --

6              MR. DUNN:  No, Your Honor.

7              THE COURT:  You're not going to cross.

8              MS. KELLMAN:  If I do, Your Honor, it will be under

9     five minutes.

10             MS. ARGO:  I think we can bring the witness in now.

11             THE COURT:  Is she down?

12             THE COURTROOM DEPUTY:  She's coming in.

13             THE COURT:  Okay.

14             MS. ARGO:  She's coming in, I think.

15             MS. KELLMAN:  Your Honor, did you plan to say

16    something to the attorney or not?

17             THE COURT:  I'm sorry?

18             MS. KELLMAN:  Did you plan to say something --

19             THE COURT:  No.

20             One other thing is there's no need for an

21    instruction on transcripts -- am I correct? -- in the charge?

22             MS. HAJJAR:  I think that's right, Your Honor.

23             THE COURT:  Okay.

24             (Witness resumes the stand.)

25             THE COURT:  All right.  We'll get the jury.

1            THE COURTROOM DEPUTY:  All rise.

2            (Jury enters.)

3            THE COURT:  Please be seated.

4            Mr. Golub.

5    BY MR. GOLUB:

6    Q    We were talking about whether or not you had a

7    recollection shortly before Mr. José Osvaldo went to Mexico in

8    late 2011, that you had a fight with him and you threw him out

9    of the apartment.

10   A    Yes.

11   Q    So there was such a fight and you did throw him out of

12   the apartment.

13   A    I spoke to him on the phone and I told him that when he

14   came back I no longer wanted him in the apartment.

15   Q    And he got out of the apartment; is that right?

16   A    He left the apartment and he took my papers.

17   Q    After he left, you went and -- you went to work in New

18   Jersey for a week as a prostitute?

19   A    I was working in New Jersey.

20   Q    And you did that -- you went there after this fight; is

21   that correct?

22   A    I -- I was already working in New Jersey.  I was staying

23   in New Jersey.

24   Q    So you weren't staying in the apartment.

25   A    No.

1   Q    When you came back after working in New Jersey, was he in

2   the apartment?

3   A    He had left the apartment.

4   Q    Because you had thrown him out; is that right?  You said

5   you didn't want to be with him anymore.

6   A    He left the apartment and he took -- when I came back

7   from New Jersey, he was already outside with his bag of

8   clothing.

9   Q    He moved -- he moved out.

10  A    He didn't move out because he was there.

11  Q    He had his belongings with him; they weren't in the

12  apartment anymore.

13  A    He left his belongings in the apartment, he just took

14  certain things, and he took my papers to...

15  Q    And you were back in the apartment and he wasn't there.

16  A    He was -- when I returned from New Jersey, he was there.

17  Q    Outside the apartment, not inside.

18  A    The apartment had several floors.  When I returned, he

19  was inside the entrance door.  He was inside the entrance

20  door, not exactly in the apartment.

21  Q    Not in the apartment part where you live with him.

22  A    He was on the ground floor waiting.

23  Q    Okay.

24        And he shortly thereafter went to Mexico; is that

25  right?

1    A    Yes.

2    Q    And he asked you to come with him.  In fact, you both

3    went to get passports from the Mexican Consulate; isn't that

4    right?

5    A    He told me that we should go -- he told me that we should

6    both return to Mexico and he would return my papers to me.

7    Q    Did you go with him to Mexico?

8    A    No, I didn't go to Mexico.

9    Q    So he went and you stayed here in the United States.

10   A    I stayed in the United States because I told him that I

11   was resigned to work as a prostitute; that he should leave me

12   here, and then he gave me -- he would give me my papers in

13   return for me working for him.

14   Q    So he left and you are in the apartment.

15   A    I don't know understand your question.  Are you referring

16   to that he left for Mexico?

17   Q    Yes.  And you're here in the apartment in Queens.

18   A    Yes.

19   Q    Living by yourself?

20   A    I had neighbors, but yes, practically alone.

21   Q    None of his brothers moved in with you to keep an eye on

22   you and watch you and make sure that you're not talking to

23   anybody.

24   A    All of his brothers left for Mexico.  He told me that I

25   had to give money to Jarocho.  If not, Jarocho would come to

*María Rosalba - Cross - Mr. Golub*                              605

1   get it.

2   Q    You wired money, you said, to him; is that right?

3   A    I sent it to him, or I would give it to Jarocho and

4   Jarocho would send it to him.

5   Q    So you sent money to him through Western Union?

6   A    Western Union -- maybe I don't recall.  I did send him

7   some -- could have been Western Union.

8   Q    You wired money to Mexico.

9   A    Yes.

10  Q    You knew how to do that, right?

11  A    He had taught me.  I had to send it under the name of

12  Nancy Alcantara, he told me that if I sent it under my own

13  name, I was going to be arrested and the police were going to

14  lock me up.

15  Q    But you sent money on other occasions to your own family

16  during the year that you were in the United States with him;

17  isn't that true?

18  A    He did it.

19  Q    To your family.

20  A    He would send them a hundred dollars.

21  Q    You sent money regularly to your family during the time

22  that you were working as a prostitute --

23            MS. ARGO:  Your Honor, asked and answered.

24  Q    -- in the --

25            THE COURT:  That's not what she just said.

1    Q    Did you do it every week, have money sent to your family?

2              THE COURT:  I'm sorry, it's the same thing.  She

3    just said that Osvaldo was the person who sent money to her

4    family.  If you want to clarify whether or not she also sent

5    money, then go ahead and do it.

6              MR. GOLUB:  Okay.

7    BY MR. GOLUB:

8    Q    Did you also personally send money to your family?

9    A    No.  He would send it in the name of Nancy Alcantara,

10   anybody's name.  He would send it to them.  They -- my family

11   knew that I was in the United States, and he did it so they

12   wouldn't think -- so they would think I was okay.

13   Q    And this was done on a regular basis; is that correct?

14   A    I don't remember.

15   Q    After you left, you said that you called your family; is

16   that correct?

17   A    Do you mean when he went to Mexico?

18   Q    After he left you and went to Mexico, you called your

19   family; is that correct?

20   A    Yes.

21   Q    And that's the same -- you used that same phone that

22   you've had for the whole time you were working; isn't that

23   right?

24   A    I don't remember.  Sometimes I would -- the delivery guys

25   would lend me their phones, they would help me.  They helped

1   me dial the numbers that you had to dial so I could call

2   Mexico from the United States.

3   Q    So after the first time they showed you, you knew how to

4   dial Mexico by yourself; isn't that right?

5   A    They would dial the number, I would talk, and then a

6   little while after that, I learned.

7   Q    So you did know how to call Mexico on your own phone.

8   A    Afterwards I did.

9   Q    All right.  Incidentally, you indicated that you had a

10  lawyer that was helping you with your immigration situation;

11  is that right?

12  A    The lawyer helped me after the agents came to my house.

13  Q    That lawyer has been helping you ever since.

14  A    The association is helping me.  I've had several lawyers.

15  Q    And has one of those lawyers been here with you in court

16  for the last two days?

17            THE COURT:  Yes.

18            Sidebar.

19            (Sidebar.)

20            (Continued on next page.)

21

22

23

24

25

*Sidebar*                                                                       608

1          (Sidebar conference held on the record out of the

2   hearing of the jury.)

3          THE COURT:  What are you trying to do, Mr. Golub?

4          MR. GOLUB:  I want to bring out from her that she

5   consulted with her lawyer during the course of her testimony

6   here.

7          THE COURT:  I said no.  I said no.  I said no to

8   you.

9          MR. GOLUB:  Excuse me.  What you said was I can't

10  make a quid pro quo that she's with the Government.

11         THE COURT:  No.  I'm telling you you cannot talk to

12  her about her speaking with her lawyer.  If you want to, if

13  you want to bring that out, I want to see some cases first.

14         MR. GOLUB:  Judge, I will withdraw the question.

15         THE COURT:  You go ahead and withdraw it.

16         MR. GOLUB:  I misunderstood the ruling.

17         MS. HAJJAR:  Your Honor, one more thing.

18         I understand Mr. Golub probably does not -- is not

19  doing it intentionally, but by walking up towards the witness,

20  this witness is terrified.

21         MS. ARGO:  So scared.

22         THE COURT:  Could you just stay behind --

23         MR. GOLUB:  I'm sorry.

24         THE COURT:  I understand.  This was not intentional,

25  and you are not an intimidating person.

*Sidebar*                                                          609

1              MS. ARGO:  You probably don't realize you are doing

2    it.  We are not saying you are doing it intentionally.

3              MR. GOLUB:  Fine.

4              (Sidebar end.)

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court.)

2                MR. GOLUB:  Your Honor, I have no further questions.

3                THE COURT:  Okay.

4                Mr. Gold.

5                MR. GOLD:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. GOLD:

8    Q    When you met José Osvaldo, how old were you?

9    A    Nineteen.

10   Q    And you were living at home at that time, correct?

11   A    Yes, that's correct.

12   Q    And you recall working, correct?

13   A    Yes, that's correct.

14   Q    And you introduced Delia to Francisco, correct?

15   A    Yes, that's correct.

16   Q    How old was Delia at that time?

17   A    I don't know how old she was.

18   Q    Did you ever find out at any time during the months you

19   lived together how old she was?

20   A    She looked young, approximately 15 or 16 years old.  I

21   don't know exactly how old she was.

22   Q    My question is:  You never asked and she never told you

23   how old she was; is that what you're saying?

24   A    Yes, that's correct.

25   Q    And how long had you known her at that point?

1            MR. GOLD:  Your Honor, if I may, my question was

2    simply how long she had known her at that point.  I don't know

3    what she's saying, but whatever it is, it's a lot longer than

4    how long she knew her.

5            THE COURT:  Okay.

6            Would you repeat the question?  Exactly what was

7    your question?

8            How long had you known her at that point?

9            THE WITNESS:  Approximately three months.

10   BY MR. GOLD:

11   Q    And you knew her from work, correct?

12   A    Yes, that's correct.

13   Q    And when you introduced her to Francisco, how old was

14   Francisco?

15   A    I don't know.

16   Q    Was he as old as José Osvaldo?

17   A    No.

18   Q    And the idea of you introducing Delia to Francisco was

19   for the two of them to get together and become a couple as you

20   and José Osvaldo did, correct?

21   A    We introduced them at the time because José Osvaldo --

22   well, he didn't want Francisco to have to wait in the car, get

23   bored.  He wanted to meet somebody, he didn't have a

24   girlfriend -- at least that's what he said -- so they could

25   become friends, become boyfriend/girlfriend, just to talk.

1   Q    Okay.

2         And so you chose Delia as what you thought was an

3   appropriate person to introduce to Francisco.

4   A    No.  That was her option.  I told her I wanted to

5   introduce her to my boyfriend's friend.

6   Q    Was it your intention to introduce somebody to Francisco

7   who was approximately his age?

8   A    I didn't know how old they were.  She was just my

9   co-worker.

10  Q    So when you were deciding who to introduce to Francisco,

11  you didn't consider introducing the person who was of a

12  similar age?

13        MS. ARGO:  I think the same question has been asked

14  multiple times.

15        THE COURT:  I will permit this question.

16        Go ahead.

17  A    No.

18  Q    Okay.

19        So after you introduced Delia to Francisco, did, in

20  fact, they become a couple?

21  A    Yes.

22  Q    And you saw them kissing and hugging and acting the way a

23  loving couple acts with one another.

24  A    José Osvaldo and I were always separate from them.  They

25  would go off and talk, whatever they did, they did it separate

1    from us.  I don't know what they did.  We were somewhere else.

2    Q    Did you ever see them kiss?

3    A    No.

4    Q    You never saw them hug?

5    A    When they would say good-bye to each other.

6    Q    You never saw them holding hands?

7    A    I don't remember that.

8    Q    Then how do you know they were a couple?

9    A    Delia told me she had a boyfriend.

10   Q    And the boyfriend was Francisco, correct?

11   A    Yes, that's correct.

12   Q    Okay.

13        Now, I believe you said that at some time in

14   September of 2010, you attended a party while you were still

15   in Mexico.

16        Do you recall testifying to that effect?

17   A    Yes, I remember.

18   Q    And I believe you said that was the party you saw José

19   Osvaldo kissing another woman, correct?

20   A    Yes, that's correct.

21   Q    And I believe you said you had gone to the party with

22   Delia but she had left, correct?

23   A    No.

24   Q    Did you go to the party with her -- with Delia?

25   A    I went to the party with José Osvaldo.

1   Q    Was --

2   A    And -- and --

3   Q    Was Delia at the party?

4   A    No.

5   Q    So you didn't testify yesterday that Delia was at this

6   party?

7   A    You are confusing me.  Which party are you talking about?

8   Q    I'm talking -- my question was:  Was Delia at the party

9   at which you saw José Osvaldo kissing another woman?

10  A    Delia was not at that party.

11  Q    So if you said that yesterday, that was in error?

12  A    I didn't make any -- say anything in error.

13           MS. ARGO:  If we can have a quick sidebar.

14           THE COURT:  It's time to move on.

15           MR. GOLD:  I'm about to.

16           THE COURT:  Okay.

17  BY MR. GOLD:

18  Q    After you moved into José Osvaldo's home, how long after

19  that did you make your first attempt to enter the United

20  States?

21  A    I don't remember.

22  Q    Was it years?

23  A    No.  It was months, but I don't remember.

24  Q    Okay.  Did you ever discuss going to America --

25  withdrawn.

1            On the day you first attempted to cross, you saw

2    Francisco and Delia in the same group that was attempting to

3    cross with you, correct?

4    A    Yes, that's true.

5    Q    And were you aware that they were going to be attempting

6    to cross with you before you got there, or did you first learn

7    that they were going to be in this group with you when you

8    arrived?

9    A    When we tried to cross the border, the three of us tried

10   to do that.  We were traveling, you know, together.

11   Q    My question is:  When did you learn that Francisco and

12   Delia were going to attempt to cross the border with you?

13   A    Right when we were at José Francisco's house.  We ate

14   there, we slept there.  We practically lived there.

15   Q    My question is very simple:  When did you learn that --

16            THE COURT:  I think she just tried to answer.

17            MR. GOLD:  Can I have it read back, then, because I

18   misunderstood.

19            THE COURT:  She said it was when she was at

20   Francisco's house, they were all there; they were living there

21   together.

22            Is that correct?

23            THE WITNESS:  Yes.

24   BY MR. GOLD:

25   Q    And how long before you actually attempted the first

1  crossing did you know that Francisco and Delia were coming

2  with you?

3  A    I don't remember.

4  Q    Did you have any discussions with Francisco before you've

5  made -- about crossing illegally into America before you

6  actually made that first attempt?

7  A    No.

8  Q    And you never discussed with Francisco before making the

9  attempt to come to the United States illegally that you were

10  going to be a prostitute here, correct?

11  A    No.

12  Q    And Francisco never threatened you to make you become a

13  prostitute or to -- withdrawn.

14         Francisco never threatened you to make you cross the

15  border, correct?

16  A    No.

17  Q    And Francisco never used any force against you to make

18  you cross the border illegally, correct?

19  A    No.

20  Q    And when you are saying "no," he didn't do those things,

21  correct?

22  A    Not upon crossing the border.

23  Q    Did you ever give Francisco any money?

24  A    No.

25  Q    Did Francisco ever give you any instructions on how to be

1    a prostitute?

2    A    No.

3    Q    Did he ever tell you how much to charge clients for your

4    services?

5    A    No.

6    Q    You got all of those instructions from Guadalupe, I

7    believe you said, correct?

8    A    Guadalupe, José Osvaldo.

9    Q    I'm sorry?

10   A    Guadalupe and José Osvaldo.

11              (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Maria Rosalba - Cross - Gold                    618

1    CROSS-EXAMINATION

2    BY MR. GOLD (CONTINUING):

3    Q    When you attempted to cross the border illegally

4    Guadalupe was in charge, correct?

5    A    Yes.

6    Q    She was the --

7    A    That's correct.

8    Q    -- Sorry.  She was the one that was giving the

9    instructions on how everyone in the group should proceed?

10   A    Yes, that's correct.

11   Q    And Francisco and Delia were part of this group?

12   A    Yes, that's correct.

13   Q    And they did what Guadalupe told them to do, correct?

14   A    Yes, she was the oldest and she was the one who said what

15   had to be done.

16   Q    When you were in the United States and began working as a

17   prostitute, I believe you testified that you saw Francisco

18   only once in a while, correct?

19   A    Yes, that's correct.

20   Q    How often did you see Delia?

21   A    I only saw Delia in some gatherings that they had.  And

22   sometimes when we were working we saw each other through the

23   delivery guys, sometimes we would go to a house and they were

24   there.

25   Q    And is it fair to say that in the entire time you were in

Maria Rosalba - Cross - Gold                619

1    the United States, on those occasions -- withdrawn.

2              Is it fair to say that on the infrequent occasions

3    that you saw Francisco, he never ordered you to be a

4    prostitute?

5    A    That's correct.

6    Q    And at no time when you were in the United States did you

7    ever give money to Francisco?

8    A    No.

9    Q    Now you indicated I believe on -- please correct me if my

10   recollection is wrong -- but that there were lists of drivers

11   that were maintained so you could do your work.  Am I correct

12   in that?

13   A    Yes.

14   Q    And did you keep those records?

15   A    No, they maintained them.

16   Q    And --

17   A    And also on the phone.

18   Q    I'm sorry?

19   A    Also on the phone.

20   Q    Okay.  And those lists were not in your handwriting,

21   correct?

22   A    No.

23   Q    Those lists were kept in the apartment.  I should say

24   were they kept in the apartment?

25   A    Yes.

1    Q    And there came a time when you left the apartment and

2    left the prostitution business as you've described, in what

3    year was that?

4    A    In 2012.

5    Q    And when you left, did you take any of these lists with

6    you?

7    A    No.

8    Q    Did you maintain any records of money that you earned or

9    clients that you saw in the prostitution business?

10   A    I changed my phone number and I left everything; I wanted

11   to leave everything behind.

12   Q    And since you weren't going to be a prostitute anymore

13   you certainly had no need or use for any of those lists,

14   correct?

15   A    That's correct.

16   Q    You're happy to be living in the United States now,

17   correct?

18   A    I'm happy.  I've made my life.  I have everything that I

19   wanted.

20   Q    And you want to stay, correct?

21   A    I like living in the United States.  I like working

22   honestly.  I like helping my family because in Mexico there is

23   only poverty.

24   Q    And in order to stay here legally and not be subject to

25   possible deportation, as you've described you have to renew

1   the visa that allows to you stay here on a yearly basis,

2   correct?

3   A    It's a work permit and I do have to renew it every year.

4   Q    And you're grateful to the United States Government for

5   allowing to you stay here, correct?

6   A    I'm grateful because not everything is the way that they

7   told us it was going to be.  Perhaps when I came here I was

8   afraid of the police and I was afraid of everybody because

9   that's what they encouraged me to feel.

10          MR. GOLD:  This is well beyond any question that I

11   raised.

12          THE COURT:  It's not really beyond it, it's a full

13   answer to the question.

14          MR. GOLD:  Fine.

15   Q    So you were grateful to the United States Government for

16   allowing to you stay here?

17   A    I am grateful and I feel blessed because there is no

18   corruption here, and they make people keep the law.

19   Q    To your knowledge, has the Government ever opposed your

20   visa renewal application?

21          THE COURT:  I think we've got the point.  Can we

22   move?

23   Q    My last question, is it important to you that the United

24   States permit to you remain here in -- living here with your

25   family in your new life?  That's yes or no.

Maria Rosalba - Cross - Gold                    622

1   A    I don't understand all of your question.  Could you

2   please repeat it?

3   Q    Certainly.  Is it important to you that the United States

4   Government continue to permit you to live here with your

5   family in your new life?

6   A    Yes.

7              MR. GOLD:  No further questions.

8              THE COURT:  Ms. Kellman?

9              MS. KELLMAN:  I have nothing, thank you.

10             THE COURT:  Anyone else?

11             MR. HUESTON:  Nothing, your Honor.

12             MS. ARGO:  The Government has no redirect, your

13  Honor.

14             THE COURT:  Thank you very much.  You are excused.

15  Thank you.

16             (Whereupon, the witness was excused.)

17             MS. HAJJAR:  Would your Honor like to break for

18  lunch now or go for an hour and then break?

19             THE COURT:  I think it makes sense to use the hour,

20  otherwise it will be a tough afternoon.

21             MS. HAJJAR:  The Government calls Fabiola.

22             COURTROOM DEPUTY:  Please stand and raise your right

23  hand.

24             (Witness takes the witness stand.)

25

Fabiola M. - Direct - Hajjar                          623

1   F A B I O L A   M.,

2              called as a witness having been first duly

3              sworn/affirmed, was examined and testified as

4              follows:

5              THE COURTROOM DEPUTY:  Please state your first name.

6              THE WITNESS:  Fabiola.

7              COURTROOM DEPUTY:  Please have a seat.

8              MS. HAJJAR:  May I begin, your Honor?

9              THE COURT:  Yes.

10  DIRECT EXAMINATION

11  BY MS. HAJJAR:

12  Q    Good afternoon, Fabiola.

13  A    Good afternoon.

14  Q    Is the first letter of your middle initial M?

15  A    Yes.

16  Q    Where were you born?

17  A    In Hidalgo.

18  Q    Is that in Mexico?

19  A    Yes.

20  Q    What is your date of birth?

21  A    June 17, 1988.

22  Q    Do you have siblings?

23  A    Yes.

24  Q    How many?

25  A    In total we're seven.

                    Fabiola M. - Direct - Hajjar              624

1   Q     Are you on the older side or younger side or in the

2   middle?

3   A     I'm the third.

4   Q     Did you attend school?

5   A     Yes.

6   Q     Can you describe where you grew up where you went to

7   school for the jury?

8   A     I was born in a small town and I went to boarding school.

9   Q     When did you stop attending school?

10  A     Around 13.

11  Q     Can you explain to the jury what happened after you

12  stopped attending school?

13  A     I went to Mexico City to work.

14  Q     What did you do for work?

15  A     Cleaning houses.

16  Q     Where did you live?

17  A     Right there at the same house where I worked.

18  Q     How old were you when you came to the United States?

19  A     Twenty.

20  Q     How did you come to the United States?

21  A     I was brought by Rosalio.

22  Q     What is Rosalio's full name?

23  A     Melendez-Rojas.

24  Q     What did you do in the United States after Rosalio

25  brought you here?

```
                    Fabiola M. - Direct - Hajjar              625
```

1   A    I, I, he had me prostitute myself.

2   Q    Did you want to work as a prostitute?

3   A    No.

4   Q    Why did you work in prostitution if you didn't want to?

5   A    Because he threatened me.

6   Q    Do you see Rosalio in the courtroom today?

7   A    Yes.

8   Q    Can you identify him by an article of clothing or by

9   where he's sitting?

10          MR. DUNN:  I'll stipulate that Mr. Rosalio is in the

11   courtroom and she identified him.

12   BY MS. HAJJAR:

13   Q    Do you know Rosalio Melendez-Rojas by another name?

14   A    El Guacho.

15   Q    Do you see anybody else in the courtroom that you know?

16   A    Miguel.

17   Q    Can you identify -- what is Miguel's full name?

18   A    Melendez.

19   Q    Can you identify Miguel Melendez by an article of

20   clothing and where he's sitting?

21   A    A green sweater.

22          THE COURT:  Indicating the defendant Miguel

23   Melendez-Rojas.

24   Q    Do you see anyone else in the courtroom that you know?

25   A    Francisco.

Fabiola M. - Direct - Hajjar                    626

1    Q    Do you know Francisco's full name?

2    A    No.

3    Q    Can you identify Francisco by something he's wearing or

4    where he's sitting?

5              MR. GOLD:  I'll stipulate to the identification.

6              THE COURT:  The witness identified Francisco.

7    BY MS. HAJJAR:

8    Q    Do you know anyone else in the courtroom, Fabiola?

9    A    Abel.

10   Q    Do you know Abel's full name?

11   A    No.

12   Q    Can you identify him by what he's wearing or where he's

13   sitting?

14   A    He's wearing, I don't know like, a purple-ish shirt.

15             THE COURT:  What end of the table, is he in the far

16   end or the near end?

17             THE WITNESS:  At the far end.

18             THE COURT:  Indicating the defendant.

19   BY MS. HAJJAR:

20   Q    Is there someone else in the courtroom that you

21   recognize?

22             MS. HAJJAR:  Do you need to stand up?

23             THE COURT:  You're welcome to stand up.

24   A    Osvaldo.

25   Q    What relationship, if any, does Osvaldo have with

```
                    Fabiola M. - Direct - Hajjar                    627
```

1    Rosalio?

2    A    They are brothers.

3    Q    Can you identify Osvaldo by an article of clothing or

4    where he's seated?

5              MR. GOLUB:  I'll stipulate, Judge.

6              THE COURT:  The identification is of defendant

7    Osvaldo.

8              MS. HAJJAR:  Thank you, your Honor.

9    BY MS. HAJJAR:

10   Q    Fabiola, did there come a time when you stopped working

11   in prostitution for Rosalio Melendez Rojas?

12   A    Excuse me?

13   Q    Did there come a time that you stopped working in

14   prostitution for Rosalio Melendez-Rojas?

15   A    Did I stop?

16   Q    Did you -- yes, did there come a time that you stopped?

17   A    Yes.

18   Q    What year was that?

19   A    In 2015.

20   Q    How did you first meet Rosalio?

21   A    At a club in the state of Mexico.

22   Q    Where in Mexico?

23   A    In Mexico City.

24   Q    How did you meet?

25   A    Well, I went to, I went out that night.  I went to dance.

Fabiola M. - Direct - Hajjar                    628

1    He was there too.  He invited me to dance.  We danced all

2    night.  He asked me for my phone number, I gave him my phone

3    number.  And then we ended up talking.

4    Q    How old were you?

5    A    Twenty.

6    Q    What happened after you gave Rosalio your phone number?

7              THE COURT:  I think we better take a lunch break.

8    Could you be back at five minutes past one?

9              (Jury exits the courtroom.)

10             THE COURT:  Just to explain, juror number two was

11   suffering from stomach problems.  I thought we better do

12   lunch.

13             (Lunch recess at 12:15 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                              629

1           A F T E R N O O N   S E S S I O N

2                        --ooOoo--

3

4           (In open court.)

5           THE COURT:  Juror number two is still sick.  Dennis

6   said he feels very sick and can't sit.  Unless somebody

7   objects, I think we should excuse him.  He was not feeling

8   well yesterday, I was told it is just getting worse.

9           MS. KELLMAN:  Does he have fever?

10          THE COURT:  No.

11          When the jury gets back up I'm going to have Dennis

12  bring juror number two in and excuse him and we'll replace

13  him.

14          MR. DUNN:  Dunn I want to bring something to the

15  Court's attention, I meant to do it at the start of Fabiola's

16  testimony.

17              But according to the reports there is four possible

18  instances of potential hearsay that a witness named Karina

19  told Fabiola something, Alicia told something, and Veronica

20  Delia.  The Veronica Delia and Karina thing relate to my

21  client, and I just want to let you know that to alert to you

22  this and --

23          THE COURT:  I understand.  We can talk about it

24  right now.  Are you ready to do so?

25          MS. HAJJAR:  As to Elizabeth Sanchez Carrion, the

Proceedings                                          630

1  witness is going to say that this person gave her instructions

2  as to how to be a prostitute.  And those statements aren't

3  hearsay.  We will elicit what she was told.

4          THE COURT:  That's fine.

5          MS. HAJJAR:  I don't believe there is any statements

6  that we're eliciting with respect to Delia and the woman she

7  knew as Flor, which is Veronica.  I can't remember the last

8  person you mentioned.

9          MR. DUNN:  For example Delia told Fabiola that

10 Rosalio has other women working for him in prostitution.

11 Delia told Fabiola that Rosalio was the reason she was running

12 away.  Those are two examples.

13         MS. HAJJAR:  I'm not eliciting those statements.

14         THE COURT:  Anything else?

15         MR. DUNN:  Yes.  Delia told Fabiola that Rosalio

16 told her not to talk with Fabiola because he was afraid that

17 Fabiola would give Delia bad advice.

18         MS. HAJJAR:  I'm not eliciting any statements made

19 to Fabiola by Delia.

20         There is one additional statement from Elizabeth

21 that I am eliciting, which is that -- if it comes out -- that

22 the witness will say that upon arrival in the United States

23 she confronted Elizabeth about why she assisted Rosario

24 bringing her here.  Elizabeth replies, You were stupid and

25 naive, something like that.  And I'm not offering that for its

Proceedings                                              631

1    truth, obviously; I'm offering it for the effect on the

2    listener to explain what happened next.

3              THE COURT:  It won't effect your client.

4              MR. HUESTON:  Any other statements that this witness

5    will be discussing about other co-defendants?

6              MS. HAJJAR:  I'll just be very clear, this witness,

7    she identified your client, Mr. Hueston, but she met him after

8    she was no longer working in prostitution for Rosalio.  I'm

9    eliciting no statements with respect to your client.

10             MR. HUESTON:  In one of the reports it does state

11   that -- I'll read it:  It identified Abel as a cousin of

12   Rosario, met him in Mexico, had women working in prostitution.

13             MS. HAJJAR:  This is information that I understand

14   she learned after she escaped.  So for that reason we're not

15   eliciting those statements from her.

16             MR. HUESTON:  Thank you for that.

17             (Juror No. 2 enters.)

18             THE COURT:  Please be seated.  I'm so sorry.  I

19   understand that you've been suffering from a stomach ailment

20   since yesterday.

21             Would you like to be excused as a result of that?

22             JUROR NO.2:  Yes, thank you.  I apologize,

23   Your Honor.

24             THE COURT:  I hope you feel better.  Thank you for

25   your service.

Fabiola M. - Direct - Hajjar                    632

1           JUROR NO.2:  Thank you.

2           (Juror No. 2 was excused and exited.)

3           (Whereupon, the witness resumes the stand.)

4           (Jury enters the courtroom.)

5           THE COURT:  Please be seated.  Ladies and gentlemen,

6     as I suspect you already knew, Juror No. 2 two was suffering

7     from a stomach ailment and has been very uncomfortable, so we

8     excused Juror No. 2.  I'm going to ask Alternate No. 1 to take

9     the place of Juror No. 2, and all the alternates to move down.

10          Ms. Hajjar.

11          MS. HAJJAR:  Thank you, Your Honor.

12    DIRECT EXAMINATION (continued)

13    BY MS. HAJJAR:

14    Q    Fabiola, before lunch you were describing how you first

15    met Rosalio, what happened after you gave him your phone

16    number?

17    A    Do you mean in Mexico or here?

18    Q    Yes, in Mexico.

19    A    Oh, he sold it.

20    Q    Sorry.  Fabiola, you described that you met Rosalio at a

21    nightclub and that you gave him your phone number; is that

22    right?

23    A    Yes.

24    Q    What happened after that?

25    A    He would call me every week.  And then the following

1   Sunday he told me he was going to take me to meet his family.

2   And I agreed, I said yes.  And so I did see him that next

3   Sunday and he took me to Tenancingo.

4   Q    Did you know that he lived in Tenancingo.

5   A    No.

6   Q    Did he tell you where he lived?

7   A    He told me he was from Puebla.

8   Q    When did you learn that he was from Tenancingo?

9   A    When I got there.

10  Q    At this moment, Fabiola, can you describe what you

11  thought of Rosalio?

12  A    Nice.

13  Q    What were your feelings towards him?

14  A    The first thing he did was make me fall for him.

15  Q    How did he do that?

16  A    That's what they do, they first make you fall for them.

17          MR. DUNN:  Objection.

18  Q    How did he do that, Fabiola?  Can you describe it to the

19  jury?

20  A    He treated me well, he spoke to me nicely, all of that.

21  He said he was going to be nice with me.  That our

22  relationship was, I'm not sure how to put this, that it was a

23  serious relationship.

24  Q    Did he talk about the future with you?

25  A    That's when he said we should go to the United States,

1   work there in a restaurant.  We'd be able to save money, build

2   a house.  He said you can also send money to your family.

3   Q     And were these things you wanted?

4   A     Yes, because my family is, was, they are very poor and of

5   course I wanted to help my mother.

6   Q     Did you agree to meet Rosalio's family?

7   A     Yes.

8   Q     How did you get there?

9   A     By car.

10  Q     How far was it from Mexico City?

11  A     About three hours by car.

12  Q     Had you ever visited Tenancingo before?

13  A     No.

14  Q     What happened when you got to Tenancingo?

15  A     When we got to Tenancingo he took me to an abandoned

16  house.  There was just one room in it.  And that's where I

17  stayed.

18  Q     How long were you there for?

19  A     For three or four months.

20  Q     Did you meet Rosalio's family while you were there?

21  A     No, only one time when I saw his mother, but that was it.

22  Q     And what was in the house that you were staying in?

23  A     Nothing, it was being built up.  There wasn't anything

24  there.

25  Q     Did you leave the house?

Fabiola M. - Direct - Hajjar                 635

1    A    No.

2    Q    Why not?

3    A    Because he told me not to leave, it was very dangerous

4    outside.

5    Q    Was he with you the entire time?

6    A    Not all the time.

7    Q    Where was Rosalio?

8    A    I don't know.  He would say he was going out to work, I

9    don't know.

10   Q    What did you do during the day?

11   A    Nothing, I would stay in the house.

12   Q    How did you eat?

13   A    When he would come he would bring food and he would bring

14   enough so that I could eat that when he wasn't there, or then

15   he would come back and he would bring food.

16   Q    Were you lonely?

17   A    Yes.

18   Q    At this time, Fabiola, did you and Rosalio begin a sexual

19   relationship?

20   A    Yes.

21   Q    When did that begin?

22   A    When he took me to that house.

23   Q    Before Rosalio, how many men had you been in a sexual

24   relationship with?

25   A    Just one.

Fabiola M. - Direct - Hajjar                    636

1   Q     While you were in Tenancingo did you have a cellphone?

2   A     Yes.

3   Q     At this time can you describe what your relationship with

4   your family was like?

5   A     My family?

6   Q     Yes.

7   A     Okay.

8   Q     Did you use your cellphone to call them while you were in

9   Tenancingo?

10  A     No.

11  Q     Why not?

12  A     Because, well, after that he sold it.  So I had no way to

13  get in touch with them.  And plus, where my mother my family

14  live there is no phone, so it was kind of hard to get in touch

15  with them.

16  Q     Who sold your cellphone?

17  A     Rosalio.

18  Q     Did you ask him if you could make any phone calls while

19  you were in Tenancingo?

20  A     Yes.

21  Q     What, if anything, did he say in response?

22  A     That he had no balance.

23  Q     Fabiola, you said you came to the United States in 2009;

24  is that right?

25  A     Yes.

Fabiola M. - Direct - Hajjar                 637

1    Q      How old were you at the time?

2    A      Twenty.

3    Q      Whose idea was it to come to the United States?

4    A      Rosalio's.

5    Q      What did he tell you about coming to the United States?

6    A      Like I said before, he said we should come to the United

7    States so we could both work in a restaurant.

8    Q      Before you met Rosalio, had you ever thought about coming

9    to the United States?

10   A      No.

11   Q      What, if anything, did Rosalio tell you about the

12   restaurant that you were supposed to work in?

13   A      He didn't say exactly where it was, all he said was we're

14   going to be working in a restaurant.

15   Q      Did he tell you where the restaurant was in the United

16   States?

17   A      No, all he said was we're going to go to New York.

18   Q      Did you agree to travel to the United States?

19   A      Yes.

20   Q      What was the plan for how to cross the border into the

21   United States?

22   A      He made all of those arrangements, he did that.

23   Q      What were the arrangements?

24   A      He was the one who talked to the coyotes.  And then he

25   made arrangements with Elizabeth, who according to him, was

Fabiola M. - Direct - Hajjar                638

1   his cousin.  He told me I would be coming here with her.  I'd

2   be traveling with her to come here.  Then he would meet with

3   me later on in New York.

4   Q    How much later on did he say he would be meeting up with

5   you in New York?

6   A    In around three months.

7   Q    Can you describe to the jury step by step how you crossed

8   the border?

9   A    He took me from Tenancingo to Puebla.  That's where I met

10  up with Elizabeth, he gave us our plane tickets.  And then we

11  landed somewhere, I don't know where we landed, but we got to

12  Nogales.

13  Q    Fabiola, I'm sorry, when you say "he," who are you

14  referring to?

15  A    Who?

16  Q    When you said that he took, he drove us, or he gave us

17  the plane tickets, who are you referring to by "he"?

18  A    Rosalio.

19  Q    After that what happened?

20  A    After that we arrived in Nogales we went to a house where

21  there was a good number of people.  And then we tried to cross

22  the border but we were caught by immigration.

23  Q    Who were you with this time?

24  A    With Elizabeth.

25  Q    You made -- you referred to a coyote before, were you

1    with the coyote?

2    A    Yes.

3    Q    What happened after your first attempt to cross the

4    border?

5    A    Well, after that immigration let us go and then we tried

6    to cross again.  But immigration caught us again.

7    Q    How many times did you attempt to cross the border?

8    A    Three times, and immigration stopped us all three times.

9    We were able to get across on our fourth try.

10   Q    For each of these attempts were you with Elizabeth?

11   A    Yes.

12   Q    When you were stopped by immigration authorities, what

13   happened?

14   A    Well, nothing, they left us in this room overnight.  Then

15   the next day they would let us go.

16   Q    At this time when you were attempting to cross the

17   border, what did you believe was the relationship between

18   Elizabeth and Rosalio?

19   A    Cousins.

20   Q    Did you later learn something else about her relationship

21   with Rosalio?

22   A    I found that out when I got here to New York.

23   Q    What did you find out?

24   A    Well, the thing is he was talking to her all the time.

25   And then I happened to show up at the place where Elizabeth

Fabiola M. - Direct - Hajjar                    640

1    was living just as a surprise, and he was there.

2             THE INTERPRETER:  May the interpreter clarify.

3             He would call her all the time, not talk to her.

4    BY MS. HAJJAR:

5    Q    When you saw them together, what did you understand about

6    their relationship?

7    A    That's when I realized they were a couple.

8    Q    Did you eventually successfully cross the border,

9    Fabiola?

10   A    Yes.

11   Q    How did that happen?

12   A    When we crossed the border we ended up in Nogales.  From

13   Nogales we went to Phoenix, Arizona.

14   Q    How did you do it?  Were you on foot or by car?

15   A    I walked.

16   Q    Where did you go after you arrived in Phoenix?

17   A    After that we went to this house.  There were also a good

18   number of people there.  We were there for about a week, and

19   then we came to New York by car.

20   Q    While you were traveling did you know what the costs were

21   to cross the border?

22   A    No.

23   Q    And the entire time you were traveling, did you pay for

24   anything?

25   A    No.

Fabiola M. - Direct - Hajjar                    641

1   Q    Did you later learn anything about the costs of travel?

2   A    Yes, that was when I got to know.  Rosalio told me that

3   it had cost $3,000 and I had to pay for that.

4   Q    Did he tell you where he got the money?

5   A    Yes, his brother lent it to him.

6   Q    Did he tell you which brother?

7   A    Osvaldo.

8   Q    Had Rosalio made any arrangements as to where you would

9   go when you arrived in New York?

10  A    Yes, I think so because when we got here there was

11  already a room for us.

12  Q    Did you personally know anyone in Queens?

13  A    What do you mean?

14  Q    When you first arrived, Fabiola, did you know anyone in

15  Queens or in New York generally?

16  A    Did I know anybody?

17  Q    Yes.

18  A    Well, I came to New York to Queens to Van Cleef.  I

19  didn't know anybody when I first came, then I met Miguel,

20  Osvaldo, Benjy, all of them here.

21  Q    Before you arrived in Queens, Fabiola, did you have any

22  friends or family members in New York?

23  A    No.

24  Q    Where did you first go in New York?

25  A    To Queens, to Corona, to Van Cleef.

1  Q     Is Van Cleef a street in Queens?

2  A     Yes.

3  Q     Can you describe to the jury what happened after you

4  arrived in Queens, New York?

5  A     When I got to Queens to the house, Elizabeth gave me

6  money to buy clothing.  Well, she went out to buy clothing,

7  and I stayed with the house.

8  Q     What happened next?

9  A     Then it was at night when Rosalio called me.

10 Q     What did he say?

11 A     He said that I should work in prostitution.  And I said

12 that I wouldn't, that I didn't want to.

13 Q     How did Rosalio react when you said you didn't want to?

14 A     He said that I had to do it.

15 Q     What kind of language did he use?

16 A     He said you have to do it because if not I'm going to do

17 something to your family.

18 Q     When he said, I'm going to do something to your family,

19 what did you understand him to be saying to you?

20 A     That he was threatening me.

21 Q     Can you explain to the jury how you felt in that moment?

22 A     I felt very badly.

23 Q     Were you upset?

24 A     Yes.

25 Q     Had Rosalio ever mentioned prostitution to you before?

Fabiola M. - Direct - Hajjar                    643

1  A    No.

2  Q    Did you want to work in prostitution after arriving in

3  New York?

4  A    No.

5  Q    What happened after the phone call with Rosalio?

6  A    And then when he told me that I had to work in that,

7  Elizabeth was there, and she came and she said to me, Well,

8  you were really stupid that you believed all that.

9  Q    That you believed all what?

10  A    About the fact that he wanted something serious with me

11  when he told me in Mexico that he wanted something that was

12  serious with me.

13  Q    So just to clarify, when Elizabeth told you that you were

14  really stupid for believing that, you meant believing in a

15  future with Rosalio?

16  A    Yes.

17  Q    What happened after she said this to you?

18  A    Nothing.  I stayed there.  I felt destroyed.  And I

19  myself asked, I asked myself why is this happening to me.

20  Q    What happened next?

21  A    Then nothing.  Elizabeth had arranged everything for me

22  to go and work the next day.

23  Q    When you say she arranged everything, what do you mean

24  what had she done?

25  A    That she had called the people for me to go, for me to go

Fabiola M. - Direct - Hajjar                644

1   the next day to work.

2   Q    At this moment did you know how to work as a prostitute?

3   A    No, she explained everything to me.

4   Q    What did she tell you?

5   A    How to put the condoms on, how much I had to charge, how

6   much time it was going to be, all that.

7   Q    How much were you supposed to charge?

8   A    Thirty-five.

9   Q    Dollars?

10  A    Yes.

11  Q    And you say how much time, how much time were you

12  supposed to spend with clients?

13  A    Fifteen minutes.

14  Q    Did Elizabeth tell you anything about condoms, how to

15  transport them?

16  A    Yes.

17  Q    What did she tell you?

18  A    That I should take them out of the packages that they

19  came in, and I should put all of them in one condom.  That's

20  how I carried them.

21  Q    Did you have an understanding of why she was asking you

22  to transport them this way?

23  A    Yes, so they wouldn't realize it.  So if we were stopped

24  by the police, they wouldn't realize we were carrying condoms.

25  Q    Can you describe to the jury what happened the first time

Fabiola M. - Direct - Hajjar                          645

1    you worked as a prostitute?

2    A    That day they took me to work.  I don't remember where

3    they took me.  That day I did 14 or 15 tickets and that's it,

4    I don't remember anything else.  I didn't -- I wasn't able to

5    do more.

6    Q    When you say 14 or 15 tickets, what do you mean?

7    A    That's the number of clients that I saw, 14 or 15

8    clients.

9    Q    Did you arrange for the driver to take you to these

10   clients?

11   A    No.

12   Q    Who did?

13   A    Elizabeth did.  She's the one who sent me with him.

14   Q    What happened to the money that you were paid?

15   A    I gave it to Osvaldo.

16   Q    All of it?

17   A    Yes.

18   Q    Did some portion go to the driver?

19   A    Yes.

20   Q    What was the split between Osvaldo and the driver?

21   A    It was half for each.  If I made 400, it was 200 for the

22   driver and 200 for Osvaldo.

23   Q    Why did you give the money to Osvaldo?

24   A    Because Rosalio told me that he was the one I had to give

25   the money to.

Fabiola M. - Direct - Hajjar                    646

1    Q    What happened when you got home after the first time you

2    worked as a prostitute?

3    A    I came back and I was very sore.

4    Q    Did you speak to Rosalio that day?

5    A    Yes.  I told him that I didn't want to go back to work,

6    that I was very sore.  And he said that I had to go to work.

7    Q    Was anything else said on this call?

8    A    No.  He only said, you no longer have any alternative,

9    you just have to go out to work.

10   Q    What happened the next day?

11   A    I went again, I went again.

12   Q    Each day you worked, did you continue to give the money

13   you earned to Osvaldo?

14   A    Yes.

15   Q    Fabiola, I'd like to show you what's been marked for

16   identification as Government's Exhibit 101.  Do you recognize

17   what is in this photograph?

18   A    Yes.

19   Q    What do you recognize it as?

20   A    That's where I went the first time when I arrived in the

21   U.S.

22           MS. HAJJAR:  The Government offers Government's

23   Exhibit 101 and publish it to the jury.

24           THE COURT:  Admitted.

25           (Government's Exhibit Number 101 so marked and

```
                    Fabiola M. - Direct - Hajjar              647
```

1    received in evidence.)

2           (Government's Exhibit Number 101 is published to the

3    jury.)

4    BY MS. HAJJAR:

5    Q    Is this the address on Van Cleef that you described

6    earlier?

7    A    Yes.

8    Q    Was this the first address you stayed at in Queens?

9    A    Yes.

10   Q    Approximately how long did you live at this address?

11   A    About four months.

12   Q    Who lived at this address with you?

13   A    Osvaldo lived there Benjamin, Benni, and myself, and

14   Miguel.

15   Q    Did anyone else live there?

16   A    No.

17   Q    You mentioned Miguel, and Osvaldo and Benjamin, what

18   relationship did they have any with Rosalio?

19   A    They are brothers.

20   Q    Who is Benni?

21   A    Osvaldo's brother.

22   Q    You mentioned Elizabeth, where did Elizabeth live?

23   A    Right there, she also lived at that house.

24   Q    Elizabeth also lived at this address?

25   A    Yes.

Fabiola M. - Direct - Hajjar                           648

1    Q    Can you describe the apartment that you lived in?

2    A    The entrance for the door is, there are two rooms.  And

3    that's where I stayed in one of the rooms with Elizabeth.  And

4    Osvaldo lived in the other room.

5    Q    What about Miguel?

6    A    Miguel lived in another apartment.

7    Q    When you first arrived, Miguel lived in a different

8    apartment than you?

9    A    Yes.  They are separate there.

10   Q    Separate apartments?

11   A    Yes.

12   Q    Do you know who if anyone Miguel lived with?

13   A    With Flor.

14   Q    Did Flor go by another name?

15   A    Flor, that was her name.  Flor, that was the name she

16   used, just that's, she's Veronica.

17   Q    Can you explain that to the jury, you say Flor and

18   Veronica, what do you mean?

19   A    Veronica is her real name, and Flor was the name she used

20   when she worked.

21   Q    What did she do for work?

22   A    She also worked in prostitution.

23   Q    Did there come a time that you lived with Flor?

24   A    Yes.

25   Q    Based on your own observations who, if anyone, was she

```
                    Fabiola M. - Direct - Hajjar              649
```

1   working for?

2   A     For Miguel.

3   Q     What about Benni, what did she do for work?

4   A     Benni was Osvaldo's girl.

5   Q     And based on -- what did that mean she was Osvaldo's

6   girl?

7   A     She worked for him.

8   Q     As a prostitute?

9   A     Yes.

10           MS. HAJJAR:  I'd like to show you what is in

11   evidence as Government's Exhibit 9.  May I publish to the

12   jury?

13           THE COURT:  Yes.

14   BY MS. HAJJAR:

15   Q     Fabiola, do you recognize the person in Government's

16   Exhibit 9?

17   A     Yes, that's Flor.

18   Q     That's the woman who also had the name Veronica?

19   A     Yes.

20           MS. HAJJAR:  I'd like to show you what is in

21   evidence as Government's Exhibit 15.  May I publish it to the

22   jury as well?

23           THE COURT:  Yes.

24   A     Elizabeth.

25           (Continued on the next page.)

Fabiola M. - Direct - Hajjar                    650

1   DIRECT EXAMINATION

2   BY MS. HAJJAR (continued):

3   Q    Government Exhibit Number 15 is Elizabeth?

4   A    Yes.

5   Q    Do you know Elizabeth's full name?

6   A    No.

7   Q    You testified, Fabiola, that Elizabeth told you what to

8   do to work as a prostitute.  What did Elizabeth do for work?

9   A    She also worked in prostitution.

10  Q    And based on your observations who, if any, was she

11  working for?

12  A    For Rosalio.

13  Q    How did you feel towards Elizabeth after you arrived in

14  the United States and -- I'm sorry.

15  A    When -- well, we didn't get on well anymore.

16  Q    You testified that Veronica went by the name Flor when

17  she worked.  Did Elizabeth go by a different name when she

18  worked?

19  A    Karina.

20  Q    At some point, Fabiola, did Rosalio join you in the

21  United States?

22  A    Could I have that again?

23  Q    Sure.  At some point did Rosalio join you in the

24  United States?

25  A    Yes.

Fabiola M. - Direct - Hajjar                651

1    Q    And approximately how long had you been working in

2    prostitution at this point?

3    A    For about three or four months.

4    Q    Where did you live after Rosalio came to the

5    United States?

6    A    Right there on Van Cleef Street.

7    Q    At the same address?

8    A    Yes.

9    Q    At some point, did she move to a different address on

10   Van Cleef?

11   A    Yes.  After Van Cleef we moved to someplace else --

12   else, 108th and 43rd.

13   Q    Before you moved to 108 Street, Fabiola, did you ever

14   live in a different address on Van Cleef?

15   A    I lived there when I first got here.  And then when

16   Rosalio came, we moved maybe three or four houses down.

17   Q    Okay.  I would like to show you what has been marked

18   for identification only as Government's Exhibit 102.

19             Do you recognize this photograph?

20   A    Yes.

21   Q    What do you recognize it as?

22   A    That's where we moved to.

23   Q    And that's you and Rosalio?

24   A    Yes.

25             MS. HAJJAR:  The Government offers

1    Government's Exhibit 102 and ask that it be published to the

2    jury.

3            THE COURT:  Admitted.

4            (Government's Exhibit Number 102 so marked and

5    received in evidence.)

6            (Government's Exhibit Number 102 is published to

7    the jury.)

8    Q    Fabiola, is this another address you lived at on

9    Van Cleef?

10   A    Yes.

11   Q    Okay.  Who did you live with at this apartment?

12   A    Miguel, Veronica, me, Rosalio and then another older

13   brother, by the name of Magdaleno.

14   Q    Can you describe the apartment you lived in at this

15   address?

16   A    It was on the second floor.  It had three rooms.

17   Q    Okay.  Fabiola, did there come time when you learned

18   that you were pregnant?

19   A    Yes.

20   Q    Approximately when was that?

21   A    Something like a month after Rosalio came.

22   Q    How did you first notice you were pregnant?

23   A    Rosalio was the one who noticed my breasts were bigger

24   and there was liquid coming out of them and he said, You're

25   pregnant?

Fabiola M. - Direct - Hajjar                653

1    Q    Were you happy about the pregnancy?

2    A    Yes.

3    Q    Did you want children?

4    A    Yes.

5    Q    Can you describe for the jury what happened?

6    A    Well, after that, he took me to a clinic to have a

7    pregnancy test to make sure that I was pregnant.  When we

8    got there, the doctor said yes, I actually was pregnant.

9    And then Rosalio made arrangements with the doctor for a

10   procedure to have an abortion.

11   Q    How did that happen; can you explain that?

12   A    He wanted me to have the abortion right then.  He

13   wanted me to abort the baby right then and there.  I didn't

14   want do that, so I left.

15   Q    What happened after that?

16   A    After that, he said, Okay, we will have the baby.  And

17   he said, I'm going to get some pills for you to take from

18   Mexico, folic acid.  But instead of that, the pills he gave

19   me were pills so I would miscarry.

20   Q    Did Rosalio give you the pills?

21   A    Yes.

22   Q    Can you describe what the packaging was?

23   A    It was a small bottle.  And the pills to make me

24   miscarry were in there.  He told me to take them, I took

25   them.

Fabiola M. - Direct - Hajjar                           654

1   Q     Did you believe they were folic acid?

2   A     Yes.

3   Q     What did it say, if anything, on the packaging?

4   A     Folic acid.

5   Q     What happened after you took the pill?

6   A     I started to bleed.  And then at about 5:00 in the

7   morning the pain started coming on stronger.  And I was

8   taken to emergency.

9   Q     Did you ask Rosalio about the pills you had taken?

10  A     Not right then.  I didn't ask him then.  Not until

11  later on.  He told me they were pills so I would miscarry.

12  Q     How long after did he tell you that?

13  A     Later on, like two years later.

14  Q     After you miscarried, Fabiola, did you ask Rosalio

15  about the pill?

16  A     He told me they were folic acid pills.

17  Q     And two years later, he said something different?

18  A     Yes.

19  Q     Fabiola, you mentioned earlier that there was a time

20  where you moved to an address on 108th Street; is that

21  right?

22  A     Yes.

23  Q     I would like to show you what has been marked for

24  identification only as Government's Exhibit 103.

25            Do you recognize this exhibit, Fabiola?

Fabiola M. - Direct - Hajjar                655

1    A    Yes.

2    Q    What do you recognize it as?

3    A    That's where we moved into later on, to the second

4    floor.

5              MS. ARGO:   The Government offers

6    Government's Exhibit 103 and asks to publish it to the jury.

7              THE COURT:   Admitted.

8              (Government's Exhibit Number 103 so marked and

9    received in evidence.)

10             (Government's Exhibit Number 103 is published to

11   the jury.)

12   Q    Which of these -- can you indicate, Fabiola, on

13   Government's Exhibit 103 where you lived?

14   A    Here.

15   Q    You can touch the screen.

16   A    (Witness complies.)

17   Q    That's the second floor of the white house?

18   A    Yes.

19   Q    And who did you live with at this apartment?

20   A    Rosalio, me, Miguel, Veronica and their older brother,

21   Magdaleno.

22   Q    And during this period of time when you lived in Queens

23   did you continue to work as a prostitute for Rosalio?

24   A    Yes.

25   Q    Did you want to?

Fabiola M. - Direct - Hajjar                    656

1   A    No.

2   Q    Why did you, if you didn't want to?

3   A    Because he continued to threaten me.

4   Q    What locations did you work in when you were working in

5   prostitution for Rosalio?

6   A    In Brooklyn, Queens, Bronx, Manhattan, Long Island,

7   Philadelphia, all over the place.

8   Q    How many days a week did you work?

9   A    All seven days.

10  Q    What hours did you work as a prostitute?

11  A    9:00 in the morning until 3:00 or 4:00 in the morning.

12  Q    Was that two shifts or a single shift?

13  A    Double shift, day and night.

14  Q    Did you always work a double shift?

15  A    Yes.

16  Q    How much sleep were you able to get each night?

17  A    Very little.

18  Q    When did you eat?

19  A    At work, once a day.

20  Q    Approximately how many clients did you see each shift?

21  A    Per shift, maybe 15, 20 clients, and it was the same at

22  night.

23  Q    Did you have to work if you were sick?

24  A    Yes.

25  Q    How old were your clients?

1   A    From 25 to 60.

2   Q    When Rosalio was in the United States, who made

3   arrangements for the delivery driver?

4   A    Elizabeth -- well, after Rosalio came and I had moved

5   in with him, Elizabeth had this notebook with all the

6   numbers and their contact information.  So sometimes I would

7   call them, sometimes Rosalio would say You're going to work

8   with him, with so and so.

9   Q    What did the notebook look like?

10   A    A big notebook.

11   Q    Did you ever share delivery drivers with other women

12   working in prostitution?

13   A    Yes.

14   Q    With who?

15   A    Well, with several of them, but the ones I knew, I went

16   with Delia once and with Flora.

17   Q    How much were clients charged while you were?

18   A    35.

19   Q    Did you get to keep any of that money?

20   A    Well, yes, if it was 35, it was 15 and 15.

21   Q    15 to the driver?

22   A    Yes.

23   Q    And what happened to the 15 -- the other 15?

24   A    Well, we would go out and each person had her own

25   driver.

1  Q    What happened to the other 15 that didn't go to the

2  driver?

3  A    I would keep them.

4  Q    And what happened to that money?

5  A    Well, then the rest of the night would go by and I

6  would give it all to Rosalio.

7  Q    Did Rosalio keep track of the money that you made?

8  A    No.

9  Q    Did he ever check you for money?

10 A    No, because he knew I was giving him everything.

11 Q    How did he know that?

12 A    Because when I took the condoms they were numbered and

13 he always saw them.

14 Q    Can you explain that to the jury?

15 A    If I took 25 to 35 and there were five left over, then

16 he would know how much I had made that night.

17 Q    And you're referring to condoms?

18 A    Yes.

19 Q    Did he check to see how many were left?

20 A    Yes.

21 Q    Was there ever a time that you tried not to give money

22 to Rosalio?

23 A    I never -- I never -- I never -- I always gave him all

24 the money.

25 Q    Based on your own observations, what, if anything, did

Fabiola M. - Direct - Hajjar                659

1    Rosalio do with the money that you earned?

2    A    What did Rosalio do with the money?

3    Q    Yes.

4    A    He liked to buy clothes, jewelry, and besides that he

5    had a woman called Karina and the gave her everything.  He

6    paid for her apartment, her clothing, everything.

7    Q    You testified that Rosalio kept track of the condoms

8    that you took each night.

9    A    Yes.

10   Q    What happened when they ran out; how did you get more?

11   A    He would get them.

12   Q    Where were they kept in the apartment?

13   A    In the closet.

14   Q    During this period of time, were you ever alone in the

15   apartment?

16   A    Yes, when he left for Mexico.

17   Q    When he would -- before he left for Mexico when he was

18   in the United States, were you ever left alone?

19   A    Yes.

20   Q    What did you do?

21   A    Once I stayed in the house with Flor because I lived

22   with Flor, and Flor said, We're not going to go work.  We're

23   going to stay at home.  And we began to clean the apartment.

24   They weren't there and they realized that we hadn't gone out

25   to work and they came back to the house and then they got

1   really angry.

2   Q    Fabiola, are you describing one occasion where you

3   didn't work?

4   A    Yes.

5   Q    Okay.  And it was an occasion where you and Flor didn't

6   work that day?

7   A    Yes.

8   Q    When you say "they came home," who are you referring

9   to?

10  A    To Miguel.

11  Q    Miguel came home?

12  A    Yes.  Miguel and Rosalio came home because we hadn't

13  gone to work, they were upset.

14  Q    What happened?

15  A    Well, Miguel gave Flor -- Miguel kicked Flor in the

16  behind and then they went to the room and then Rosalio and I

17  went to the room.

18  Q    What happened?

19  A    Rosalio had me go in the room.  He pushed me onto the

20  bed.  And he began yelling at me and all that, and why

21  hadn't I gone to work and all that.

22  Q    How often did Rosalio yell at you?

23  A    Each time that I didn't bring him enough money.

24  Q    When you were working, Fabiola, did you go by a

25  different name?

1    A    Yes.

2    Q    What was it?

3    A    Lourdes.

4    Q    And why did you use the name Lourdes?

5    A    That's the name Elizabeth gave.

6    Q    After Rosalio arrived in the United States, were there

7    times where you had a problem with a client?

8    A    Yes.

9    Q    Can you explain to the jury what happened?

10   A    I think the client was on drugs, I don't know.  He bit

11   me.  And I was so scared because he wouldn't let me get out.

12   And after that, I left and then the driver took me home.  I

13   told Rosalio to take me to the hospital, but he didn't want

14   to.  And right then and there, he cured me at home and then

15   I was just there for a week and then I had to go back to

16   work.

17   Q    Can you describe the injury, Fabiola?

18   A    Yes.  The client yanked out a piece of flesh here.  You

19   could see my teeth right here (indicating).

20   Q    Were you bleeding?

21   A    Yes.

22   Q    Did it leave scar?

23   A    Yes.

24   Q    And is that the -- you indicated the lower side of your

25   cheek?

1    A    Yes.

2    Q    Was there another time a client hurt while you were

3    working?

4    A    Yes.  Another client, he raped me and then he held a

5    gun to my head.

6    Q    Did you tell Rosalio?

7    A    Yes.

8    Q    How did he react?

9    A    Nothing, as if nothing had happen.

10        He said nothing happened to you, you're all right.

11   Q    Did you have to work the next day?

12   A    Yes.

13   Q    Was there another time a client hurt you?

14   A    Yes.

15   Q    Can you explain what happened?

16   A    Yes.  There was also a time when a client got upset and

17   he grabbed me by the neck, and then I began to scream and

18   there were people in the other room so they opened up and

19   that's when I was able to leave.

20   Q    And when you say people in the other room, who were

21   these people?

22   A    There were neighbors there.

23   Q    Were they strangers to you?

24   A    Yes.

25   Q    How did they get in?

1   A    They knocked the door down.

2   Q    Were you able to escape?

3   A    Yes.

4   Q    Did you tell anyone what happened to you?

5   A    I think I told Delia.

6   Q    Did you tell the driver?

7   A    Yes, I did.

8   Q    What did he say?

9   A    Nothing.  He didn't say anything.

10  Q    Fabiola, at this time did you ever try to go to the

11  police?

12  A    No.

13  Q    Can you explain to the jury why not?

14  A    Because he told me if I went anyway, they were not

15  going to believe me.  And in the second place, he told me

16  that what I was doing was a crime and if I spoke up, they

17  were going the put me in jail.

18  Q    Did you believe Rosalio?

19  A    Yes.

20  Q    Fabiola, did this violence have an affect on you

21  emotionally?

22  A    Yes.

23  Q    What kind of effect?

24  A    Because when I look at myself in the mirror, I see the

25  scar.  It reminds me of everything.

1   Q    Fabiola, I'm going to show you a few pictures.  I'm

2   going to show you what is in evidence as

3   Government's Exhibit 4.

4           And do you recognize the person in this

5   photograph?

6   A    Yes.

7   Q    Who is that?

8   A    Francisco.

9   Q    Did Francisco have a nickname?

10  A    I think that they called him Mojorra.

11  Q    I'm showing you Government's Exhibit 7 in evidence.  Do

12  you recognize the picture in Government's Exhibit 7?

13  A    Yes.

14  Q    Who is it?

15  A    That's Guadalupe.

16  Q    And what relationship does Guadalupe have to any of the

17  defendants, if you know?

18  A    Miguel, Osvaldo and Rosalio, they're brothers.  And

19  they're her brothers.

20  Q    I'm going show you what is in evidence as

21  Government's Exhibit 12.  Do you recognize the person in the

22  Government's Exhibit 12?

23  A    Yes, Delia.

24  Q    I'm showing you what's in evidence as

25  Government's Exhibit 24.  Do you recognize this person?

1   A    That's the eldest brother, Magdaleno.

2   Q    Okay.  Fabiola, earlier you identified the defendant

3   Francisco.  What relationship did he have to Rosalio?

4   A    Francisco was Delia's partner.

5   Q    And what was the relationship between Francisco and

6   Rosalio?

7   A    Oh, the nephew.

8   Q    Francisco was the nephew of Rosalio?

9   A    Yes.

10  Q    Can you describe for the jury how you met Francisco for

11  the first time?

12  A    I met him because he came to where I lived on 112th.

13  Q    Who did he come with?

14  A    With Guadalupe.

15  Q    Did he come with anyone else?

16  A    It was Delia, Francisco and Guadalupe who came.

17  Q    And where did they stay?

18  A    They stayed where I lived at 112th.

19  Q    I'm going to show you what is in evidence as

20  Government's Exhibit 104.

21          And if I could --

22          MS. HAJJAR:  Thank you.

23  Q    Do you recognize Government's Exhibit 104?

24  A    Yes.

25  Q    What is it?

1    A    That's where I used to live on the ground floor.

2    Q    And that's the tan building on the left-hand side?

3    A    This one (indicating), yes.

4    Q    You testified that Delia came with Francisco at this

5    time to live with you.  And how old did she appear to you at

6    this time?

7    A    Both of them were minors, 16, 17, I don't remember.

8              MS. KELLMAN:  Move to strike, Your Honor, not

9    responsive.

10             THE COURT:  Yes.  Strike that, ladies and

11   gentlemen.  The question was how old did Delia appear to be.

12             THE WITNESS:  16, she was a minor.

13             THE COURT:  Thank you.

14   Q    And based on your on observations who did Delia work

15   for, if anybody?

16   A    For Francisco.

17   Q    And Delia worked as a prostitute for Francisco?

18   A    Yes.

19   Q    Did you have a nickname, Fabiola?

20   A    Another name?

21   Q    Not a name for work.  Did you have a nickname?

22   A    Oh, Delia used to call me Chapparita.

23   Q    What does that refer to?

24   A    To the fact that I'm short.

25   Q    Did Delia call you something else?

1    A    Tia.

2    Q    And does Tia mean?

3    A    Tia, because she saw me there with Rosalio, so she

4    thought that I was his aunt.

5    Q    Based on your observation, Fabiola, what was the

6    relationship like between Francisco and his uncle, Rosalio?

7    A    It was good.

8    Q    Did you ever hear Rosalio say anything to Francisco

9    about Delia?

10   A    Yes.  Just this one time, I heard him tell him to tell

11   Delia to work day and night.

12   Q    You heard Rosalio say what to who?

13   A    To Francisco.  He told him, Francisco, to tell Delia,

14   to pressure her, to work day and night.

15   Q    What did Rosalio do while you were living with him and

16   Francisco and Delia?

17   A    He -- well, all he did was go out to -- you know,

18   workout.

19   Q    Did he work?

20   A    No.

21   Q    Did there come a time when Rosalio left the

22   United States?

23   A    Yes.

24   Q    Where did he go?

25   A    To Mexico.

1   Q     And what, if any, communications did you have with
2   Rosalio while he was in Mexico?
3   A     Over the phone, every day, he would call me every day.
4   Q     What did he tell you on the phone?
5   A     Where are you, what are you doing, are you working?
6   Q     Fabiola, did he say anything about your family?
7   A     Yes.  When he went to Mexico, he went to see my family.
8   Q     How do you know that?
9   A     Because my mother called me.  I called her.
10  Q     Did Rosalio tell you that he had visited your family?
11  A     Yes.
12  Q     What words did he use, what did he say?
13  A     Well, when he went to see my family, it was all very
14  nice.  He treated them very well.
15  Q     How did it make you feel that he visited your family
16  while he was in Mexico?
17  A     More -- more worried.
18  Q     Why?
19  A     Because it was a threat.  He had threatened to do
20  something to them.  He went and saw them, so I thought to
21  myself, he is going to come through with what he said.  He's
22  going to go through with what he said.
23  Q     While Rosalio was in Mexico, what did you do with the
24  money that you earned in prostitution?
25  A     One time I give gave it to his brother-in-law, and the

Fabiola M. - Direct - Hajjar                    669

1   other times, I would send it to him.

2   Q    Did anyone tell you to do that?

3   A    Yes.  Him.

4   Q    Okay.

5   A    Rosalio.

6   Q    Fabiola, you said that you lived with Delia for some

7   period of time.  Did there come a time when Delia left?

8   A    Yes.

9   Q    Can you explain what happened to the jury?

10  A    The first time she tried to do it, she just said she

11  was leaving, and she left.  She came back at night.  That's

12  all I know.

13  Q    Was there -- did Delia make another attempt to leave?

14  A    Yes.  A month later, she tried to leave and she never

15  came back.

16  Q    Were you there when she left?

17  A    Yes.

18  Q    Explain what happened for the jury.

19  A    Yes.  She just told me she was leaving.  She started

20  gathering up her things.  She called a cab and she left.

21  Q    Did you encourage her?

22  A    I told her to leave, to in fact, leave.

23           MR. GOLD:  I'm sorry, I couldn't hear that.

24           THE COURT:  Would you court reporter read that

25  back, please.

1               (Requested portion read back.)

2               MR. GOLD:   Thank you.

3    Q    Did there come a time when you left Rosalio?

4    A    Yes.

5    Q    Can you describe what happened to the jury, please?

6    A    I couldn't stand being with him anymore.  I couldn't

7    take it anymore.  I was upset with the fact this his other

8    women existed, they would hit me, I couldn't take it

9    anymore.  Even though he knew how upset I was about these

10   other women, he never did anything about it.  That's when I

11   made my plan.  I saved up a bit of money and I got myself a

12   room.  And once the room was ready, I left.

13   Q    And you refer to "other women," Fabiola.  What did you

14   understand these other women to be, who they -- what they

15   did?

16   A    Colombia, as far as I understood, she worked for him,

17   too.

18   Q    As a prostitute?

19   A    Yes.

20        Karina, well, she had a child with him.  They were

21   married.  He treated her well.  He didn't work.

22   Q    How do you know that?

23   A    He came to where I was living.  He came to tell me

24   everything.  He told me everything.  Everything I was making

25   from my work, he was giving to her.  That's what Rosalio

1    told me.

2    Q    What happened after you got a room?

3    A    So I went to that room, and then he found me a week

4    later.

5    Q    How did he find you?

6    A    In the park.

7    Q    What happened?

8    A    Then he told me to go back with him.  So I thought he's

9    not going to give me a minute of peace, he's never going to

10   leave me alone.  So I went back to him.

11   Q    How did you feel towards Rosalio at this time?

12   A    I had no way out.

13   Q    Did you come up with another way of leaving Rosalio?

14   A    After I went back to him, he told me he was planning to

15   go to Mexico.  And that was when I made my plan.  I

16   convinced him that I was going to behave as I should.  I

17   wasn't going to try to escape.  And I would send him my

18   money from what I was doing for work as I always did, and

19   that's what happened.  He left.  He went the Mexico.  He

20   left in December.  And he called me the day after he got

21   back to Mexico and that was when I told him I didn't want to

22   have anything more to ever do with him again.  I didn't want

23   to have anything to do with him.  And when I told him I

24   didn't want to have absolutely anything more to do with him,

25   he cursed at me.  He threatened me.  He told me he was going

1    to go knock down my house.  I said I don't care.  Do what

2    you like.

3    Q    Did you understand him to be referring to your house in

4    Mexico?

5    A    Yes.

6    Q    Your family's house?

7    A    Yes.

8    Q    Fabiola, you said -- you testified that you convinced

9    him that you would behave, that you would continue to send

10   money to Rosalio.  Why didn't you just tell him you were

11   leaving?

12   A    Because he wouldn't let me.  He would never let do

13   that.

14   Q    And after he called you from Mexico and threatened your

15   family, did you speak to him again?

16   A    No, that was the last time I spoke to him.  I didn't

17   talk to him after that.

18            MS. HAJJAR:  May I have one moment, Your Honor?

19            THE COURT:  Yes.

20            MS. HAJJAR:  No further questions, Your Honor.

21   Thank you.

22            THE COURT:  Mr. Dunn?

23            MR. DUNN:  Yes, Your Honor.

24            (Pause in proceedings.)

25   CROSS-EXAMINATION

Fabiola M. - Cross - Dunn                    673

1   BY MR. DUNN:

2   Q     Good afternoon.

3   A     Good afternoon.

4   Q     My name is Thomas Dunn.  I'm an attorney.  I represent

5   Rosalio.

6           Now, you met Rosalio at a nightclub, correct?

7   A     Yes.

8   Q     And over a two-week, three-week period you and he went

9   out, correct?

10  A     One week.

11  Q     And where would you meet him when you went out on these

12  dates?

13  A     There were no other dates.

14  Q     Well, you were -- withdrawn.

15          Did you ever go out to dinner with him before he

16  took you to his town?

17  A     No.

18  Q     So during this one-week period you didn't go out

19  anywhere; is that correct?

20  A     No.

21  Q     But during this one-week period, did you see him?

22  A     No.

23  Q     So you meet him at a nightclub, correct?

24          When is the next time that you meet him?

25  A     Yes.

Fabiola M. - Cross - Dunn                    674

1          The next time I saw him, was the time I was
2    supposedly supposed to meet his family, which I never did.
3    Q    Well, where did you meet him?  That one day, where did
4    you meet him?
5    A    He came to pick me up near where I lived.
6    Q    You told him where to meet you?
7    A    Yes.
8    Q    Did he know where you worked?
9    A    Not exactly.  But he met me kind of near there.
10   Q    So you met him at the nightclub one night, then the
11   next time you met him was somewhere near your house; is that
12   correct?
13   A    Yes, where I was working.
14   Q    So he met you where you were working -- withdrawn.
15          The next time you met him at the nightclub you met
16   him at where you worked; is that correct?
17   A    Yes.
18   Q    And after that meeting near -- at your work, that's
19   when he asked you to go to his home in Tenancingo; is that
20   right?
21   A    Yes.
22   Q    And that's when -- is that when you left to Tenancingo,
23   after he asked you?
24   A    Not Tenancingo, he said it was to Puebla.
25   Q    Okay.  But wherever it was on the night or the day he

Fabiola M. - Cross - Dunn                    675

1   met you where you worked and he asked you to go with you,

2   that was the same time that you went with him, right after

3   he asked you; was that correct?

4   A    Yes.

5   Q    And he had a -- an SUV or a car with him at that time;

6   is that correct?

7   A    A car.

8   Q    And you both got in the car and drove off from your

9   town to what you believed was Puebla; is that correct?

10  A    Yes.

11              (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. DUNN: (Continuing.)

3    Q    You never told your parents you were going; is that

4    right?

5    A    No -- yes.

6    Q    And he had never seen your house, correct?

7    A    No.

8    Q    When you got in that car and left with him, he did not

9    know where you lived; is that right?

10   A    Yes.

11   Q    In this short period of time where you met him at the

12   nightclub, he met you at your job, you got in the car and

13   drove to what you believed was Puebla, had you concluded that

14   you and he had some kind of a relationship together?

15   A    Yes, because he had already asked me to be his

16   girlfriend.

17   Q    And he didn't ask you that on the night of the nightclub;

18   he asked you when he met you at your place where you were

19   working, correct?

20   A    No, he asked me that over the phone because for the whole

21   week we were speaking on the phone.

22   Q    So at some point in time you got to a town that you

23   learned was Tenancingo, correct?

24   A    (No verbal response.)

25   Q    Now, at that point, you still had your own cell phone,

1   correct?

2   A     Yes.

3   Q     On the three-hour trip from your town to Tenancingo, did

4   you make a call to your family?

5   A     No.

6   Q     So finally you get to Tenancingo, he takes you to a

7   house, and is it your testimony that you stay there for two,

8   three, four months; is that your testimony?

9   A     Yes.

10  Q     And during that period of time, you became angry -- isn't

11  that correct? -- with him because of the fact that you were

12  being left by yourself, you hadn't met his family, and you are

13  stuck in this town, correct?

14  A     I didn't get angry with him.  I just told him why hadn't

15  I met his mother and he would say:  Later, later.  He was

16  going to take me later.

17  Q     To the best of your recollection, how many months did you

18  spend in Tenancingo?

19  A     Four months.

20  Q     How often would you speak to him about the fact that you

21  had never met his family or his mother?  How many times during

22  that period of time would you say you talked to him about

23  that?  Was it every day?

24  A     Then afterwards, I met his mother.  She was the one who

25  came to the house, to the abandoned house.  She came there.

1    Q    I'm going to ask the question again.

2         During this period of time, during the whatever

3    period -- the several months that you were there, did you

4    speak to Rosalio each day about the fact that you were not

5    seeing his mother or any family members?

6    A    His mother, I did meet her.  She came to see me where I

7    was staying.

8    Q    All right.  Let's forget about that one -- withdrawn.

9         She saw you once, correct?

10   A    Yes.

11   Q    How long were you there before she came to visit you?

12   A    About a month.  About after a month.

13   Q    During that first month before you saw her, did you speak

14   to him every day about, "When am I going to meet your mother?"

15   A    No.

16   Q    Did you talk to him at all during that period of time?

17   A    Yes.  He took me -- it's not that I said, like, when,

18   when, but after that, then I never said anything to him again

19   about that.

20   Q    What did you talk about?  Like, typically, what did you

21   talk about when he was gone the entire day and he would come

22   back to the place?  What -- what would you and he talk about?

23   A    Nothing.

24   Q    Didn't you think that was unusual?

25   A    When he came -- he would say that he was going out to

1   work.

2   Q    Well, let me ask you this:  He comes home at night.  He's

3   wherever he's been, he comes back, you and he -- yes or no --

4   you and he do not speak?

5   A    Yes.

6   Q    And was it like that for three months?  Was it like that

7   that you didn't speak -- that he wouldn't speak to you for

8   three months when he came back from work?

9   A    Well, when we were in Mexico, he behaved very well

10  towards me.

11  Q    But he did not speak to you -- correct? -- during this

12  entire time in his house?

13          MR. DUNN:  Do you want me to repeat it?

14          THE INTERPRETER:  Yes, please.

15  BY MR. DUNN:

16  Q    During this three-month period when you were living with

17  him and he comes back in the evenings, is it your testimony

18  that you and he, during that entire time, did not speak?

19  A    Well, when he always talked to me, he would say, let's go

20  to New York, we are going to work over there.

21  Q    Over this three- or four-month period that you're there,

22  did you ever think about leaving while he was away during the

23  day?

24  A    No.

25  Q    During this three- or four-month period, did he tell you

1   regularly that he loved you?

2   A     Yes.

3   Q     Did you ever complain about being left alone or staying

4   in that town?

5   A     He was always very affectionate, like I said.  While

6   they're in Mexico, they behave very well towards you.  They

7   cord you, they treat you well, they say nice things to you,

8   they say pretty things to you.  It's so that you don't leave

9   him, in other words.  The real nightmare is when you arrive

10  here in the United States.

11  Q     At any time during this three- or four-month period when

12  you were in Tenancingo, did you attempt to contact your

13  family?

14  A     Because I didn't have a phone anymore.

15  Q     Did you ever ask:  Can you please give me your phone so I

16  can call my mother?

17  A     Yes, but he always said that he didn't have any balance.

18  Q     Did you ever see him make a phone call during the three

19  or four months that you were with him in Tenancingo?  Did you

20  ever see him use a phone where he made a call?

21  A     Not in my presence, no.

22  Q     When he proposed for you to go to New York, did you want

23  to go to New York?

24  A     Yes, because he spoke nicely to me.  He said we were

25  going to work together; that we were going to work in a

1  restaurant.

2  Q    So you wanted to go to New York; is that correct?  Yes or

3  no.

4  A    I thought that...

5  Q    Did you ever want to contact your family and let them

6  know you're going to the United States into New York?

7  A    Yes, but I wasn't able to contact them any longer.

8  Q    Now, you made three attempts before you were successful

9  to get to the United States; is that correct?

10  A    Yes.

11  Q    And you told the federal agents that you would willingly,

12  voluntarily go back to Mexico; is that correct?

13  A    Yes.

14  Q    Now, on any of those three times that you were in their

15  custody, did you say:  I have my mother's phone number here.

16  Would you please call her?  I just want to let her know I'm

17  okay.  Did you ever ask that?  Yes or no.

18  A    No.

19  Q    Now, in the beginning when you -- withdrawn.

20         When you were in the United States for the first

21  time and you're there for several months, Rosalio is not

22  there, correct?

23  A    No.

24  Q    And this woman, Elizabeth, tells you that you're going to

25  work as a prostitute; is that right?  Yes or no.

1   A     Rosalio told me.

2   Q     Well, did Elizabeth tell you first?

3   A     No.  Rosalio told me first.

4   Q     And you told Rosalio, "I'm not going to do that," right?

5   A     Yes.

6   Q     And then he started telling you that he loved you; is

7   that right?  Yes or no.

8   A     While in Mexico, yes, he did say that he loved me, but

9   when we were here, he didn't say that any longer.

10  Q     He never said it on the telephone?

11  A     No.

12  Q     Eventually, he comes to New York; is that right?

13  A     Yes.

14  Q     Several months after you get to New York, right?

15  A     Yes.

16  Q     Were there times when he was there with you that he told

17  you he loved you, he wanted you to work so you would make some

18  money and that you could build a house, but did he tell you

19  that he loved you?

20         MS. HAJJAR:  Objection, Your Honor.

21         THE COURT:  I'm sorry, what -- okay.

22         Don't respond yet.

23         MR. DUNN:  Want me to break it down?

24         MS. HAJJAR:  Objection to form.

25         MR. DUNN:  I will do it again.

1          THE COURT:  I think it's both compound and -- I'm

2    not sure how it's advanced beyond anything you have been

3    doing.

4          MR. DUNN:  I'll withdraw, Your Honor.

5    BY MR. DUNN:

6    Q    When he was finally in New York, did you have discussions

7    where he told you that he loved you?

8    A    No.

9    Q    He yelled at you from time to time; is that right?

10   A    Yes.  Yes.

11   Q    He never hit you, did he?

12   A    No, but he would push me.  That's it.

13   Q    He pushed you on that one occasion on the bed, right?

14   A    It was about two times.

15   Q    So on two occasions he pushed you; is that right?

16   A    Yes.

17   Q    But he never slapped you; he never punched you, correct?

18   A    No.  They don't hit you in the face because that leaves

19   black and blues, and then if the clients see the black and

20   blues, then they don't accept you, that's why he didn't hit me

21   in the face.

22   Q    Now, were there times when you would come back from

23   seeing your clients where the deliveryman would drop you off

24   and you would come back to the place where you lived and no

25   one was there?

*Fabiola - Cross - Mr. Dunn*                                684

1   A    Rosalio was always there.

2   Q    You mentioned something about people working out in the

3   park.

4           Do you remember that?

5   A    Uh-huh.

6   Q    Would Rosalio work out in the park?

7   A    In the morning.

8   Q    And would you be back at the house?

9   A    No.  He would leave when I left to go to work.

10  Q    Now, you went -- you had hundreds and hundreds of

11  clients -- correct? -- that you were taken to?

12  A    Excuse me?

13  Q    I'll repeat it.

14          You mentioned that you went to see clients.  Is it

15  fair to say that you did that hundreds and hundreds and

16  hundreds of times?  Yes or no.

17  A    That I saw clients?

18  Q    You saw a lot of clients, right?

19  A    Yes.

20  Q    You said you saw anywhere from 15 to 30 clients a day; is

21  that right?

22  A    Yes.

23  Q    And you worked every day of every month that you were

24  there, correct?

25  A    Yes.

1  Q    Out of all these people that you saw, were there ever any

2  nice men that happened to be clients?  Did you ever see or

3  meet any nice men that were clients?

4  A    No.

5  Q    How about drivers?  You had a lot of different drivers,

6  correct?

7  A    Yes.

8  Q    Did you ever complain to a driver -- any driver -- about

9  what was going on and you really have to get out of this

10 business?

11 A    No.

12 Q    Now, would there be -- withdrawn.

13        Let's talk about going -- some of your clients in

14 Manhattan.

15        When you would go to Manhattan, were there times

16 when you would go during the day?

17 A    Yes.

18 Q    And when you were driving around, did you notice that

19 there were a lot of people on the street?

20 A    Yes.

21 Q    Were there occasions when you saw police officers either

22 standing on a corner or you would see a police car on the

23 street or a policeman just in general walking on the street?

24 Did you ever see any of that?  Yes or no.

25 A    Yes.

1  Q    Were there times when you would go in Manhattan, go into

2  apartment buildings to see clients in buildings that would

3  be -- have a number of floors, like six, seven, or eight

4  floors?

5  A    Yes.

6  Q    And in some buildings, did you have to know an apartment

7  number and you buzz a button and be allowed into the building?

8  Does that ever happen?

9  A    The client would be called, I would wait at the door, and

10  I would be buzzed in and I would go up.

11  Q    Okay.

12        Now, would a deliveryman -- delivery fellow or the

13  driver stay in his car or van?

14  A    Yes.

15  Q    Were there occasions when you came out of these buildings

16  and the driver wasn't there?

17  A    Not all the -- not all the time, but they're always

18  pretty on top of things waiting for you to come out.

19  Q    So there were occasions when you would come out of these

20  buildings and you would have to wait for the driver to show

21  up; is that right?

22  A    Yes.

23  Q    Yes?  I didn't hear the answer.  Sorry.  Or was there an

24  answer?

25  A    Yes.

1  Q      Thank you.

2         You wanted to get out of this business; you wanted

3  to get away from Rosalio, correct?

4  A      Yes.

5  Q      And when you would exit these buildings, you would have

6  some money; is that right?

7  A      Whatever the client had paid me.

8  Q      It's money.  You had it, correct?

9  A      Yes.

10 Q      And you wanted to get away -- withdrawn.

11        On any occasion where the driver didn't show up for

12 a while and you had money, did you ever say to yourself, I'm

13 running, I'm getting out of here, I'm looking for someone to

14 help me?  Does that ever cross your mind?  Yes or no.

15 A      I didn't know anybody here.  Who was I going to turn to?

16 I was here all by myself, and plus, I have -- I had $35 on me.

17 What was I going to do with $35?  Where was I going to go?  I

18 would end up sleeping on the street.

19 Q      You and Delia talked about Delia running away, correct?

20 A      She made the decision first.  She was the first one to

21 decide to leave.

22 Q      Just -- I'm going to repeat the question.  It calls for a

23 yes or no answer.

24        Did you and Delia speak about Delia running away?

25 A      No.

1    Q    You never spoke to Delia about her running away?

2    A    No.

3    Q    Didn't she tell you she was running away and then she

4    asked you to come with her?

5    A    The first -- no.  She just told me right when she was

6    leaving, "I'm getting out of here."

7    Q    And you were there when she called the cab, correct?

8    A    Yes.

9    Q    And she never said to you, Why don't you come with me

10   now, we have a chance?

11   A    No, because she told me she was going to see some

12   relatives she had here.  That's where she was going to go.

13   Q    You mentioned about there were occasions where you saw

14   clients in Pennsylvania; is that right?

15   A    Yes.

16   Q    What would you say the longest drive was from where you

17   lived in Queens to any location that -- to see a client?  What

18   would you say was the longest?  Was it over three hours?

19   A    Yes.

20   Q    And were there times where you -- the driver had to stop

21   for gas -- withdrawn.

22             Were there times when the driver had to stop for gas

23   at any kind of location on the highway?

24   A    No.

25   Q    Never got gas.

1    A    No.

2    Q    Six-hour roundtrip and never got gas; is that right?

3    A    I've only ever been to Pennsylvania, and from here to

4    Pennsylvania is three hours.  That's not so far.

5    Q    Did you return from Pennsylvania?

6    A    Yes.

7    Q    And you never saw the driver get gas.

8    A    No.

9    Q    Did you --

10            THE COURT:  Can we talk at sidebar for a minute?

11            MR. DUNN:  Sure.

12            (Sidebar.)

13            (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                690

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3              MR. DUNN:  Hi, Judge.

4              THE COURT:  I'm afraid you have been covering the

5    same territory for the last 25 minutes.  Can you possibly move

6    on?  They got the point.

7              MR. DUNN:  Okay.  I understand what you're saying.

8              THE COURT:  It just goes on.  Thank you.

9              MR. DUNN:  That's fine.

10             MS. ARGO:  Your Honor, since it's 3:30, is it

11   possible we can take a break now?

12             THE COURT:  We'll take a break now.

13             MS. ARGO:  Thank you, Your Honor.

14             (Sidebar end.)

15             (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  Ladies and gentlemen, I think we have

3  been sitting for long enough.  How about a break?

4          THE COURTROOM DEPUTY:  All rise.

5          (Jury exits.)

6          THE COURT:  Do you think you can take this time to

7  go through your outline and -- it seems that if you make -- if

8  you try to make a point and it's hard, move on, okay?

9          MR. DUNN:  I will, Judge.

10         (A recess in the proceedings was taken.)

11         THE COURT:  Please be seated.

12         I gather that the last alternate is a Sabbath

13 observer and must leave at 4:30 tomorrow afternoon.  I don't

14 know how you feel.  I would be willing to go along with that.

15 You probably would be delighted to go along with that.

16         MS. KELLMAN:  We would love to stay until 6:00, but

17 we can agree to let her go.  That would be fine, Judge.

18         THE COURT:  The same juror indicated that he may

19 have a hardship problem, he will find out tomorrow, but he

20 learned that his job may not pay him anything for --

21         MS. KELLMAN:  I'm sorry, Judge, what was that?

22         THE COURT:  His job.

23         MS. KELLMAN:  But which juror?

24         THE COURT:  Now it's Alternate Number 5.

25         MS. KELLMAN:  The Sabbath observer is 6?

*Proceedings*                                                    692

1            THE COURT:  No.  Same person.

2            MS. KELLMAN:  Okay.

3            THE COURT:  So we may discover tomorrow that we

4    ought --

5            MS. KELLMAN:  The Sabbath is a problem.

6            THE COURT:  The Sabbath won't be the problem, but

7    something else may be.

8            Mr. Dunn, how long, about, do you think you will be?

9            MR. DUNN:  Ten to fifteen, Your Honor, if I get yes

10   or no answers.

11           THE COURT:  In terms of other people's cross,

12   Mr. Golub?

13           MR. GOLUB:  Judge, I don't anticipate cross at this

14   time.

15           THE COURT:  No cross?

16           MS. KELLMAN:  I may have very short cross.

17           THE COURT:  Anyone else?

18           MR. GOLD:  The same, Your Honor.

19           THE COURT:  Short cross?

20           MS. KELLMAN:  Judge, can we find out what the plan

21   is after that?

22           THE COURT:  Yes.

23           I suppose the other witness.

24           MS. HAJJAR:  The next witness will be Delia.

25           MS. KELLMAN:  Thank you.

1             THE COURT:  Is someone getting the witness?

2             MS. HAJJAR:  Your Honor, she's just in the restroom,

3    but I think there's -- there's -- there's another witness in

4    the bathroom, so we're just keeping them apart for a moment.

5             THE COURT:  Okay.  We'll wait.

6             (Pause.)

7             THE COURT:  We're bringing the jury in.

8             (Witness resumes the stand.)

9             THE COURTROOM DEPUTY:  All rise.

10            (Jury enters.)

11            THE COURT:  Please be seated.

12            Mr. Dunn.

13   BY MR. DUNN:

14   Q    I'm going to try to ask some questions that call for yes

15   or no answers.

16            Do you understand that?

17   A    (No verbal response.)

18   Q    If you don't understand the question -- I'm sorry.

19   A    Okay.

20   Q    If you don't understand the question, just let me know

21   and I'll repeat it or rephrase it.

22   A    Okay.

23   Q    Now, you began at one point to save -- to try to save

24   money to get an apartment to leave Rosalio, correct?

25   A    Yes.

1    Q    And, in fact, you did; you moved out and you got an

2    apartment, correct?

3    A    A room.

4    Q    You got a room that you rented out that you paid for,

5    correct?

6    A    Yes.

7    Q    And at some point after being away from Rosalio for a

8    while, you ran into him in a park in Queens, correct?

9    A    First he called me.

10   Q    You ignored his calls, correct?  I mean, you might have

11   spoken to him, but you ignored them, correct?

12   A    Yes.

13   Q    How far was this park -- well, withdrawn.

14          How far was the house where you had this room from

15   where you had previously lived, like, a couple weeks before?

16   A    Not very far.

17   Q    So at some point in time, you meet him in a park, right?

18   A    Yes.

19   Q    Was this during the day?

20   A    Yes.

21   Q    Were there other people in the park?

22   A    No.

23   Q    What time during the day was it, if you remember?

24   A    It was the afternoon.

25   Q    Does this park have fields where people can partake in

1    sports?

2    A    Yes, but there were no people there.

3    Q    So the only two people in the park were you and Rosalio,

4    right?

5    A    Yes.

6    Q    You wanted to get away -- withdrawn.

7          When you left his house and you got this room, you

8    wanted to stay away from him, correct?

9    A    All I really wanted was to get out of there.

10   Q    So you wanted to get away from him, right?

11   A    Yes.

12   Q    You would have hoped never to see him again.

13   A    Yes.

14   Q    But you agreed to meet him in a park; is that right?

15   A    I was in the park and he showed up.

16   Q    So it just so happened he came to the park and he spoke

17   to you and he asked you to come back with him, correct?

18   A    Yes.

19   Q    By the way, you were the only person in the park before

20   he arrived, correct?

21   A    Yes.  I was sitting there in the park and he showed up.

22   Q    Why did you go to the park that day?

23   A    Because the park -- the park is very close to where I was

24   living, that's why.  I just went in there to sit down.

25   Q    And you went back with him, correct?

1    A    Yes.

2    Q    After you had made such a big effort to leave, you went

3    back with him; is that right?  Correct?

4    A    Because I had no other option.

5    Q    You had gotten your own place; is that right?

6    A    Yes.

7    Q    Now, I would like to direct your attention to July of

8    2017.

9         Did agents from Homeland Security come to where you

10   were living at the time?

11   A    Yes.

12   Q    And they asked you to accompany them to their offices; is

13   that right?

14   A    Yes.

15   Q    Did they handcuff you?

16   A    No.

17   Q    Did they tell you you were under arrest?

18   A    No.

19   Q    Did -- I'm sorry.

20        Did they tell you that they could arrest you for

21   being in the country illegally?

22   A    No.

23   Q    When you were with them on the way to their office, were

24   you frightened?

25   A    Yes.

1  Q    And were you frightened when you were speaking with them

2  in their offices?

3  A    Yes.

4  Q    And they told you -- withdrawn.

5           They wanted information from you about what you had

6  been doing since you had gotten to the United States; is that

7  correct?

8  A    They had already -- they had already investigated

9  everything.

10 Q    They wanted you to talk to them, though, correct?

11 A    Yes.

12 Q    And they -- I'm sorry, sorry.

13           They wanted to know information from you about the

14 prostitution that you were involved in; is that correct?

15 A    Yes.

16 Q    And you advised them that you would cooperate with them;

17 is that correct?

18 A    Yes.

19 Q    And they gave you some kind of status that permitted you

20 to stay in the United States; is that correct?

21 A    No.

22 Q    They gave you -- did they give you permission to apply

23 for a work permit?

24 A    Yes.  But I just have a temporary one.

25 Q    Do you ever recall being told about a status that's

1    called "continued present status"?

2    A    No.

3    Q    As far as you know, you can stay in the United States

4    now; is that right?

5    A    I don't know.

6    Q    Do you fear deportation?

7    A    No.

8    Q    I would like to step back for a moment.

9         You mentioned that there were a couple of women that

10   there was representations that they were married to Rosalio;

11   is that correct?

12   A    Just one is married.

13   Q    And that was Elizabeth?

14   A    No.  Karina.

15   Q    Well, are Elizabeth and Karina the same person?

16   A    No.

17   Q    Did Elizabeth tell you that she was in a relationship

18   Rosalio -- with Rosalio?

19   A    Yes.

20   Q    Now, Rosalio had told you that he loved you; that he

21   wanted to marry you; that he wanted to have a family with you;

22   is that right?

23   A    No.

24   Q    He never told you that his plan was that you and him

25   could get married?

1   A     No.

2   Q     Weren't you upset -- withdrawn.

3           Isn't it a fact that you were upset when you heard

4   that Karina was married to Rosalio and had a child of his?

5   A     No.

6   Q     There was a woman that you met, and her name was Esme

7   Luna; is that the correct pronunciation?

8   A     I don't know what her name is.  I never heard the true

9   name.  I knew her as Colombian.

10  Q     Was there a woman that assaulted you on the street that

11  attacked you?

12  A     Yes.

13  Q     And this was a woman that you met through the

14  prostitution business, correct?

15  A     I met her because she was Rosalio's woman.

16  Q     And she is jealous of you; is that correct?

17  A     I don't know if she was jealous of me, but he hit me --

18  excuse me -- but she hit me, and what Rosalio did was run

19  away.

20  Q     I'm just asking you a question about her.

21          Isn't it a fact that you told people that she was

22  extremely jealous of your relationship with Rosalio?  Isn't

23  that a fact?

24  A     I don't know.  Perhaps yes.  I don't know.

25          (Continued on the following page.)

1    CROSS-EXAMINATION

2    BY MR. DUNN:   (CONTINUED)

3    Q    You told people that she was extremely jealous of you;

4    isn't that correct?

5              MS. HAJJAR:   Objection.

6              Objection, Your Honor.

7              THE COURT:   Yes, I'm confused.  Did you tell people

8    that she was extremely jealous of you or did you just think

9    she was?

10             THE WITNESS:   I thought it.

11             THE COURT:   Okay.

12   Q    And at some point, she attacked you, correct?

13   A    Yes.

14   Q    And she told you to stay away from Rosalio, right?

15   A    She didn't tell me to stay away.  She just came and she

16   grabbed me here and she kicked me.

17   Q    And she never said why?

18   A    No.

19   Q    You never asked her?

20   A    No.

21   Q    Did you ever sit down later, after it happened, and think

22   to yourself why it may have happened?

23   A    No.

24   Q    Do you remember signing a document under penalty of

25   perjury in which you said that "Rosalio brought me in a house

Fabiola M. - Cross - Dunn                          701

1    in Tenancingo that was under construction and he told me it

2    was a house for us to live in together when it was completed

3    and that we would get married and have a family"?

4              MS. HAJJAR:  Objection.

5              THE COURT:  Sidebar.

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    702

1          (The following occurred at sidebar.)

2          MS. HAJJAR:  Your Honor, this is not an appropriate

3     way to -- I don't know exactly what he attempted to elicit.

4          THE COURT:  I don't know what he's doing either.

5          MR. DUNN:  Okay.  Well, Ms. Fabiola said that there

6     was no discussion about love or marriage or anything like

7     that, and she signed a declaration.  And I think we have the

8     Spanish copy in which he told her, or that they would get

9     married and have a family together.

10         THE COURT:  So that was the statement?

11         MS. HAJJAR:  Yes, except here's the problem:

12    Mr. Dunn has already elicited that he told in the beginning of

13    his cross-examination when he started going temporally through

14    what happened, the witness said yes, he told me, he told me he

15    loved me, yes, we had a relationship, yes, she said something

16    like that's what they do.  Later on, Mr. Dunn circled back and

17    he did ask again, Did he tell you that he loved you?  And at

18    this point, my understanding was the witness had -- we had

19    moved on from the Mexico portion.

20         THE COURT:  She already did say.

21         MS. HAJJAR:  Mr. Dunn confused her because she said

22    no.  It was evident she already responded to his question.

23         THE COURT:  I think that's right.  Sometimes the

24    order of your questions and the nature of the questions, I

25    mean, you're very hard, going through my mind trying to think

```
                         Sidebar                        703
```

1   how would I answer this question one way or the other if I

2   were her.

3           MR. DUNN:  I wasn't trying to confuse her, Judge.

4           THE COURT:  I know that wasn't intentional.  I'm

5   sorry.  I didn't mean that.

6           MR. DUNN:  One of the difficult things with the

7   witness, she can't answer a yes-or-no question.  She goes on

8   and on and on.

9           THE COURT:  You know, not necessarily.  There are

10  some questions that are really yes or no.  There are others

11  that are yes because --

12          MR. DUNN:  Okay.

13          THE COURT:  Okay.

14          (Sidebar conference ends.)

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          MR. DUNN:  I have no further questions, Your Honor.

3          THE COURT:  Okay.  I guess, Ms. Kellman, it's your

4    turn.

5          MS. KELLMAN:  Thank you, Judge.

6    CROSS-EXAMINATION

7    BY MS. KELLMAN:

8    Q    Good afternoon, Fabiola.

9    A    Good afternoon.

10   Q    My name is Susan Kellman, and I have just a few followup

11   questions, if I might.

12   A    Okay.

13   Q    You testified a little while ago that there came a time

14   in July of 2017 when federal agents came to your -- to the

15   place where you were living and asked you to accompany them to

16   their offices, correct?

17   A    Yes.

18   Q    And you weren't under arrest, correct?

19   A    Yes.

20   Q    But you told the jury and all of us that you were

21   frightened, correct?

22   A    Yes, because at that moment I thought it was Immigration

23   and that they were going to report me.

24   Q    And that's because you were not legally in the

25   United States, correct?

1    A    Yes.

2    Q    But of course, they didn't deport you, correct?

3    A    No.

4    Q    And they asked you to help them with the investigation

5    that was on -- with an investigation that was ongoing,

6    correct?

7    A    Yes.

8    Q    And they told you that if you wanted bail, that you would

9    have to tell them the truth, correct?

10   A    Yes.

11   Q    You understood that, right?

12        MS. KELLMAN:  I'm going to move to strike --

13   A    Yes, when they talked to me about the --

14        MS. KELLMAN:  I'm sorry, Your Honor.  I asked a

15   question.  Did she understand that?  It's a yes or no.

16        THE COURT:  I think she said she didn't, so I don't

17   think it's yes or no.  I think she's explaining.  What's the

18   issue?

19        MS. KELLMAN:  I'd like to rephrase the question.

20        THE COURT:  All right.  Rephrase the question.

21        MS. KELLMAN:  I'll withdraw the last question.

22        THE COURT:  Okay.

23   Q    Did you understand that you had to tell them the truth?

24   A    Yes.

25   Q    And you understood that they were in a position to help

1   you stay in the United States, correct?

2   A    They didn't talk to me about that.

3   Q    But you knew that they were federal agents, correct?

4   A    Yes.

5   Q    And you knew that you were in the United States

6   illegally, correct?

7   A    Yes.

8   Q    And you knew from your own experience that on several

9   occasions, you had been at the border and stopped by federal

10  agents and sent back to Mexico, correct?

11  A    Yes.

12  Q    And that happened on more than one occasion, correct?

13  A    Yes.

14  Q    So you understood, well understood, that federal agents

15  had the ability to send you out of the country or help you

16  stay in the country, correct?  Yes or no?

17  A    Yes.

18  Q    Now, during the course of this interview, they asked you

19  about your different experiences and observations in

20  connection with this prostitution investigation, correct?

21  A    Yes.

22  Q    And one of the things that you offered to them was the

23  fact that you knew this fellow Miguel and his girl, I think

24  you called her Veronica, correct?

25  A    Yes.

1  Q    And you met with these agents twice in July of 2017,

2  correct?

3  A    Yes.

4  Q    And at that time, you told the agents that you had been

5  present at a time when Miguel smacked Veronica in the face,

6  correct?

7  A    Not a slap.

8  Q    Well, do you recall being interviewed again by the agents

9  in December of 2019?

10 A    Yes.

11 Q    And do you recall at that time that you clarified the

12 fact that you had misspoken and that Miguel had not, as you

13 had previously said, smacked Veronica in the face but kicked

14 her in the behind?

15 A    Yes.

16 Q    And since you began speaking with the agents in July of

17 2017, there's been no attempt to deport you from the

18 United States, correct?

19 A    No.

20 Q    And after you clarified your misstatements from July of

21 17 of 2017, there was still no effort to deport you from the

22 United States, correct?

23          MS. HAJJAR:  Objection.

24          MS. KELLMAN:  I can rephrase it, Judge.

25          THE COURT:  Okay.

Fabiola M. - Cross - Gold                          708

1   Q     Since your interview in December of 2019, has there been

2   any attempt to deport you from the United States?

3   A     No.

4              MS. KELLMAN:  I have nothing further.

5              THE COURT:  Anyone have any other questions?

6              Mr. Gold.

7   CROSS-EXAMINATION

8   BY MR. GOLD:

9   Q     When you testified this morning, you indicated that when

10  you met Delia, she was 16 years old; is that right?

11  A     Yes.

12  Q     Had she ever given you a different age?

13  A     No.

14  Q     And what year was this that you met her?

15  A     I don't remember.

16  Q     How long did she and you live in the same apartment,

17  approximately?

18  A     Maybe two or three years, I don't remember.

19  Q     Okay.  And she was 16 years old.  Do you know how old

20  Francisco was when you first met him?

21  A     About seventeen.

22  Q     So they were pretty much the same age?

23  A     Yes.

24  Q     Now, there came a time when you indicated she left the

25  apartment; do you recall that?

Fabiola M. - Cross - Gold                    709

1   A    Yes.

2   Q    And she left the apartment in the morning, I believe you

3   said, and then changed her mind and returned back; is that

4   correct?

5   A    Yes, she came back at night.

6   Q    And then there came another time when she left

7   permanently, correct?

8   A    Yes.

9   Q    How much longer after this first leaving did she finally

10  leave the apartment for good?

11  A    About a month later.

12  Q    And when she left, she went around the apartment to pack

13  up her belongings, correct?

14  A    Yes.

15  Q    Did you see her pack?

16  A    Yes.

17  Q    Did she take anything that wasn't hers?

18  A    No.

19  Q    And before leaving, she called a taxi, correct?

20  A    Yes.

21  Q    And that was on her cell phone?

22  A    Yes.

23  Q    Correct me if I'm wrong, but did you say that when she

24  left, she told you that she was going to be staying at some

25  relative's house?

Fabiola M. - Cross - Gold                    710

1   A    Yes.

2   Q    Did she indicate who this relative was?

3   A    A cousin.

4   Q    And was this cousin living in New York as well?

5   A    She didn't tell me where he lived.

6   Q    There finally came a time when you left, correct?

7   A    Yes.

8   Q    And when you left, you took all of your belongings,

9   correct?

10  A    Yes, just clothes.

11           MR. GOLD:  I have no further questions.  Thank you.

12           THE COURT:  Okay.  Anything else?  Mr. Golub?

13  Nothing?

14           MR. GOLUB:  Nothing further.

15           MS. HAJJAR:  No redirect, Your Honor.

16           THE COURT:  Okay.  Okay, thank you very much.  You

17  are excused.

18           (Witness Excused.)

19           MS. ARGO:  Your Honor, the government calls Delia.

20           (Pause.)

21  D E L I A,

22           called as a witness having been first duly

23           sworn/affirmed, was examined and testified as

24           follows:

25           THE CLERK:  Please state your name for the record.

1              THE WITNESS:  Delia.

2              THE CLERK:  She understood.

3              THE COURT:  You understood?

4              THE INTERPRETER:  Your Honor -- by the

5    interpreter -- perhaps the government would like to answer

6    that question.

7              MS. ARGO:  Yes, Your Honor.

8              THE COURT:  Sidebar.

9              MS. ARGO:  Either way, I was going to address it

10   with the witness directly, if that's all right.

11             THE COURT:  Okay.  Yes.

12   DIRECT EXAMINATION

13   BY MS. ARGO:

14   Q    Delia, I understand that you'd like to testify in English

15   today.  Is English your first language?

16   A    No, it's not.

17   Q    What is your -- what is English for you?

18   A    English is my third language.

19   Q    What's your first language?

20   A    I speak in My an dialect.

21   Q    What is your second language?

22   A    Spanish.

23   Q    Are you still in the process of learning English?

24   A    Yes, I do.

25   Q    Because English is your third language, would you like

1    the assistance of a Spanish interpreter to stand by to assist

2    you from time to time?

3    A    Yes, I need help.

4         THE COURT:  Fine.

5    Q    Good afternoon, Delia.

6    A    Good afternoon.

7    Q    Delia, do you see anybody in the courtroom that you know?

8    A    Yes, I do.

9    Q    Please identify each person that you know and identify

10   them by an article of clothing they're wearing or the order in

11   which they're sitting.

12   A    In the right side, there is Abel.  He's wearing a blue

13   shirt with a black jacket.

14        MS. ARGO:  Let the record reflect that the witness

15   identified Abel Romero-Melendez, seated at the end of the

16   defense counsel table.

17        THE COURT:  Yes.

18   A    Then in the second line is Francisco Melendez-Perez.

19        MR. GOLD:  I'll stipulate to the identification,

20   Your Honor.

21        THE COURT:  Identified.

22   A    I see Rosalio sitting down in the third chair.

23        THE COURT:  Indicating the defendant.

24   Q    Go ahead.  Anyone else that you see that you recognize?

25   A    Yes.  There is Miguel Melendez.

1   Q     Anyone else that you see?  You can stand up if you'd
2   like.
3         THE COURT:  Yes.
4   Q     Can you see all the way to the front?
5   A     Yes, I can see.
6   Q     Okay.  Do you see anyone else you recognize?
7   A     Yes.
8   Q     Who do you see?
9   A     Jose Osvaldo.
10        THE COURT:  Indicating the defendant, Jose Osvaldo.
11        MS. ARGO:  Thank you, Your Honor.
12  Q     Just going one by one, Delia, let's talk about how you
13  know each of these individuals.
14        Let's start with Francisco.  How do you know
15  Francisco?
16  A     I know Francisco because I met him in Tecamachalco
17  Puebla, where I grew up.
18  Q     What else about him do you know?  How is he important to
19  you?
20  A     He was the person who involved me -- who was -- he
21  promised me that he will take care of me, he'll love me, that
22  he will keep me safe most of the time.  He was one of the
23  persons who traffic me at the age of 14 years old, while I was
24  a child.
25  Q     What about Rosalio Melendez-Rojas, how do you know him?

1   A    I know him because when I arrived in New York back in

2   2010, I met him for the first time.  He was the one who picked

3   me up.

4   Q    What is his relationship to Francisco, if you know?

5        THE WITNESS:  Could you help me with this?

6   A    He's Francisco's uncle.

7   Q    How about Jose Osvaldo?  What relationship does Jose

8   Osvaldo have to Francisco?

9   A    He is Francisco's uncle.

10  Q    And how about Miguel Melendez-Rojas, what is his

11  relationship to Francisco?

12  A    He's Francisco's uncle.

13  Q    And how about Abel Romero-Melendez, what is his

14  relationship to Francisco?

15  A    He is his uncles' cousin.

16  Q    And when you say uncles' cousin, are you referring to

17  Rosalio Jose Miguel and Jose Osvaldo?

18  A    Yes, that's correct.

19  Q    Okay.  Delia --

20       THE INTERPRETER:  Could the interpreter just

21  correct?  It's uncles', plural, cousin.

22       MS. ARGO:  Yes, got it.

23  Q    Delia, where are you from?

24  A    I'm from Mexico.

25  Q    How far did you go in school?

Delia - Direct - Argo                    715

1   A    Sixth grade.

2   Q    How old were you when you left school?

3   A    Approximately 12, 13 years old.

4   Q    When did you come to the United States?

5   A    I came into the United States back in 2010, while I was

6   14 years old.

7   Q    Why did you come to the United States?

8   A    I came to the United States because Francisco told me

9   that if we came here, we could be able to earn money and to

10  have a family and have future, kids and a house.

11  Q    And when you came into the United States, can you say

12  again, how old were you at that time?

13  A    I was 14 years old.

14  Q    You mentioned earlier that Francisco trafficked you.

15  What do you mean by that?

16  A    When I was 14 years old, Francisco obligate me to work,

17  to be a sex laborer while I was a child.

18  Q    For approximately how long did Francisco force you to be,

19  as you call it, a sex slave in the United States?

20  A    Approximately, three years and a half.

21  Q    When did you stop working as a sex slave for Francisco?

22  A    I stopped working for him April of 2014, while I was

23  17 years old.

24  Q    When did you first meet Francisco?

25  A    I met Francisco for the first time on April of 2010, when

1    I was 13 years old.

2    Q    How did you meet Francisco?

3    A    I met Francisco because a friend introduced me to him.

4    Q    Who was this friend?

5    A    My friend's name is Rosalba.  And one day she mentioned

6    to me that she was asked by Jose Osvaldo to go on a date and

7    she didn't want to go by herself, and that he had a friend and

8    she introduced me to Francisco.

9    Q    How did you know Rosalba?

10   A    I know Rosalba because we both worked together on an ice

11   cream shop.

12   Q    So what did you decide to do?

13   A    Well, at that time, I didn't had friends, and I decide to

14   met him.  And I went with my friend Rosalba and I wait in the

15   park where I used to wait for the transportation.

16   Q    And is that where you met him?

17   A    Yes, I met him in a park.

18   Q    What happened when you met?

19   A    My friend introduced me to Francisco and then she left

20   with Jose Osvaldo.  And I stayed with Francisco and we both

21   talked together on a bench of the park.

22   Q    What did you talk about with Francisco?

23   A    He told me at that time that he was 16 years old.  And

24   because of that, I didn't want to look that young and I said

25   that I was 16 years old as well.  That was before my

Delia - Direct - Argo                          717

1    14-year-old birthday.  And he asked me for my phone number.

2    At that time, I didn't had a phone.  We didn't had that money

3    to be able to get one.  And because of that, he give me his

4    phone number.  He wrote it down on a piece of paper.  And

5    later on, I asked to my friend Rosalba if I could borrow her

6    phone, and that's how I got in touch with Francisco.  And

7    that's how we get connected to each other.

8    Q    And once you got connected with Francisco, did you make

9    plans to meet up again?

10   A    Yes.  He asked me to -- if I could meet him again.  And

11   we met a couple times.

12   Q    What did you think of Francisco at this time?

13   A    Well, at that time I thought that he were handsome, he

14   were a good looking guy, and of course I liked him.

15   Q    How was he towards you?  How did he act?

16   A    He was nice to me.  He would say to me that I was cute,

17   that I was a nice girl and that he wanted -- he asked me if I

18   could be his girlfriend.

19   Q    Delia, just the month and day, when is your birthday?

20   A    My birthday is on May 3rd.

21   Q    And so you said you met Francisco in April of 2010?

22   A    Yes, that's correct.

23   Q    And so you were 13 at that time?

24   A    Yes, that's correct.

25   Q    And then how soon after you met Francisco did you turn

1    fourteen?

2    A    A couple days later.

3    Q    And then after you had met up with Francisco a few times,

4    what, if anything, did you decide to do?

5    A    There was one of these Saturdays that he asked me if I

6    could met his family, and I said yes.

7    Q    And did you then go to meet his family?

8    A    Yes, I went to meet his family.  But while we were on our

9    way to his home, I remember telling him that I was 14 years

10   old.  And at the middle of the road again I said that I was

11   14 years old, and he said that it was okay.

12   Q    And who else was in the car with you when you had this

13   conversation?

14   A    It was my friend Rosalba and Jose Osvaldo and myself, and

15   Francisco as well.

16   Q    And who was driving?

17   A    Jose Osvaldo was the one who was driving.

18   Q    Did anyone else comment or react on your age?

19   A    No.  They said nothing at all.

20   Q    How long did this trip take to get to Francisco's

21   family's house?

22   A    It was approximately, like, two hours.

23   Q    When did Francisco ask you to come to his family's house

24   in relation to when you first met him?

25   A    Can you repeat that one more time, please?

                    Delia - Direct - Argo                    719

1    Q    Sure.  And if you need help, that's fine, too.

2         When in relation to when you met Francisco did he

3    ask you to come to his family's home?

4    A    I don't remember exactly, but he asked me after a few

5    dates.

6    Q    So when he asked you to come, what did you understand

7    this to mean?

8    A    At that time, I thought that he asked me to live with

9    him, to go with him and to met his family for the first time.

10   Q    Did you expect to stay there?

11   A    I didn't expect to stay there at that time because I had

12   to work to the next day, but it was late when we arrived there

13   and I couldn't go back.

14   Q    What did you think at that point?

15   A    I didn't know where I was.  I didn't had a phone at all.

16   And he asked me if I could stay with him that night, and I end

17   up staying with him.

18   Q    And that was just that night at that time; is that right?

19   A    That was the first night.

20   Q    What happened once you arrived at Francisco's family's

21   home?

22   A    Jose Osvaldo and Rosalba left.  And Francisco and I, we

23   get into the house.  And he opened the door, we got into his

24   room.  That first night, Francisco and I had sex, and he

25   obligate me to have anal sex.  It was very painful.  I bled a

1    lot.  I still remember seeing the sheets of the bed.

2    Q    Did you want to have anal sex?

3    A    No.

4    Q    What, if anything, did you tell Francisco?

5    A    I didn't want to have sex in that way.

6    Q    After this, what happened next?

7    A    After that, the next day, we get up, and I remember

8    hearing a voice of a little girl saying "Paco," "Paco."  Later

9    on that day, I find out that it was his sister.  And he called

10   me in, Francisco introduced me to his mom.  His mom asked me

11   what was my name and how old I was, and I told her that I was

12   14 years old.

13   Q    Did you learn what Francisco's mother's name was?

14   A    Yes.

15   Q    What is it?

16   A    Her name is M-a, space, A-n-a.

17   Q    How do you pronounce that?

18   A    Ma Ana.

19   Q    What happened after that?

20   A    After I met his family, his mom told me that I had to

21   clean the restrooms.

22   Q    This was right after you had met Francisco's mother?

23   A    Yes, that's correct.

24   Q    What did you think of that?

25   A    I didn't like it, but I felt like I had no choice.

Delia - Direct - Argo                    721

1    Q     Did you want to go home at any point?

2    A     Yes.

3    Q     Why didn't you go home?

4    A     At that time, I felt that Francisco loved me.  He bought

5    me some clothes and he make me feel loved by his family.

6    Q     Was there anything going on at home where you had come

7    from, where you were living --

8    A     Yes.

9    Q     -- that made you not want to go home?

10   A     Yes.

11   Q     What was that?

12   A     As a little girl, I was sexually abused by my father and

13   my uncle.  And because of that, I thought many numbers of

14   times about it and I -- because of that situation and how I

15   felt that Francisco were treating me, I choose to stay with

16   him.

17   Q     Had you ever tried to run away from home before?

18   A     Yes, I tried.  But I went back home again.

19   Q     Now, you said that you met his mother and then she asked

20   you to start cleaning.  What happened next?

21   A     They would send me to go to work on the fields.  I don't

22   like at all to work on the fields.

23         Rosalba and I wouldn't see each other that often,

24   but there was these day where I felt --

25         MR. GOLD:  Objection, Your Honor.  This is beyond

Delia - Direct - Argo                    722

1    the question.

2             THE COURT:  I'm sorry, I'm having difficulty.

3             MS. ARGO:  Your Honor, I simply asked what happened

4    next.

5             MR. GOLD:  Exactly.  So what she thought is not --

6             THE COURT:  Just wait.

7             Ask the next question.

8    Q    So you said you had to work in the fields.  What else

9    kind of work did you have to do?

10   A    I -- while I was in their home, I would had to clean,

11   take care of the kids that they were only 1 year old, between

12   there.  I had to clean.  That's the work that they obligate me

13   to do while I was in their home.

14   Q    You mentioned children.  Whose children were these?

15   A    I learned that those kids were one of Rosalio's kids and

16   one of the kids of Miguel.

17   Q    What did Francisco do while you worked?

18   A    He said that he used to work on the fields, but I don't

19   know what else, what kind of work he was doing.

20   Q    Aside from Francisco's mother, who else, if anyone, in

21   the family did you meet?

22   A    I met Benjamin, who is the tio de Francisco.

23            THE INTERPRETER:  Who is Francisco's uncle.

24   A    The cousins.  His cousins.  His two sisters, Selene and

25   Maribel.  I met his Aunt Guadalupe.  Guadalupe had, at that

Delia - Direct - Argo                          723

1   time, two kids.

2   Q    Did you know at the time where you were?

3   A    I didn't know where I was at that point because when I

4   met Francisco, he told me they were living in Puebla, so I

5   thought that I was in Puebla.

6   Q    Had you ever spent any time outside of your own hometown?

7   A    No.  It was the first time that I was out from home.  At

8   that time I was 14 years old, so my family didn't allow me to

9   go out by myself that much.

10  Q    What was your relationship with Francisco like at this

11  time?

12  A    It was like his girlfriend at that time who was living

13  with him.  And his family make me feel loved, that he care

14  about me, that he loved me.

15  Q    Had you ever been in a romantic relationship before?

16  A    He was my first boyfriend that I had.

17  Q    You testified previously that Rosalba and Osvaldo had

18  traveled with you to Francisco's town.  Did you see Rosalba

19  during this time that you were there?

20  A    Yes, I saw her a couple times.

21  Q    What was your relationship like with Rosalba during this

22  time?

23  A    We didn't see each other that much.  Sometimes they would

24  come -- she would come with Jose Osvaldo at the house.

25               And there was this time where Rosalba didn't had her

1    period and I did had mine.  A few days later on, she didn't

2    came for a couple of days and then she showed up and she

3    mentioned to me that she were bleeding a lot.  And I heard the

4    conversation from Jose Osvaldo and Francisco and other of --

5    other families, the member of their families there, that he

6    was making fun of her.  She called her La Sin Perro.

7    Q    What does that mean?

8    A    That means that they had taken her doggies away.

9    Q    What did you understand that to mean?

10   A    An abortion.  What would I understand from that when she

11   had told me that she was bleeding a lot, that she was in pain.

12   And she would cry because of that, but she felt like didn't

13   had option.  I didn't know how to react at that time because

14   it wasn't --

15           MR. GOLD:  Objection, Your Honor.

16   A    I thought --

17           THE COURT:  I don't understand the objection.  Do

18   you think it's going beyond the question?

19           MR. GOLD:  Completely.

20           THE COURT:  Why don't you keep asking questions.

21   Q    What exactly did you hear Jose Osvaldo say about Rosalba

22   and La Sin Perro, if you can recall?

23   A    That after she had lost the doggies, now she had to lose

24   weight because she was fat.  And they called her La Sin Perro,

25   the one without a puppy, because she had lost a baby.

Delia - Direct - Argo                    725

1  Q    You said that Francisco was present for this

2  conversation?

3  A    Yes, that's correct.

4  Q    Who else was present besides Francisco and Jose Osvaldo

5  and yourself?

6  A    It was his grandmother.

7  Q    What was his tone when he made this statement?

8  A    It was more like nothing and --

9        MR. GOLD:  Excuse me.  When who made a statement?

10 Q    What was Jose Osvaldo's tone when he made this statement?

11 A    He was, like, making fun of that.  He was making fun of

12 her and laughing about her because she had lost the doggies.

13 And I thought that was showing a lack of respect for a person

14 that you love.

15 Q    Where did Rosalba live at this time?

16 A    She lived in a different place than I was.

17 Q    Where was this place?

18 A    The place is near the cemetery in Tenancingo.

19 Q    How do you know this?

20 A    Because Francisco took me there to see it, them.

21 Q    What did the inside of this house look like?

22 A    It was empty.  The only thing that was, it was a bed.

23 There was no furniture, there was nothing.  There was no

24 kitchen at all.

25 Q    Where did Jose Osvaldo live at this time, if you know?

1  A    He were living with Rosalba.

2  Q    Were you able to contact your family at all while you

3  were in Tenancingo?

4  A    Yes, I was able to contact my family, and Francisco give

5  me a phone.  When I called to my mom, I remember that when she

6  answered, she said, "I have no daughters."  And Francisco

7  were, like, making fun of that, like, oh, she didn't answer

8  the phone and she saying that she doesn't have a daughter.

9  Q    How did that make you feel?

10  A    I felt bad and I was crying.

11  Q    What, if anything, did you do as a result of that

12  conversation?

13  A    I had to call back again, and Francisco took me to visit

14  my family.

15  Q    Can you describe to the jury what that visit was like?

16  What did you do?

17  A    So Francisco and his mom, Jose Osvaldo, Rosalba, and I

18  went to visit my family.  On our way to the house of my

19  parents, they stop and got a basket.  It contain food with

20  fruit and alcohol drink.  Francisco got one for my mom and

21  Rosa -- I'm sorry, Jose Osvaldo got one for Rosalba's family

22  as well.

23  Q    Why did Francisco bring this basket of food and alcohol

24  to your family?

25  A    Because in Mexico the tradition is that when you take

1    your girlfriend to live with you, your family goes and talk to

2    their family and telling them that you're safe and that

3    they're living with you and that they don't have to be worry

4    about it.  And if your family accept that, that means that

5    they accept that person.

6    Q    How did the visit go with your parents?

7    A    I felt that it went good at that time because they accept

8    that basket.

9    Q    What did Francisco tell your parents?

10   A    He told to my parents that I was okay and that I was safe

11   and that they didn't have to be worry about me.

12   Q    What, if anything, did Francisco's mother tell your

13   parents?

14   A    She told to my parents that I was okay, that I was safe,

15   and that one day we will get married.

16   Q    Where did you go next?

17   A    After that, we went to visit Rosalba's parents.  And Jose

18   Osvaldo did the same thing.  He gave the basket to Rosalba's

19   parents and they talked that -- about her.

20            THE COURT:  Can you move a little bit -- move the

21   microphone slightly closer to your mouth?

22            Thank you.

23   Q    Did you listen to this conversation as well?

24   A    Yes, I was there.

25            And also, his -- Rosalba's mom gave to her a bag of

1   trigo.

2          THE INTERPRETER:  Of wheat.  A bag of wheat.

3   A    So she could be able to make tortillas at -- I don't

4   remember that much of the conversation at this time.  It's

5   been almost ten years.

6   Q    Yes, I understand.

7          You said that Rosalba's parents provided a bag of

8   wheat to Rosalba?

9   A    Yes.

10  Q    And that was so she could make tortillas?

11  A    Yes, so she could make that.  Because now she was living

12  Jose Osvaldo.

13  Q    Did there come a time that you visited your parents

14  again?

15  A    Yes.  We went to visit my family.  And at that time,

16  Francisco told me that we had to ask for my documents to my

17  parents, and I did it.

18  Q    What kind of documents are you referring to?

19  A    It was my birth certificate and it was a certificate from

20  school, from sixth grade.  And there was some pictures as

21  well.

22  Q    Did Francisco tell you why he needed your documents?

23  A    He needed my documents because he wanted to -- he was

24  going to take me across the border.

25  Q    Which border are you referring to?

Delia - Direct - Argo                                729

1    A     From Mexico to the United States.

2    Q     What had he told you previously about traveling to the

3    United States?

4    A     He told me that we had to come to the United States

5    because here in the United States we're going to make money,

6    earn, to be able to provide to your family.  We will have a

7    house and you will work for a couple of years.  Then after

8    that, we can come back and we can have kids.

9    Q     Did he tell you at all -- I'm sorry, strike that.

10            Did Francisco tell you at all what kind of work you

11   and he would be doing in the United States?

12   A     At that time he didn't told me what type of job we were

13   going to do.

14   Q     You mentioned that you went to get your identifying

15   documents, your identity documents.  Did you, in fact, get

16   those from your parents?

17   A     Yes, I did.

18   Q     And who actually held on to those documents?

19   A     Francisco was the one who got my -- who hold on to my

20   documents.

21   Q     Where are those documents now, if you know?

22   A     I don't have those documents because Francisco was the

23   one who had those documents.

24   Q     I'm going to show you what's in evidence as Government's

25   Exhibit 109.

1          MS. ARGO:  This is already in evidence, so it can be

2     published to the jury.

3     A    I can't see it.

4     Q    Hold on just a second.

5          Do you recognize this picture?

6     A    Yes.  That's the car of Jose Osvaldo.  And that's the one

7     that he used to drive us from Puebla to their home.

8     Q    And what else in this picture do you recognize?

9     A    In the picture there is the green and brown door.  This

10    is the house of Benjamin, one of the brothers of Rosalio.

11         And there is another house in the left side that

12    there's green, that there is green.  That's from Francisco's

13    parents.

14    Q    And that's the house which you testified previously,

15    that's where you stayed; is that correct?

16    A    Yes, that's correct.

17    Q    Okay.  I'm now going to show you what's in evidence as

18    Government's Exhibit 108.

19         MS. ARGO:  This can also go to the jury as well.

20    Q    Do you recognize Government's Exhibit 108?

21    A    Yes, I do.

22    Q    What is it?

23    A    I see the house of Rosalio and is the one that is in the

24    color green.

25    Q    The green house?

1   A    Yes.

2             And there is a blue one that is in the same area.

3   At that time when I was there, it was white and it was Jose

4   Osvaldo's house.

5   Q    How do you know those things, that those houses belonged

6   to each of those brothers?

7   A    Well, because -- I know that because Francisco used to

8   say that it was Rosalio's house and that the other one were

9   Jose Osvaldo's house.

10  Q    Delia, but was this blue house, the one that used to be

11  white, is that where Rosalba was staying?

12  A    No.  She was staying in a different house, where it's

13  near the cemetery.

14  Q    Have you ever been inside this blue house on the right?

15  A    I never was able to be in the inside of the blue house,

16  but I was able to go inside of the green house one time.

17  Q    I want to direct your attention now to July of 2010.

18  What, if anything, happened then?

19  A    In July of 2010, that's when Francisco Guadalupe Rosalba

20  and I, we attempt for the first time to cross the border

21  illegally.

22  Q    And so can you just describe to the jury how that came to

23  be?  What happened first?

24  A    Yes.  So we had to take the airplane.  And when we

25  arrived to Hermosillo, there was some Mexican soldiers.

1    Q    Let's back up for one second, Delia.  Let's start at the

2    beginning if we can.  What, if anything, did Francisco tell

3    you about this trip before you left?

4    A    He told me that we were going to cross the border and

5    that we will able to have -- if we would cross the border and

6    be able to do it, we would come to work here and save money

7    and then go back again to Mexico.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Delia - Direct - Argo                    733

1   DIRECT EXAMINATION

2   BY MS. ARGO (CONTINUED):

3   Q    How far was Francisco's town from the border, if you

4   know?

5   A    I don't remember how far it is at this moment.

6   Q    How did you plan to get to the border?

7   A    Well, José Osvaldo were the one who bought and give us

8   the flights.

9   Q    When you say the flights, do you mean airline tickets?

10  A    Yes, that's correct.

11  Q    Did you know at the time where you were flying to?

12  A    No, I didn't know at that time.  It was the first time

13  that I was going out from my -- out of the -- outside from

14  the town.  I was unable to go out by myself.

15  Q    Before these plans were made, did you get any other

16  kinds of documents, identifying documents?

17  A    Yes.  José Osvaldo took us to their -- municipal to the

18  municipal office so we could get IDs, and they had phone

19  numbers, addresses on them, so in case anything happened,

20  they would be able to be contacted.

21  Q    And then you said José Osvaldo was the one who got the

22  airline tickets for you?

23  A    Yes, that's correct.

24  Q    At this time, who had your birth certificate?

25  A    It was Francisco who had my birth certificate.

1    Q    Did you know at the time how much this trip to the

2    border was going to cost?

3    A    No.

4    Q    Who went with you on this trip to the border?

5    A    The person who went with me was Francisco, Rosalio,

6    Guadalupe was the sister of the brothers Melendez, and

7    Rosalio and I.

8    Q    So what happened on this trip?  I think you were

9    starting to explain that and I made you back up?

10   A    Yes, that's correct.

11               So when we arrived to Hermosillo, there was this

12   Mexican soldiers that they stopped us and asked us where are

13   you going.  And they didn't say nothing.  I was the one who

14   answered, and said, well, we're going to visit my uncle s

15   and Francisco and we -- we left, and then stay said, Shut

16   up.  Don't say nothing at all from now and on.

17   Q    Who said that?

18   A    Francisco.

19   Q    Did he provide you with any other instructions?

20   A    Yes.  So then they said -- then Francisco and Guadalupe

21   said that I wouldn't have -- needed to say nothing at all,

22   that I have to be quiet if someone would ask me anything she

23   will be the one who will be answering for me.

24   Q    And you said Francisco said this as well as Guadalupe?

25   A    Yes, both of them.

Delia - Direct - Argo                    735

1   Q    And so what happened next?

2   A    Then I was quiet.  We tried to cross to border but we

3   got lost.  And the persons from --

4   Q    You can use the interpreter if you need.

5   A    The border patrol agent, they arrest us.  They had us

6   all in line.  They ask us for all of our information.  I

7   remember giving my first name, but I was told -- Guadalupe

8   told me that they had to give a different last name and a

9   different age.  At that time I was 14 years old.

10  Q    Where did you go after that?

11  A    Because we got arrested, we got deported and then we

12  had to try to cross the border one more time.  And Guadalupe

13  make a phone call and someone sent her money, and we tried

14  to cross the border again, and it happened the same thing.

15  We got arrested and we had to go back Tenancingo.

16  Q    Do you know Guadalupe called?

17  A    She used to be in contact a lot with Rosalio.

18  Q    So after this second attempt failed, what happened

19  next?

20  A    We had to go back to Tenancingo.  It was the same, they

21  sent me to work in the fields, which I didn't like it at

22  all.  And after that a couple months later, we attempt to

23  cross the border again.

24  Q    When was that?

25  A    It was on October of 2010.  I don't remember exactly

1  the date at this moment.

2  Q    Who went on this trip to try to cross the border with

3  you at this time?

4  A    The third time it was Guadalupe, Francisco, and myself.

5  Q    And so describe for the jury what happened on that

6  trip.

7  A    That trip, we were able to cross the border.  We

8  arrived in Brooklyn -- in the Bronx.  There was the driver

9  who drop us for Phoenix, Arizona, to the Bronx.  And this

10  driver called one of the brothers Melendez and say that we

11  were here and that he would want more money so he could

12  release us.  And later on, they arrived there, there was a

13  black taxi who arrived -- who was inside of this taxi were

14  Miguel Melendez, there was Rosalio.

15  Q    What happened at that point?

16  A    At that point, I had to get out from the taxi.  I was a

17  little bit slow.  Rosalio got angry and said you should move

18  really fast.  And I got inside of the taxi, all of us, three

19  of us, Guadalupe, Francisco, myself, Rosalio and Miguel.

20  Q    You said that the driver who brought you up to the

21  Bronx from Arizona wanted more money?

22  A    Yes.

23          So they paid for a coyote so they can help us to

24  cross the border illegally.

25  Q    When you say "they," who are you referring to?

Delia - Direct - Argo                    737

1   A    I'm referring to José Osvaldo, Rosalio because they

2   were the ones who were arranging this.

3   Q    You said that you then got in another taxi; is that

4   right?

5   A    Yes, that's correct.

6   Q    What happened then?

7   A    We got inside of the taxi.  We got -- at that time I

8   didn't know, which now I know that it was in Queens.

9   Q    Who was in the taxi with you on your way to Queens?

10  A    There was Nelson who was a driver.  There was Rosalio,

11  Miguel, Francisco, myself and Guadalupe.

12  Q    Approximately what time was it when you got to Queens?

13  A    It was at night.

14  Q    Where did you arrive to in Queens, if you know?

15  A    So I remember driving towards in an apartment.  We

16  stopped there because I needed to use the bathroom so bad.

17  And then went into a different house.

18  Q    Who was in that house?

19  A    In the second house, at that time, there was no one

20  there.  But in this place Rosalio was living there with

21  Fabiola, that has a scar on her face.

22  Q    I'm going to show you what's already in evidence as

23  Government's Exhibit 10.

24       MS. ARGO:  You can show that to the jury as well.

25  Q    What's in Government's Exhibit 10, if you know?

Delia - Direct - Argo                    738

1   A    That's Fabiola.  That's the one who used to live with

2   Rosalio and she was working for him.

3   Q    I'm now going to show you what's in evidence as

4   Government's Exhibit 104.

5              Do you recognize what's in

6   Government's Exhibit 104?

7   A    Yes.  That's the place where I lived for three years

8   and a half.

9   Q    Delia what happened that next full day after you

10  arrived in the United States?

11  A    Francisco and Rosalio left.  They locked me inside of

12  the house.  Francisco provide me these iPhone, iPads and he

13  told me to memorize a phone number and that's when I was

14  hungry and needed to call him.

15             There was no food at all.  There was no nothing.

16  So I even remember calling him and saying, I'm hungry.  And

17  then he said okay.  I will send you food.  Just open the --

18  there's a window in this house where it has a locker there

19  was padlock on it.  So it was open and the food, which was

20  Chinese food could be passed through it.  And there were

21  bars, but you can't see in this photograph.

22  Q    And can indicate at all where the window was on the

23  photograph?  Okay.  Actually draw it, if you would like.

24  A    Yes (indicating).  That was in the outside in the left

25  side.

1          MS. ARGO:   Let the record reflect the witness is

2    indicating the left-hand side of the tan building in

3    Government's Exhibit 104.

4    Q    So that was the first day.

5          What else happened?

6    A    They left during those days.  I -- I remember asking to

7    Francisco that what type of job we were going to do.  He

8    said, I don't know.  I don't know.  And he kept saying that

9    for a couple days.  Then there was a day that he came and

10   said to me, I find a job where you can make more money what

11   you earn in a week, you will be able to earn on a day.  He

12   said that I had to sleep with men.  At that time I didn't

13   understand what meant that.

14   Q    Who else was there for this conversation?

15   A    There was Rosalio.

16   Q    What else did Francisco say?

17   A    Then he said to me, that that was the only thing that I

18   could do.  And that he -- I -- I got angry at that time

19   because that's not something that we do, that's not

20   something that I wanted to do.  And he said well, he didn't

21   insist that night, then he came back again and says to me --

22   and he said to me, Do you see you don't even speak English

23   you don't work.  If you go outside, the police will arrest

24   you.

25          At that point I was 14 years old.  What can a 14

1   years old do and think?  I was scared.  I couldn't even go

2   and ask for help.  I couldn't even walk outside and say,

3   Hey, can you help me when I know that here in the

4   United States you need to speak in English to be able to ask

5   for help.

6   Q    Who else was present for this conversation that you

7   just mentioned?

8   A    It was Rosalio who was there as well.

9   Q    How did this person -- conversation progress?

10  A    So after he said that to me, then he said, Well, if you

11  don't do this, I will go and kill your family.

12  Q    How did you react?

13  A    It was hard for me to hear that someone could go and

14  kill my family.  And I knew that Francisco knew where my

15  family lived and his family knew because Francisco's uncle

16  José Osvaldo went there as well.  So they knew where my

17  family lived and I didn't want my family to be hurt.

18  Q    So what happened at that point?

19  A    At that point I felt as a young girl who is 14 years

20  old, that I have no option, and I had to accept that.

21  Q    So once you accepted --

22  A    Once --

23  Q    -- what he was telling you, what happened next?

24  A    Once I accepted that, Fabiola and Rosalio taught me how

25  to become a prostitute.  I didn't know what that meant at

1  that time.  I was 14 years old.

2  Q    What, if anything, did Rosalio instruct you?

3  A    Rosalio instruct to Fabiola that she will teach me how

4  to put a condom to -- into the penis of a guy.  She told me

5  that -- and how -- the lubricant I had to use.  She told me

6  that I had to carry with me 20 condoms or more with me, and

7  that they had to open one of the condoms and open the other

8  one.  And open one and add all of the other condoms in the

9  same one and leave it under my breast so in case the police

10 would stop us they don't check a girl or a lady's breast or

11 anything at all.  So they wouldn't even be able to think of

12 what -- what was going on.

13 Q    Who told you?

14 A    Rosalba and Rosalio, they were the ones who were

15 directing me.  They told me that I had to make sure that I

16 had the condoms under my breast.

17 Q    Let me just back up for a second.  Didn't you say that

18 it was Fabiola and Rosalio who was present for this

19 conversation --

20 A    Yeah, both --

21 Q    -- just so I understand?

22 A    Both of them were giving me instructions.

23 Q    That's Rosalio and Fabiola?

24 A    Yes, that's correct.

25 Q    I just wanted to be sure.

1           What else were you told about how to be a

2    prostitute?

3    A     Fabiola told me that they had to be in that room with a

4    client, client?  For 15 minutes and I shouldn't take more

5    than 15 minutes there.  That is she taught me -- Fabiola

6    taught me how to do the position, that I had to do oral sex.

7    I didn't like that.  It made me feel bad.  I was 14 years

8    old.

9    Q     Aside from what had happened to you as a child in your

10   relationship with Francisco, had you ever had sex before?

11   A     No, I didn't have sex before.  I had sex for the first

12   time with him.

13   Q     How did you know how much to charge?

14   A     Well, Fabiola told me that it was $35 but if the driver

15   said that it was more, he will let me know.

16   Q     How did you know how long to work for?

17   A     Because Rosalio provided me a phone and that's how I

18   used to check how long I had to be inside of that room,

19   because I'm bad with watch.  I can't read that at all, I

20   need a phone to be able to see the time.

21   Q     How were you supposed to get clients?

22   A     Well, Rosalio gave it to me these notebook that

23   contains phone numbers of drivers and I had to call them and

24   say, Hey, they have a girl for this week because I'm looking

25   where to work.  And that's how I used to work, going to work

Proceedings                    743

1   with these drivers who would drive me around and these

2   drivers will get calls from these clients, and they will

3   make sure telling them that, Hey, I have a fresh meat here.

4   Q    What do you mean, Hey, I have the fresh meat here?

5   What did you understand that to mean?

6   A    That you're new to this.

7   Q    What does that mean?

8   A    That you haven't even had -- that you haven't had --

9   that you're new at this.

10  Q    Why was that seen as something that was important or

11  valuable?

12  A    Because when you are new, you don't get -- you're not

13  used to have sex, your body's small.  Your vagina is small.

14  And those guys who used to pay for younger girds like me who

15  are 14 years old, love that.  And that's how they used to

16  get clients.

17          MS. ARGO:  Your Honor, it's 5:30.  This actually

18  is a good stopping point.

19          THE COURT:  Okay.

20          MS. ARGO:  Perhaps we can let the jury go.

21          THE COURT:  Have a good night, ladies and

22  gentlemen.  Again, just leaves your notes in the jury room

23  and don't talk about the case.

24          Have a lovely evening.

25          THE COURTROOM DEPUTY:  All rise.

Proceedings                           744

1              (Jury exits the courtroom.)

2              (The following matters occurred outside the

3      presence of the jury.)

4              (The witness exits the witness stand.)

5              THE COURT:  A couple things.  First, am I the only

6      one who is having trouble with understanding her?  It could

7      be just me.

8              MR. GOLD:  It's not.

9              MS. ARGO:  She can certainly switch back to

10     Spanish.

11             THE COURT:  Can we do that?

12             MS. ARGO:  Of course.

13             THE COURT:  I would appreciate it.  That I think

14     the court reporter would, too.

15             MS. ARGO:  Okay.  That's fine.

16             THE COURT:  How much longer do you think you'll be

17     with her?

18             MS. ARGO:  I would say about hour and a half, two

19     hours.

20             THE COURT:  Okay.

21             MS. ARGO:  Two hours I think would probably be

22     safe to say.

23             THE COURT:  And do we have any sense of

24     cross-examination?  I guess it's Mr. Gold, it might as well

25     be you.

Proceedings                              745

1             MR. GOLD:  Your Honor, I would imagine it would be

2    roughly the same time.

3             THE COURT:  About two hours.

4             MR. GOLD:  With the interpreters.

5             THE COURT:  I think it would be clearer for you

6    when you do that.

7             MR. GOLD:  Yes, it is.

8             THE COURT:  Okay.

9             MR. GOLD:  Judge, I would also like to alert the

10   Court to a potential problem.  I've been speaking with and

11   consulting with the Government on but I just want to throw

12   this out here so no one is surprised.

13            Prior to the trial the Government provided all of

14   us, I'm sure the Court has a copy as well of a series of

15   summary sheets reflecting wire transfers made by a variety

16   of defendants, witnesses, including Delia and the other

17   individuals who testified thus far.  They have not obviously

18   been admitted as evidence as yet.  However, there are -- the

19   sheer numbers that are on these reports are something I wish

20   to cross-examine the witness about.

21            And my request is that either I be allowed subject

22   to connection when these charts come in that these are the

23   actual numbers.  I'm not asking anything beyond what is

24   reflected in various charts and just --

25            THE COURT:  Are you cross-examining this witness?

Proceedings                746

1          MR. GOLD:  Yes.

2          THE COURT:  You want to cross-examine Delia about

3  Delia in the charts?

4          MR. GOLD:  Correct.  About wire transfers

5  attributed to her as well as perhaps a few other people.

6          But primarily let's just say to her.  I'm not --

7  the alternative to using these summary charts is we need to

8  go transaction by transaction off of a CD asking her about

9  them, and we will be here until the summer.  And it serves

10  no purpose.  I don't want to do that.  I'm sure the Court

11  doesn't want me the do that.  And the simple solution is

12  simply to allow me to use these witnesses, I will use

13  whatever language the Government wants me to use in terms of

14  referring to these documents, not putting words in their

15  mouth.  These are accumulated records in possession of

16  the Government.  It's summary charts, rather, of the

17  accumulated records.  They're going to be introducing it, I

18  just want to do it now.

19          THE COURT:  Instead of waiting later to call her?

20          MR. GOLD:  Yeah, because I can't cross-examination

21  her on it.

22          THE COURT:  Okay.

23          MR. GOLD:  And, again, the alternative I have to

24  play a CD of thousands of wire transfers.

25          THE COURT:  Okay.  Let me just hear from the

Proceedings                                    747

1  Government.

2          MS. ARGO:  Your Honor, I guess I'm just a little

3  unsure as to how this is going to be used.  I imagine if

4  it's to try to refresh her recollection in some way, I mean

5  Mr. Gold is welcome to try.  I just don't know that it will.

6  If he wants to cross-examination --

7          THE COURT:  Well, you'll presumably start with the

8  questions relating to, did you do any wire transfers in

9  approximately when and approximately how much.

10          MR. GOLD:  Correct.

11          THE COURT:  And if she can't remember then you'll

12  ask if this refreshes her recollection and she will either

13  say it does or it doesn't.

14          MS. ARGO:  The only problem with the summary

15  spreadsheet, Your Honor, is that actually added up all of

16  the amounts over a certain amount of time.

17          THE COURT:  Right.

18          MS. ARGO:  I feel fairly certain in saying that I

19  don't think Delia has ever sat down with a calculator and

20  figured out exactly how much money she sent other time.

21          MR. GOLD:  Which is exactly my problem and that's

22  why I want to use the chart.

23          MS. ARGO:  I just don't know that she could ever

24  testify to that or that could be even impeached on that

25  because it's not something within her realm of knowledge, I

Proceedings                748

1    guess.

2            If Mr. Gold just wants to establish the fact that

3    she did, in fact, send wire transfers we can certainly

4    inquire as to that, but as to the exact amount of like the

5    dollar amount, I don't think she's going to know.

6            MR. GOLD:  Your Honor, let's presume that I know

7    what I'm doing for a minute.

8            THE COURT:  You may well it's just that we're

9    trying to discuss whether or not it's going to be permitted,

10   so I need to understand it, too.

11           MR. GOLD:  Yes, I get that.

12           But assuming that my reason, which I'm not about

13   to divulge at this point is relevant, is material and is

14   admissible, and that had these charts been in evidence

15   already, the inquiry I'm about to embark upon is

16   appropriate.

17           If we start from that assumption, the question

18   then becomes how do we mechanically do this so that I can

19   refer to documents that are technically not in evidence that

20   the Government fully intends to offer themselves, you know,

21   in three days or whenever.

22           THE COURT:  I'm sorry, it would really help me a

23   lot if I understood what you were getting at.

24           MR. GOLD:  May I approach *ex parte* and tell the

25   Judge -- and tell the Court, Your Honor.

Proceedings                          749

1        THE COURT:  What difference is it going to make?

2   They're not going to talk to her about this anyway.  I mean,

3   it's not like you're disclosing anything extreme.  It's 20

4   minutes of 6:00.  This presumably will happen tomorrow and I

5   would like to understand -- I can't imagine why it has to be

6   a secret.

7        MR. GOLD:  Well, I don't -- for starters, I have

8   no idea who these people in the audience are and whether any

9   of them are in contact with the witness, permissibly.

10        THE COURT:  Okay.  We'll do it at sidebar with

11   Government Counsel.

12        MR. GOLD:  Okay.

13        (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                    750

1          (The following occurred at sidebar.)

2          MR. GOLD:  Very simply, Your Honor, there has

3   already been evidence and I anticipate voluminous other

4   questions eliciting the same information that this witness

5   was threatened repeatedly, and had to do prostitution work

6   or -- under penalty of her parents and family being killed.

7          THE COURT:  Right.  That's already come out.

8          MR. GOLD:  Okay.  It has and it will come out 12

9   more times, if we're lucky.

10          The point is, as the Court will recall, in

11   December of 2011 until June of 2012, my client and

12   apparently all the others were back in Mexico for whatever

13   reason.

14          THE COURT:  There was a period of time they were

15   all gone.

16          MR. GOLD:  Right.  And she will testify, according

17   to 3500 material, she will testify that during the time

18   Francisco was in Mexico, he was in daily -- virtually daily

19   contact with her --

20          THE COURT:  He was in contact with her?

21          MR. GOLD:  Yes.  During which he was continuously

22   threatening her and telling her she has to work harder.

23   She's not doing enough money, she's not doing enough, et

24   cetera, et cetera, et cetera.

25          THE COURT:  Right, right.

Sidebar Conference                751

1              MR. GOLD:  These records that I specifically want

2      to refer to, will show that at her working $250 a shift,

3      which is what is she will testify to, give or take, that

4      that was her income.  If you divide the amount of money she

5      sent between December of 2011 and June of 2012 when he was

6      in Mexico and threatening her daily, I'm going to kill your

7      family unless you send more money, unless you work harder

8      I'm going to kill you, I'm going to kill -- it comes out to

9      about 24 days of work, single shift work.

10             So I think that directly impeaches -- and, of

11     course, nothing happened to her family.

12             I understand this directly impeaches her claim as

13     to --

14             THE COURT:  So what you're saying is she was

15     stealing the money?

16             MR. GOLD:  No.  I'm saying that these records show

17     that she worked a total 22 days or 24 days.  That she did

18     not work harder, she did not send more money to him.  She

19     just didn't do it, and she will testify that she stopped

20     working, she stopped calls from the drivers.

21             But the degree to which the numbers change both

22     before and after completely undermines the concept that she

23     was working under threat and penalty and under fear of --

24     for her family's life and her own.

25             So therefore, what I'm looking to do is take their

Sidebar Conference                    752

1   charts that show these transfers that they attribute to her

2   okay, and say okay, here it is, it comes out to

3   5,000-something -- approximately $5,000 from December until

4   June.  And that -- and the reminder of the year it was only

5   an additional 5,000.  So that whatever these threats were

6   obviously they didn't take place.  And obviously she didn't

7   take seriously or else she would have worked harder.  I did

8   the math.  Again, take a single income shift of $250 and I

9   think at that time she worked doubles, but at single shifts

10  250 just averaging, it came out that she worked a total of

11  44 point something days for 2011.

12          THE COURT:  Is she the only one who is sending

13  money?

14          MR. GOLD:  For her own.

15          MS. HAJJAR:  This is something that we spoke to

16  Mr. Gold about before earlier.

17          The problem is that these charts don't reflect a

18  comprehensive -- the witness is going to put in these

19  charts, is going to explain exactly how these records were

20  put together.

21          How -- how this person identified which records

22  would be relevant and the witness will explain that there

23  were 1 or 2 identifying factors as to each wire remitter,

24  sender and receiver that included that recipient or sender

25  in this chart.

1              And that is because sometimes there was an -- it's

2        either a name or address or sender name and address or some

3        other identifying factor, in other words --

4              THE COURT:  So you're saying those charts are not

5        comprehensive if they didn't fall within the narrow

6        categories.

7              MS. HAJJAR:  That the witness will explain exactly

8        how that data was compiled and why the summary chart

9        reflects what it does.

10             And she will explain what the parameters, why

11       these specific parameters were chosen and why additional

12       wire records weren't included or were included.  We

13       explained that if Mr. Gold wants the Government to say, this

14       is our understanding of exactly how much money was being

15       sent by a particular victim witness, that's not the case.

16             THE COURT:  That's not going to be what it shows.

17             MS. KASSNER:  I would say just for clarification

18       they establish what we consider a floor, not a celling.

19             THE COURT:  I understand.

20             MS. KASSNER:  So there's a real problem.

21             MR. GOLD:  Your Honor, and I'm happy --

22             MS. KASSNER:  It's a great argument.

23             THE COURT:  I'm thinking that maybe this is

24       something that you want to use -- in other words, maybe you

25       want to lay -- it's an argument.  It doesn't all have to

Sidebar Conference                      754

1   come out in cross-examination.  You need enough in

2   cross-examination that you can make the argument in closing.

3           MR. GOLD:  Yes, but part of being able to make the

4   argument effectively in closing, we haven't confronted the

5   witness about this information directly.

6           We're in an *Alice in Wonderland* type of situation

7   where --

8           THE COURT:  I think we are, that's the problem.

9           MR. GOLD:  Where the Government -- please, please.

10  Where the Court is saying I can't do it because the records

11  they intend to introduce aren't really accurate.

12          THE COURT:  No, they're not inaccurate.

13          They're saying that the parameters, the basis on

14  which they constructed these figures related to a specific

15  address or a specific name or specific telephone or

16  something.

17          MS. ARGO:  Exactly.

18          THE COURT:  So that what they're saying is at

19  least this much money went, but we had absolutely no idea as

20  to how much more.

21          I mean, when I looked through those records I

22  thought to myself, wow, there's lot of extrapolation here.

23          MR. HUESTON:  There's one issue and this is more

24  of a technical issue and this issue is getting ahead of me

25  because what Mr. Gold is talking about, but in the summary

Sidebar Conference                    755

1    when they do the designations, they use a symbol V for

2    victims and I just think -- I was going to the raise that

3    with them in terms -- I think if you look at in the

4    spreadsheet, this is different types of designations and one

5    of them is V, and I was going to ask you to look at it.  I

6    just don't think --

7              MS. KASSNER:  We can change that.

8              MR. HUESTON:  I don't think it's a big deal, I

9    just got ahead of me.

10             THE COURT:  That's fine.  They'll change that.

11             MS. ARGO:  And, Your Honor, if Mr. Gold wants to

12   ask the witness who is going to have the wire transfer

13   spreadsheet, questions about the same thing, it's fine.  I

14   mean, she's going to explain the parameters of how the

15   spreadsheet was created.

16             THE COURT:  When they go in the parameters will be

17   explained.

18             The problem is if you conduct the kind of

19   cross-examination of her witness based on the spreadsheets

20   that you're planning, it's going to mislead the jury now as

21   to what the spreadsheets mean.

22             MR. GOLD:  Well, first of all the Government is

23   free to redirect on them and I am willing to use whatever --

24             THE COURT:  They can't redirect on it because this

25   won't be in evidence.

Sidebar Conference                    756

1          MR. GOLD:  I am willing to do, use any language of

2    their choice to make clear that nothing is being

3    misrepresented.  I will say now these are approximations.

4    These perhaps are not complete.  I will do --

5          I will preface it in whatever way that the Court

6    and the Government chooses, I just want to confront the

7    witness.

8          MS. KELLMAN:  May I say something?

9          THE COURT:  Let me just hear.

10         MS. KASSNER:  There's the concern that it will

11   confuse the jury, but there's separate concern this is going

12   to confuse the witness into thinking there's something that

13   we calculated that she's never seen before that's somehow

14   true or right or accurate and she doesn't -- she's never

15   seen these spreadsheets.  She's never seen these charges.

16   She's never seen these wire transfer words.  She knows what

17   she did and she can answer questions about what she did, but

18   confronting her about -- even if you characterize the

19   spreadsheet, it's misleading.

20         MS. ARGO:  And that's the problem, too, is the

21   redirect does nothing because she can't -- she can't

22   redirect on it.

23         THE COURT:  No, I understand.  She can't be

24   redirected on it, it can't solve the problem.

25         MS. ARGO:  Right.

Sidebar Conference                757

1           THE COURT:  I don't know why there has to be what

2      I consider misleading confrontation on cross in order for

3      you to make the argument in summation.  I think you can make

4      the argument.  You can cross her, you know, bringing out

5      that she made these -- you know, that she sent this money

6      and what the circumstances of that was, you know, all of

7      that is free, is open to you and appropriate.  But if you

8      start using this spreadsheet, it's going to be confusing.

9           I'm understanding -- thinking we're going to call

10     her back after the spreadsheet.

11          MR. GOLD:  Well, that's what I'm going to have to

12     do or go through line by line on the CD, transaction by

13     transaction asking her.

14          MS. ARGO:  But that doesn't do any good.  It's not

15     like she's going to remember every single transaction.

16          MR. GOLD:  But that's -- what you're saying, but

17     what's interesting is not a single witness has yet testified

18     as to how much money they sent.  It would have been nice if

19     we heard something about that instead of having this, well,

20     here is how I figured I would create this chart.

21          The witness should be asked, they should have

22     testified as to --

23          THE COURT:  If the chart was created that way and

24     it is their chart and someone will testify how it was

25     created, then why can't you just take the witnesses'

1    testimony and take the chart and make an argument.

2         The problem is misleading the jury in

3    cross-examination and confusing the witness -- I think it

4    would confuse the witness.  I mean that's a lot of what's

5    happened with these witnesses.

6         MS. HAJJAR:  It's the difference between saying,

7    isn't it true you sent over, whatever, a hundred thousand

8    dollars to Mexico?  And saying, isn't it true the Government

9    has calculated the amount of money you sent.

10         MR. GOLD:  I'm not saying that.

11         MS. HAJJAR:  That's the difference.

12         MR. GOLD:  I'm not saying that.

13         MS. HAJJAR:  You're free to ask the former but the

14    latter is what we're having a problem with.  That's the part

15    that -- as if we're endorsing this number.

16         MR. GOLD:  Again, I'm more than willing to use

17    whatever language that would avoid that issue.

18         MS. HAJJAR:  Just ask for the former question.

19         MR. GOLD:  I will ask her very simply, from this

20    time period to this time period send out X amount of dollars

21    and she will say, I don't have a clue.

22         MS. KASSNER:  And then that's really --

23         MS. ARGO:  There's nothing else that could be

24    done.

25         MR. GOLD:  Which brings me back to square one.

1           THE COURT:  Well, it may bring you to square one

2    but your getting to square two is going to confuse the jury

3    and confuse the witness.

4           MR. GOLD:  If I tell the jury -- hang on -- tell

5    the witness and the jury that later on there will be an

6    explanation in detail about how these charts were prepared,

7    but as these charts show, between this period of time and

8    this period of time this is what the --

9           THE COURT:  Well, you're saying as these charts

10   go, this.  That's not true.  They said they prepared charts

11   that had a floor.  The floor is developed from whatever the

12   criteria were that enabled them to put something into the

13   chart because either they had an address or something else

14   that permitted them to put that in.  But there were a lot of

15   things they couldn't put it, they didn't have the

16   information.

17          MR. HUESTON:  Judge, the only thing I would say

18   about the floor, I don't want to argue too much.  In looking

19   at the record -- this a comprehensive research that they

20   did.

21          THE COURT:  I'm sure they did.  But figuring out,

22   I mean, it's mind-boggling.  It's just mind-boggling.

23          MR. HUESTON:  I've been looking at it and I agree

24   it's really difficult.  Anyway.  But I don't think -- it may

25   be a fair comment to say, you know, this was a comprehensive

1  investigation that these HIS did.  Look at this money.  They

2  put in name, they put in addresses, they looked at wire

3  transfers for Mexico, you know, Western Union.  I mean,

4  there must be -- I think it's a fair estimation of maybe 15

5  different wiring sources.

6          THE COURT:  There are a lot of sources.

7          MS. HAJJAR:  But here's the key problem.  A lot of

8  the wire records, which I'm sure you've seen, transposed

9  addresses and have different names, deliberately or no, they

10 have small changes in addresses, names and other things,

11 which make it very difficult to identify comprehensively how

12 many transfers were made from a particular address or a

13 particular individual because little things were either

14 deliberately or unintentionally misspelled or changed.  So

15 when you ask the wire transfer company to provide all

16 records that are transmitted by individuals to a specific

17 address, we are not able to find a -- get a comprehensive

18 set of results because of these changes and inaccuracies and

19 on top of it, the foundation has already said many witnesses

20 have side, I didn't use my real name and so including

21 Fabiola testified today she used as fake name.  There's

22 another layer of difficulty.

23          THE COURT:  There are a lot of different things

24 that -

25          MS. ARGO:  And, Your Honor, quite frankly, the

1   biggest problem is how do you explain to the jury what this

2   chart is?  It's not clear.  It's not going to be clear to

3   the jury -- I'm going way too fast.

4           THE COURT:  We all are.

5           MS. ARGO:  You would think I could slow down a

6   little bit I'm sorry.

7           But that, you know, the jury's not going to

8   understand where this chart came from, why it's being shown

9   to her if she doesn't know what it is.  What does it stand

10  for?  It is, in fact, true?  It's coming out of nowhere

11  isn't going to help things, it's going to confuse thing.

12          MR. GOLD:  Three days from now it's going to be

13  explained in full and they'll have --

14          THE COURT:  Three days of confusion.

15          MS. KELLMAN:  Your Honor, I'm just wondering if

16  it's possible to call the preparer of the chart out of order

17  so that we don't have anybody misled and we have an

18  explanation and then we all make --

19          MS. ARGO:  Well, the problem Delia's already on

20  the stand right now.

21          MS. KELLMAN:  Well, that happens all the time in

22  trial.

23          THE COURT:  Well, it wouldn't be the end of the

24  world if we broke.  I realize it's not as smooth.

25          MS. ARGO:  Even if it is in evidence, again, this

1    is a chart that she knows nothing about.  We're going to

2    show her something and tell her that this number represents

3    something that it, in fact, does not.  This is not all of

4    her wire transactions.  It's not a comprehensive look at

5    every single wire transfer.

6              MR. GOLD:  No, it's -- I'm sorry.

7              MS. ARGO:  I don't understand what the point of it

8    would be even if it's already in evidence to try to confront

9    this witness with something that she didn't author, she

10   doesn't know anything about, she never sat down with a

11   calculator and added all these numbers up to figure out how

12   much money she sent when.  And also the fact is the

13   parameters here are such that there very well might be many,

14   many more transfers that just didn't get captured within

15   that number.  The point isn't going to be made the way

16   Mr. Gold wants to make it unless he wants to make it in

17   closing.

18             MR. GOLD:  Again, the representation by the

19   Government that these charts were prepared through their

20   best efforts.

21             MS. ARGO:  Uh-huh.

22             MR. GOLD:  Is not -- that it's not necessarily

23   reflective of everything, but they did a hell of a lot of --

24   I'm sorry -- they did an awful lot of work in order to

25   prepare and accumulate the data and the -- you know, the

1   full weight and breadth of the Government set about to find

2   this out and this is what they came up with.  How is that

3   not relevant for me to be able to confront a witness who is

4   testifying about these very transfers, whose is testifying

5   about threats that she had to work harder unless she sent

6   more and she didn't.  How do I do that without confronting

7   her?

8           THE COURT:  The problem, I mean, have to accept

9   the Government's representation about how the charts were

10  put together.  Because at least they know that.  So I don't

11  expect the testimony to be any different.

12          Given what they have been saying to use the charts

13  as a basis to cross-examine her as a liar when she says

14  she's not afraid and she's not working as hard as she can

15  when, in fact, the charts, the way they're created don't

16  support that, is misleading and it's confusing to the

17  witness.

18          MR. GOLD:  Here's our problem, Judge.  None of the

19  witnesses have testified as to amounts that they've sent.

20  None of them.  And if you ask -- I think this is deliberate

21  because none of them have a clue what they sent, which I

22  certainly understand.

23          So what we're left with is the next best thing.

24          THE COURT:  Why didn't you ask her how much --

25          MR. GOLD:  Because she's going to say, I don't

1  know.  I will ask her, I promise, but I guarantee you the

2  answer is, I don't have a clue.

3         THE COURT:  But she's not going to have a clue

4  when you confront her with the document.

5         MS. ARGO:  Exactly.  It won't refresh her

6  recollection.  It won't --

7         THE COURT:  It really won't help.

8         MR. GOLD:  All right.  Forget using the chart

9  itself.

10         All I want is to use the numbers from the chart

11  and say something of the effect that if, in fact, the amount

12  that has been discovered that you are responsible for --

13         THE COURT:  No, don't call it the amount from

14  the --

15         MR. GOLD:  Okay.  Like I said, I'm open to any

16  language, any language whatsoever.

17         THE COURT:  Could it be X amount.

18         MS. ARGO:  That's fine.

19         MR. GOLD:  And if she says no.

20         MS. ARGO:  Then she says no.

21         THE COURT:  Then she says no.  You're going to

22  have the chart in later and do it in summation.  You'll be

23  able to use those figures.  Could it be this amount?  You'll

24  argue in summation that's the amount of the Government's

25  chart.  Okay?

```
                    Sidebar Conference                765
```

1           MR. GOLD:  We made our arguments upfront.  My
2    record is --
3           THE COURT:  I'm trying.
4           MR. GOLD:  I appreciate it, Your Honor, it's one
5    thing to say --
6           MR. HUESTON:  The charts are incomplete.
7           THE COURT:  I mean, that's where we started that.
8           MR. GOLD:  That's what I'm having trouble with.
9    That the charts aren't necessarily accurate.
10          THE COURT:  Exactly.  Argue that.
11          MR. GOLD:  No, I would prefer to argue the facts
12   that actually are in evidence.  Okay.
13          MR. GOLUB:  If by chance we get done tomorrow with
14   this witness, which we probably won't, is there anybody else
15   that you'll call next tomorrow is a short day.  We're ending
16   at 4:30.
17          MS. ARGO:  We'll probably get maybe like a
18   custodian or somebody else.
19          MR. GOLD:  Not a fact witness.  My cross won't be
20   that much.
21          MS. CISTARO:  So tomorrow is not a fact witness.
22          MR. HUESTON:  It is Davies.
23          MS. HAJJAR:  It could be Davies or the wire
24   custodian, it could be the CBP person customs and border
25   protection.  Something boring.

Sidebar Conference                                          766

1              MS. ARGO:  Anticlimactic.

2              THE COURT:  What a relaxing day.

3              MS. ARGO:  Or less harrowing.  We'll see how long

4     it goes tomorrow with this witness.

5              THE COURT:  Have a good evening, Your Honor.

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X                                        767

1          (Sidebar ends; in open court.)

2          (Matter adjourned to Friday, March 6, 2020, at

3    9:30 a.m.)

4

5    *I (we) certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.*

6
            */s/ David R. Roy*              *5th Day of March, 2020*
7              *DAVID R. ROY*                        *Date*

8                         *I N D E X*

9                    *W I T N E S S E S*

10

11

                    M A R I A   R O S A L B A
12
     CROSS-EXAMINATION (CONTINUED)                   559
13   BY MR. GOLUB

14   CROSS-EXAMINATION                               610
     BY MR. GOLD
15

16                   F A B I O L A   M .

17   DIRECT EXAMINATION                              623
     BY MS. HAJJAR
18
     CROSS-EXAMINATION                               672
19   BY MR. DUNN

20   CROSS-EXAMINATION                               704
     BY MS. KELLMAN
21
     CROSS-EXAMINATION                               708
22   BY MR. GOLD

23
                          D E L I A
24
     DIRECT EXAMINATION                              711
25   BY MS. ARGO

I N D E X                                      768

*I   N   D   E   X*  *(CONTINUED)*

*E   X   H   I   B   I   T   S*

Government's Exhibit Number 101                   646

Government's Exhibit Number 102                   652

Government's Exhibit Number 103                   655